```
 1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                      JACKSONVILLE DIVISION

 3   UNITED STATES OF AMERICA,      Jacksonville, Florida

 4              Plaintiff,          Case No. 3:13-mj-1087-JRK

 5   -vs-                           Thursday, April 25, 2013

 6   FREDERIC CILINS,               9:13 a.m.

 7              Defendant.          Courtroom 5D

 8   _____

 9

          DIGITALLY RECORDED DETENTION HEARING
10       BEFORE THE HONORABLE JAMES R. KLINDT
            UNITED STATES MAGISTRATE JUDGE
11

12                   A P P E A R A N C E S

13   GOVERNMENT COUNSEL:

14           Kelly Karase, Esquire
             U.S. Attorney's Office
15           300 North Hogan Street, Suite 700
             Jacksonville, FL  32202
16

17   DEFENSE COUNSEL:

18           Michelle Smith, Esquire
             Law Office of Michelle P. Smith
19           P.O. Box 1788
             Orlando, FL  32802-1788
20

21   COURT REPORTER:

22           Shelli Kozachenko
             221 North Hogan Street, #185
23           Jacksonville, FL  32202
             Telephone:  (904) 301-6842
24           Fax:  (904) 301-6846

25           (Proceedings recorded by electronic sound recording;
     transcript produced by computer.)
```

# T A B L E   O F   C O N T E N T S

**GOVERNMENT'S WITNESS:**                              **Page No.**

  **KIM LEE WATSON**

     DIRECT EXAMINATION BY MS. KARASE.............     35

     CROSS-EXAMINATION BY MS. SMITH...............     44

     REDIRECT EXAMINATION BY MS. KARASE...........     52

     RECROSS-EXAMINATION BY MS. SMITH.............     56


## G O V E R N M E N T   E X H I B I T S   R E C E I V E D

                                                    **Page No.**

GOVERNMENT'S EXHIBITS 1 THROUGH 3...................     73


## D E F E N S E   E X H I B I T S   R E C E I V E D

                                                    **Page No.**

DEFENDANT'S EXHIBITS 1 THROUGH 5...................     75

1              **P R O C E E D I N G S**

2   Thursday, April 25, 2013                          9:13 a.m.

3                          -   -   -

4          COURT SECURITY OFFICER:  All rise.  United States

5   District Court in and for the Middle District of Florida is

6   now in session, the Honorable James R. Klindt presiding.

7          Please be seated.  This is the case of the United

8   States of America against Frederic Cilins, Case

9   3:13-mj-1087-JRK.  Kelly Karase represents the United States.

10  Michelle Smith represents Mr. Cilins.

11         And is it Charmant Theodore?

12         THE INTERPRETER:  Charmant Theodore, that's

13  correct.

14         THE COURT:  Is here as the interpreter, and I'm

15  going to swear him now.

16         Please if you'd raise your right hand, please, sir.

17         Do you solemnly swear to translate this case from

18  English to French and French to English to the best of your

19  ability?

20         THE INTERPRETER:  I do.

21         THE COURT:  All right.  And would you state your

22  full name, please?

23         THE INTERPRETER:  Charmant Theodore.

24         THE COURT:  Right.  And, Mr. Theodore, if you

25  would, please, make a simultaneous translation of what is

1    said in the courtroom?

2            THE INTERPRETER:  Yes, I will, Your Honor.

3            THE COURT:  All right.  Thank you very much.

4            All right.  This is a continuation of the detention

5    hearing, and I believe Ms. Smith was -- I don't want to say

6    in the middle of her proffer but was in her proffer when we

7    recessed.  There were a number of documents that I know that

8    she was trying to locate.

9            And so why don't -- Ms. Smith, why don't you give

10   us a status of where we are and where we're going.

11           MS. SMITH:  Your Honor, I'm going to speak at the

12   table.  The court reporter indicated she could not hear me

13   from here, so --

14           THE COURT:  All right.  Thank you.

15           MS. SMITH:  When I said table, in front of the

16   lectern.

17           I have the passport from France, the 2007 passport.

18   I have the original that we will surrender to the Court if

19   the Court grants bail.

20           THE COURT:  All right.  That was the passport that

21   Ms. Karase said that there was a copy of in Mr. Cilins' --

22   whatever was taken from him by law enforcement, and now you

23   have the original.

24           MS. SMITH:  I have the original.

25           And, Your Honor, consistent with normal, you know,

1  persons who travel foreignly, they typically keep copies of

2  their passports in case they are lost or stolen while

3  traveling.

4          THE COURT:  All right.

5          MS. SMITH:  That is indeed the case here.

6          I have an attestation from the *Sous-Prefet de*

7  *Grasse*, which is the equivalent of the mayor or the governor

8  of the regional office where he is from in Antibes, France.

9  I also have a certified language from French to English

10 interpretation of that.

11         The original is now sitting in my office.  I did

12 get copies faxed to me this morning, but I will represent as

13 an officer of the court that these are true and accurate

14 copies, and I'll provide one to Ms. Karase.

15         THE COURT:  I'm trying to remember.  Your mortgage

16 documents and other related matters was Defendant's Composite

17 Exhibit 1.

18         Are you going to mark this for --

19         MS. SMITH:  I will, Your Honor.  Just for

20 identification, the first one is the attestation.  It is

21 signed by Natacha, N-a-t-a-c-h-a, Doutre, which is

22 D-o-u-t-r-e.

23         It indicates in French that they issued two

24 passports to Mr. Cilins, passport No. 07AK267949 and passport

25 08CT94852X, and that they issued them for professional

1   reasons, for example, if you need a visa and you have to send

2   the passport off, as I indicated to the Court, to get a visa

3   and you needed to travel for business.  They also cited the

4   French law that has been renewed in a circular.

5          And, again, Composite Exhibit 1 is the attestation

6   and a certificate from Dominique Gutierrez, who is a

7   certified French interpreter by the state from

8   van Hissenhoven, Incorporated, Language.

9          THE COURT:  And you say Composite Exhibit 1, but

10  why don't we make it 2 since we already have a 1.

11          MS. SMITH:  That's fine, Your Honor.  I'm so sorry.

12          THE COURT:  That's all right.  That's fine.  Thank

13  you.

14          MS. SMITH:  And, Your Honor, (unintelligible).

15          THE COURT:  All right.  Thank you.

16          MS. SMITH:  Your Honor, the next item that I have

17  is actually from the French consul.  I was able to procure

18  the original from the French consulate.  It is a letter from

19  the Atlanta -- it's from the vice consul or the deputy consul

20  Caroline Pasquier, which is C-a-r-o-l-i-n-e, P-a-s-q-u-i-e-r,

21  indicating that the French government has verified that there

22  are two valid French passports, and, again, I'll repeat the

23  numbers.  08CT94852, issued on October 21st, 2008, valid --

24          THE COURT:  Can you tell me that date again?  I'm

25  sorry.

 1         MS. SMITH:  Yes, sir.  October 21, 2008, valid

 2   through October 20th of 2018; and 07AK26794 issued on March

 3   19th, 2007, and valid through March 18th, 2017.  The

 4   difference between the ending numbers is they've omitted the

 5   last X or Y, that last number.

 6         Your Honor, after looking -- and I'll provide

 7   the -- Ms. Karase with a copy of the letter.  I'll show her

 8   the original.

 9         And I'd ask to admit the original into the

10   (unintelligible).

11         THE COURT:  Thank you.

12         MS. SMITH:  And, Your Honor --

13         THE COURT:  This will be Defendant's Exhibit 3,

14   then?

15         MS. SMITH:  Yes, Your Honor.  Thank you.

16         Your Honor, the passport that I represented I had a

17   while ago in my hands is the '07 passport, and, again, the

18   bottom number reads 07AK267943, and I'll show this to

19   Ms. Karase.

20         The other passport that is in the possession of the

21   FBI that I just took the copy that was provided to both me by

22   Ms. Karase and I believe the Court at the last hearing is the

23   08CT948523 passport issued in 2008.

24         Your Honor, when we spoke with the French

25   consulate -- I actually spoke with the office several times,

1  both in Miami and in Atlanta.  They indicated they would not

2  verify verbally whether a passport was valid or not valid

3  because they had to run it through the -- they have a

4  computer system much like our DAVID system that only one

5  person, the vice consul, can actually log in and check the

6  passports.  It runs all the way back to the database in

7  France.  That's the reason they provide it only in a written

8  format.

9        The consul indicated -- the consul indicated that

10 they would be willing to speak with Your Honor today if need

11 be, but I don't think they need to since we have a

12 certified -- we actually have a letter with a seal on it, and

13 I have another one, Your Honor, so . . .

14       Does Your Honor have any questions about the

15 passports before I move on?

16       THE COURT:  No.  I'll -- you know, I'll take a

17 break at some point and make sure that I've read all of this

18 and looked through it, but I don't have any questions at this

19 point.

20       MS. SMITH:  Okay.

21       THE COURT:  Thank you.

22       MS. SMITH:  Your Honor, I have a letter from the

23 United States government that was issued on April 17th

24 addressed to the Honorable James C. Francis, which is the

25 magistrate judge in the Southern District of New York that

1  presumably will be hearing the matter in New York initially.

2  The letter was issued asking the Court to set a date.

3          As of today's date, I don't know that any date has

4  been set for an appearance in New York, so all I have is a

5  copy of the letter that was e-mailed by the government to me,

6  but I would submit that to the Court.  And Ms. Karase and I

7  both received it on (unintelligible).

8          Your Honor, I don't remember if I said the other

9  day that my client was willing to submit to electronic

10 monitoring.  If I did not, I would state that today.  Also,

11 he is willing to submit to home confinement.  Also I have

12 spoken with his family and friends.  They are willing to pay

13 for a 24-hour, seven-day-a-week security guard if necessary

14 to sit on him to make sure that he doesn't flee back to parts

15 unknown in France and actually shows up for court.

16         With regard to the mortgage documents that I

17 provided you, there was a correction.  We talked about --

18 there was -- I thought we may have some more corrections to

19 the pretrial services report -- if I can approach the table,

20 I'll --

21         THE COURT:  Yes.  Yes.  Please.

22         MS. SMITH:  As a housekeeping matter, we need -- I

23 listed six properties, I believe, the other day that I read

24 off the addresses and the mortgages that -- and the amounts

25 of property.

```
 1              After reviewing them with Mr. Cilins and after

 2    talking to him with the pretrial services report, there is

 3    one additional property we need to add.  That property is at

 4    19667 Turnberry Way, and Turnberry is T-u-r-n-b-e-r-r-y,

 5    Aventura, Florida 33180.

 6              This is Mr. Cilins' residence when he and/or he and

 7    his family come to the United States.  The residence is

 8    unencumbered.  I have not had the mortgage documents

 9    prepared, but I did bring my laptop, and I do have -- I have

10    the ability to prepare them and the affidavits necessary.

11              The minimal amount on this house -- I've not run

12    the number through the court -- through the property

13    appraiser's.  The home there is, however, worth at least

14    $295,000 free and clear.  It may have a higher value than

15    that, but -- so we do need to add that one, when we were

16    comparing what was listed on pretrial and what I gave the

17    Court.

18              The other issue with regards to the mortgages, as I

19    said in court the other day, I had them prepared.  I asked

20    the attorney that handles his affairs in Miami to prepare

21    them.  After reviewing them when I left court -- you know, we

22    had tried to get everything together in that little short

23    two-day period -- I noticed they were addressed to the wrong

24    clerk of court.

25              So I have -- I have changed that and have pages
```

1  that we can slide in if we need to change them, instead of

2  the Orlando courthouse, which is not even the correct address

3  anymore, to the Bryan Simpson Courthouse here at Jacksonville

4  if need be.  I did bring those documents today with me.

5          THE COURT:  Thank you.

6          MS. SMITH:  The affidavits, as I said earlier -- as

7  I represented to the Court, that are attached, if the Court

8  allows Mr. Cilins to put forth these and allows him bond, as

9  the security for any bond, he would execute the affidavits,

10 and he would also execute any necessary signatures on the

11 mortgages.

12          And, Your Honor, just so that we're clear, some of

13 these mortgages are combined properties, so when you pull the

14 property appraiser's records in Miami, there's lots of

15 parcels, but the attorney actually combined them as they are

16 for physical addresses, for lack of a better way of saying

17 it, or as they were purchased in blocks.

18          For example, the condominium block maybe has three

19 parcels that are part of that and all three of them are

20 listed on one mortgage because it's -- so I just wanted to

21 clear up any confusion with that.

22          THE COURT:  I might -- after Ms. Karase asks

23 whatever questions that she has of you, I might ask you to

24 walk me through a couple of those because I went through them

25 and I think I understand what you have here, but I want to

1    make sure that I do.

2            MS. SMITH:  And, Your Honor, again, I didn't

3    prepare them, and if there's any deficiencies, I brought my

4    laptop.  I have the documents.  We can get them reexecuted.

5    If I have to FedEx them to Miami to get the manager of the

6    LLCs to sign, they have indicated that they will be willing

7    to do so today or tomorrow, either one, so . . .

8            Your Honor, the only other thing -- the other day

9    after reviewing the transcript, I'd like to clear up -- I

10   think I was not -- I'm trying to slow down.  I want to clear

11   up, if I can, a little bit of the proffer that I gave the

12   other day, if I can make some factual clarifications --

13           THE COURT:  Yes.

14           MS. SMITH:  -- that I think will help the Court in

15   understanding our position for bond.

16           These have to do with -- Your Honor, if I may, I've

17   got umpteen dozen sets of those.  These have to do with the

18   contracts and the entities as I understand from the

19   investigation, the limited investigation, that I've done in

20   the week that I've had this -- week and a half that I've now

21   had this case.

22           The site in question is the Simandou site in

23   Guinea.  Simandou is a region in Guinea.  If you look at

24   Guinea on a map, there is a -- Guinea looks like a boomerang.

25   It sort of wraps around Nigeria.  It sits on the western

1   coast of Africa.  Simandou is in the very top portions of

2   that boomerang far from the coast.

3        Rio Tinto had a contract, and still does have a

4   contract, for parts of Simandou to do exploration, to do

5   mining in Simandou province and on these parcels, and

6   Simandou is a huge province covering four different -- or

7   huge block of land covering four or five different provinces

8   or little small city-states in Guinea.

9        Rio Tinto had had the rights for several years.

10   Rio Tinto was not performing under their mining concession

11   rights.  In 2006 BSGR, which is the entity in question in the

12   complaint, was granted a license to start the exploration and

13   research on portions of Simandou.  Rio Tinto is still there.

14        BSGR later, after the contract, after -- and I

15   think I said but I want to make sure, Lansana Conte died

16   December 21st of 2008.  The military junta, I've since

17   learned -- and I don't remember the leader of the junta at

18   that time -- you know, there was an actual coup d'etat.

19   Press reports, the United Nations, and the Human Rights Watch

20   noted that the coup d'etat took effect immediately upon the

21   death of Lansana Conte.

22        The junta reaffirmed -- they relooked at -- they

23   established a committee and they reaffirmed the contracts in

24   question here with BSGR.  It was a lengthy committee process,

25   and they reaffirmed them.  Actually the president and the

1   junta and the parliament at the time reaffirmed and re-signed

2   the contract with BSGR.

3           THE COURT:  Would that have been sometime, then, in

4   2009?

5           MS. SMITH:  It was 2009 when they reaffirmed those

6   contracts, and they did a lengthy investigation.  Rio Tinto,

7   it's my understanding -- well, let me not confuse the Court

8   or myself.

9           In 2010 Alpha Conde came to power, in June, I

10  believe, of 2010, March or June -- and, Your Honor, forgive

11  me.  I don't have that exact date.

12          THE COURT:  Okay.

13          MS. SMITH:  It's either March or June.  I believe

14  it's June.  And he instituted, some two years later, after

15  BSGR and Vale, who BSGR had entered into a contract with, a

16  Brazilian mining company, Vale, to do -- to handle day-to-day

17  operations of the mines, he instituted his own technical

18  review and committee of Simandou and the concessions.

19          This involves all concessions to Simandou,

20  including Rio Tinto's, Chinalco, who's now in partnership

21  with Rio Tinto, and the Brazil Vale, and then some other

22  smaller mining entities that have other mining rights.  No

23  one's contract, including BSGR's, has been invalidated to

24  date by the Guinean government.

25          Mamadie Toure was run out of the country in January

1  of 2009 very shortly after the first of the year by the

2  military junta.  She has not been back to Guinea since.  It

3  is our position, both from a proffer and argument standpoint,

4  that any influence that she had, if she had any -- and we are

5  certainly not conceding that she had any with Lansana

6  Conte -- died with Lansana Conte.  Otherwise she would still

7  presumably be in Guinea doing whatever she had, if she still

8  had influence over those contracts.

9         And I think factually -- I just wanted to make

10  sure -- because I know we talked about a lot of contracts,

11  and I wanted to make sure we had a viable timeline to work

12  with when we got down to the argument point.

13        Do you have any questions, Your Honor, about the

14  timeline of -- and I know Ms. Karase was probably going to

15  have some questions for me.

16        THE COURT:  No.  I'm -- no.  You may continue.

17        MS. SMITH:  Okay.  I believe, if I can just have

18  one moment with my client, that's all I'm going to have for

19  the proffer, and then Ms. Karase obviously will get a chance

20  to cross-examine me.

21        Your Honor, there's one other thing.  In between

22  the period -- and, Your Honor, so that the military junta's

23  clear was -- the president or the leader of the junta was

24  Dadis Camara, and then there was a transition period where a

25  Monsieur Konate was in power prior to Alpha Conde taking

1   power in June of 2010.

2         The other two things that I proffered about -- that

3   I proffered about the other day were that Mamadie Conde -- or

4   Mamadie Toure, the CW in this case, has legitimate business

5   contacts with my client in other avenues nonrelated to

6   mining, nonrelated to Guinea.  There have been the provision

7   for the building of schools, the importation of chicken into

8   South Africa, and these are all legitimate business contracts

9   that they have had over the years.

10         My investigation, and after speaking with persons

11   on several continents -- I think I missed all but two --

12   there seems to be a pattern and practice of persons doing

13   business in countries such as Guinea, Nigeria, Sierra Leon,

14   Rwanda, most of the Sub-Saharan African countries, whereby

15   companies go in.  They get legitimate, lucrative contracts

16   for mining, for gas, petroleum, other natural resources, and

17   then there is a -- I won't say a coordinated, but for lack of

18   a better -- a coordinated group of scam artists that come out

19   and then attempt to show contracts, "Oh, you owe me money

20   because I helped you procure this.  You owe me this.  If you

21   don't, I'm going to do X.  I'm going to go to the

22   government."  And it has happened not only with BSGR, with

23   Mr. Cilins.  It is my understanding it had happened with Rio

24   Tinto.  It has happened with other companies.

25         If they refuse to pay -- the people go away.  They

1  come back.  It is sort of, as it was explained to me,

2  unfortunately a cost of doing business in that region is that

3  they know they're going to get hit with these scams and these

4  shakedowns, for -- I guess scam's not the right word.

5  Shakedown is more the right word, extortion or blackmail.

6         So I wanted to also proffer that, and the fact that

7  many times these persons create, as we -- as I stated in the

8  proffer the other day, false documents without any original

9  documents, without any original signatures that could be

10 subjected to any sort of testing, you know, ink testing,

11 signature, fingerprints, any of the other things that modern

12 forensically scientifically we can do.  Most of the time

13 there is never an original contract produced with these

14 shakedowns.

15        And I think that's the end of my proffer, Your

16 Honor.

17        THE COURT:  All right.  Thank you.

18        Ms. Karase?

19        MS. KARASE:  Your Honor, may I have just a quick

20 moment with Ms. Smith just to point out one of the mortgage

21 documents?

22        THE COURT:  Yes.  I'll tell you what.  I need to

23 take about a five-minute recess for something, so we'll take

24 a short recess.

25        COURT SECURITY OFFICER:  All rise.

```
 1                (Recess from 9:37 a.m. until 10:04 a.m.; all

 2   parties present.)

 3                COURT SECURITY OFFICER:  All rise.  This Honorable

 4   Court is back in session.

 5                Please be seated.

 6                THE COURT:  All right.  I apologize for the extra

 7   delay.  I had something come up in another case that I had to

 8   deal with.

 9                Let's see.  Now, Ms. Smith, you were finished with

10   your proffer?

11                MS. SMITH:  I think -- I think, Your Honor, I am.

12   I think I'm finished.  The only thing -- and I know I

13   proffered this the other day but I'll say it again just for

14   clarity's sake.  But Mamadie Toure is not a wife of -- and

15   never was the actual wife of Lansana Conte, which was the

16   president two times back or three times back in Guinea.  She

17   was never the wife, and I believe the FBI may actually be in

18   possession of evidence that may actually prove that, which

19   would be the tapes.

20                THE COURT:  I believe you said she was a mistress

21   but not the wife.

22                MS. SMITH:  She was the mistress, not the wife.

23                THE COURT:  All right.

24                MS. SMITH:  And that's by her own -- that she's the

25   mistress.  I don't know -- I obviously have no personal
```

 1   knowledge of that.  Neither does my client, but that is the

 2   word on the ground in Guinea, is that she is the mistress.

 3          THE COURT:  Okay.  Ms. Karase, do you have

 4   questions on the proffer?

 5          MS. KARASE:  I do, Your Honor.

 6          And, Your Honor, I'll preface this with I'm not

 7   sure of the relevance one way or the other, but, Ms. Smith,

 8   what is the information that you have about the relationship

 9   between Ms. Toure and former President Conte?

10          MS. SMITH:  As I just stated, that some people

11   believe she is the former mistress of the deceased Lansana

12   Conte.

13          MS. KARASE:  Who?

14          MS. SMITH:  Who as in who --

15          MS. KARASE:  You said some people.

16          MS. SMITH:  Some people.  Press reports.  There are

17   various government officials in Guinea that believe that.

18   There's press reports that believe that.  There's press

19   reports that also say she is a wife of the president.

20          But the tapes that are in the government's

21   possession, it's my understanding, she is discussing on there

22   that she was not his actual wife, that, "Oh, you know the

23   custom.  We get to claim each other as husband and wife but

24   we weren't married."

25          THE COURT:  You talking about the tapes, the tapes

```
 1   that --

 2            MS. SMITH:  That they have in their --

 3            THE COURT:  -- they're using --

 4            MS. SMITH:  Yes, Your Honor.

 5            MS. KARASE:  And have you reviewed those tapes?

 6            MS. SMITH:  I have not.

 7            MS. KARASE:  Okay.  What do you base that

 8   information on then?

 9            MS. SMITH:  Discussions with my client and also

10   discussions -- and in the investigation with the tapes, I

11   believe your tapes with my client, and on that issue alone --

12   and that is the only issue I inquired about was with regard

13   to the tapes.

14            With regard to the other information, there were

15   press releases.  There are reports from Guinea.  There are

16   several investigative reports from Guinea that list her as a

17   consort, i.e., a mistress.

18            And there are also press reports that list her as

19   the fourth wife.  There are other press reports that list her

20   as claiming fraudulently to be the first wife, Henrietta

21   Conte, that at some times she's actually pretended to be the

22   first wife.

23            MS. KARASE:  Okay.  Are you familiar with an expose

24   done by Global Witness?

25            MS. SMITH:  Global Witness ran by Beny -- or by
```

1   George Soros?  Yes.

2           MS. KARASE:  Okay.  So you would agree, then, that

3   there are several press reports as well that list her as his

4   wife?

5           MS. SMITH:  As I just said in my testimony, I did.

6           MS. KARASE:  Okay.

7           MS. SMITH:  And George Soros, as we all know, has

8   an ax to grind against Beny Steinmetz.  George Soros, it's my

9   understanding, has an agreement with Rio Tinto in order to

10  try to get BSGR out of country so that Rio Tinto could get

11  Simandou back in place.

12          MS. KARASE:  Now, you're referring to -- you

13  believe our source to be Mamadie Toure, correct?

14          MS. SMITH:  I do.

15          MS. KARASE:  And Mamadie Toure, you've proffered,

16  is involved in legitimate business transactions with your

17  client currently?

18          MS. SMITH:  Currently -- currently meaning today,

19  no.

20          MS. KARASE:  How recently were those transactions?

21          MS. SMITH:  I think there have been legitimate

22  business transactions as recently as 2012.

23          MS. KARASE:  And with what companies were those

24  transactions?

25          MS. SMITH:  There were transactions in Miami --

1          MS. KARASE:  I'm sorry, Ms. Smith.

2          Are we --

3          THE INTERPRETER:  No, no.  Go ahead, please.

4          MS. SMITH:  Do you need us to repeat?

5          THE INTERPRETER:  Continue.

6          MS. SMITH:  Okay.  I believe there were legitimate

7   real estate transactions where Mamadie Toure was trying to

8   buy a piece of property.  Actually I don't think that

9   involved my client.  She's been trying to buy some property

10  here in Jacksonville, other properties in Miami.

11         I believe they've had legitimate dealings with

12  chicken, importing chicken from Brazil into South Africa and

13  other South American countries.

14         There have been legitimate building projects

15  involving a school in Sierra Leon, I believe.  I'm not

16  certain about the country, but another country.  There's been

17  all -- there's been various assorted legitimate projects

18  involving Mr. Cilins and Ms. Mamadie Toure.

19         MS. KARASE:  What companies that Mr. Cilins is

20  involved in did transactions with Mamadie Toure?

21         MS. SMITH:  I don't know the exact companies.

22         MS. KARASE:  Okay.  Were any of those ventures

23  profitable?

24         MS. SMITH:  I don't know the exact companies.  I

25  don't know the -- so I don't know the answer to that

1   question.

2         MS. KARASE:  Okay.  Well, aside from the names of

3   the companies, do you know if any of the outcomes of these

4   ventures were profitable?

5         MS. SMITH:  I have no idea.

6         MS. KARASE:  All right.  Now, you mentioned --

7         MS. SMITH:  If I can just say that I don't know

8   about the chicken business, what occurred with that, whether

9   that was -- whether CFW, the company that's listed in the

10  pretrial services report, is involved in that.  And, again, I

11  don't know what -- what the profit margin, if there was a

12  profit -- I don't know anything about that.

13        MS. KARASE:  All right.  But that was as recently

14  as 2012?

15        MS. SMITH:  I said they had done some business.  I

16  don't know if the chicken business was in 2012.

17        MS. KARASE:  Okay.  Now, you mentioned at the

18  proffer the other day, and certainly in the documents that

19  you've submitted regarding the real estate, that Mr. Cilins

20  has some involvement with Pha Investments, LLC?

21        MS. SMITH:  He does.

22        MS. KARASE:  And also with Hollywood Beachfront

23  Townhomes, LLC.

24        MS. SMITH:  He does.

25        MS. KARASE:  What is his business with each of

 1   those entities?

 2          MS. SMITH:  I believe -- I'd have to get the

 3   documents to see what the involvement is according to the

 4   Department of State.

 5          So, Your Honor, may I approach the table?

 6          THE COURT:  Yes.

 7          MS. SMITH:  According to the Department of State,

 8   which is gathered off of sunbiz.org in Florida, Pha

 9   Investments, it appears that Mr. Cilins and Jeremy Noy were

10   both managers at the inception of the business in 2012 of the

11   LLC.  It's an LLC.

12          MS. KARASE:  And Hollywood Beachfront Townhomes?

13          MS. SMITH:  It's my understanding that when the

14   corporation was -- or the LLC was established, he was an

15   initial member, as they call it, member manager, manager

16   member -- forgive me.  I wasn't -- it's been a long time

17   since I've done business law, but he was an original member

18   manager in establishing Hollywood Beachfront Townhomes, LLC.

19          MS. KARASE:  And has he profited from either of

20   his -- from his employment with either of these entities?

21          MS. SMITH:  Yes.  As listed on the pretrial

22   services report, those entities actually own the properties,

23   and there's real estate -- they're getting rentals off those

24   properties.  Those LLCs were established solely for the

25   purpose of owning the properties to prevent personal

1   liability in case someone fell, slipped, there was some sort

2   of an injury or accident on the rental properties.

3           MS. KARASE:  Okay.  The income that is listed on

4   the pretrial services report as being connected to these --

5   those properties, is that the only income that he's derived

6   from rental properties?

7           MS. SMITH:  As far as I know.  I don't know any

8   other income.

9           MS. KARASE:  All right.  And the property that

10  you've recently disclosed, one of the properties that was

11  newly disclosed, the 2300 North Surf Road valued at

12  $1,165,500, does your client derive any rental income from

13  that property?

14          MS. SMITH:  Your Honor, may I have the original

15  documents that I submitted to Your Honor?

16          THE COURT:  What was the address on that?

17          MS. KARASE:  It's 2300 North Surf Road in

18  Hollywood, Florida.

19          MS. SMITH:  I believe that is one of the rental

20  properties, but I am not entirely sure if that is one of the

21  rental properties or -- at least it looks like it is a lot

22  that is owned by one of the -- by the LLC and that is listed

23  on the pretrial services report.

24          It may be -- it may actually be a lot.  It looks to

25  be a lot, so there may not be any rental income.  It may be

1    an actual -- because the three parcels state that they are --

2    they appear to just -- they may be lots.  I don't know.

3          MS. KARASE:  Okay.  You're not sure whether or not

4    there's any rental income that comes from that property or

5    not?

6          MS. SMITH:  Not specifically.  He listed the rental

7    income, I believe -- if I can get the pretrial services

8    report, he did not list the actual addresses when he gave

9    them, but he did list out five of his six properties on the

10   pretrial services report.

11         MS. KARASE:  All right.  And as we've covered, none

12   of those properties are valued at over a million dollars,

13   correct?

14         MS. SMITH:  Excuse me?  That's not correct.

15         MS. KARASE:  There's a property that's listed in

16   the pretrial services report --

17         MS. SMITH:  The pretrial services report, he

18   estimated, obviously, very low.  The tax assessor obviously

19   is a more accurate assessment.  Better for him to estimate

20   low on the pretrial services report than to estimate high and

21   then be accused of lying.  He estimated low, it looks to me.

22         And then we have the actual property appraiser's

23   records which state what the properties are.

24         MS. KARASE:  All right.  Well, Ms. Smith, let's go

25   through this and try to match this up so that we can

1   understand.

2          MS. SMITH:  I don't know that I can match them

3   because I don't know the -- which address matches which one.

4          MS. KARASE:  All right.

5          MS. SMITH:  So we can try, but I don't think that I

6   can actually do that.  That's the reason that I produced the

7   mortgages and went through them with the tax assessors'

8   information.

9          MS. KARASE:  Okay.  Well, let's try it.

10         So you list -- your client provided to pretrial

11  services that there's a Hollywood, Florida, condominium

12  that's valued at approximately $112,000, correct?

13         MS. SMITH:  As far as I know.  I wasn't present.

14         MS. KARASE:  Okay.  Well, you certainly have a copy

15  of the pretrial services report.

16         MS. SMITH:  I do, but I wasn't present.  That's

17  fine.

18         MS. KARASE:  Okay.  And that pretrial services

19  report lists a property in Hollywood, Florida, valued at

20  $112,000?

21         MS. SMITH:  It does.

22         MS. KARASE:  All right.  Now, your client has a

23  property in Hollywood, Florida, at 1900 Van Buren Street, and

24  based on the paperwork that you provided to me, that one is

25  the closest to the $112,000, valued at $86,110.

1              Would you agree?

2         MS. SMITH:  I don't know that we can match them up

3    that way, and I'm not prepared to admit that we can match

4    them up that way.  I think the actual tax collector documents

5    are the best evidence that we have at this point in time.

6         MS. KARASE:  Okay.  Well, is it your position that

7    your client disclosed the $1,165,500 condominium when he met

8    with pretrial services --

9         MS. SMITH:  It's my position --

10        MS. KARASE:  -- before they did the report?

11        MS. SMITH:  -- that he disclosed what he understood

12   when he went through the pretrial services report -- he

13   disclosed obviously from the list here five of six of his

14   properties.  He was -- it is my position there was no attempt

15   to be deceitful.  He minimized the value of the properties,

16   and once he had counsel and an interpreter, he told me the

17   exact -- what he had and we went -- what names they were

18   listed, and we were able to retrieve the information then.

19        MS. KARASE:  Actually, it's five of the seven.

20        MS. SMITH:  Five of seven, five of six.

21        MS. KARASE:  Correct?

22        MS. SMITH:  I don't know how many --

23        MS. KARASE:  Well, there are five in the pretrial

24   services report, and you've told us about seven here today.

25        MS. SMITH:  Okay.

 1          MS. KARASE:  Is that right?

 2          MS. SMITH:  I don't know if there's six or seven.

 3    I don't know.  I'd have to count them, Ms. Karase.

 4          THE COURT:  I think everything's going to speak for

 5    itself on some of those things, so in terms of some of that,

 6    that can be argument because it's clear that there are five

 7    in the report, and the number that have been disclosed will

 8    be clear, and whether Ms. Smith admits it or not, it will

 9    speak for itself.

10          MS. KARASE:  Now, you've mentioned that Mamadie

11    Toure had not been back to Guinea for several years, correct?

12          MS. SMITH:  That is my understanding, that she has

13    not been back to Guinea for several years.  And when I asked

14    you had you checked her travel records, you indicated you did

15    not check her travel records.

16          MS. KARASE:  Okay.  But what do you base your

17    understanding on?

18          MS. SMITH:  On information received from the

19    Guinea -- from Guinea itself.

20          MS. KARASE:  Okay.  And was that in a telephone

21    conversation or in records or how?

22          MS. SMITH:  It's work-product privilege.  I'm not

23    going to disclose that.

24          MS. KARASE:  Okay.

25          THE INTERPRETER:  The interpreter would request you

1  slow down.

2           MS. KARASE:  Yes, sir.

3           MS. SMITH:  Yes, sir.  Thank you.

4           MS. KARASE:  And do you have any personal

5  information as to whether or not Mamadie Toure had contracts

6  with the entity you've referred to as BSGR?

7           MS. SMITH:  I have no knowledge from any

8  investigative source, either directly or indirectly, that

9  Mamadie Toure had any legitimate contracts with BSGR.

10          MS. KARASE:  And the entity you're referring to as

11  BSGR, that stands for Beny Steinmetz Group Resources,

12  correct?

13          MS. SMITH:  I believe that's what it is on the

14  Internet, yes.

15          MS. KARASE:  And Beny Steinmetz is one of the

16  wealthiest men in Israel, correct?

17          MS. SMITH:  He is, as is George Soros one of the

18  wealthiest men in the United States.

19          MS. KARASE:  And Mr. Steinmetz and Mr. Cilins have

20  a close personal relationship, do they not?

21          MS. SMITH:  I do not know that.

22          MS. KARASE:  In the complaint, and I'm going to

23  direct your attention to page 10, 16(c), there's reference to

24  a high-ranking individual within the Entity.

25          MS. SMITH:  Okay.

```
 1            MS. KARASE:  Do you believe that to be Beny

 2   Steinmetz?

 3            MS. SMITH:  I don't have any belief whatsoever.  I

 4   was not privy to the telephone conversation.  I do not know

 5   what was on that conversation.  The government has indicated

 6   it only has English draft transcripts that they have

 7   prepared.  I don't have the tapes.  I've not listened to them

 8   in either French or had someone interpret them.  I have no

 9   belief and no position on that whatsoever.

10            MS. KARASE:  Okay.  But you have a belief and a

11   position as to who the CW is and who the Entity is, correct?

12            MS. SMITH:  I do.  The CW is Mamadie Toure.

13            MS. KARASE:  Okay.  And that's your understanding,

14   correct?

15            MS. SMITH:  That was the lady that was at the

16   airport who -- when -- at the point in time when my client

17   was arrested on April 14th.

18            MS. KARASE:  Now, you've mentioned that your client

19   is willing to have his family or associates pay for a 24-hour

20   guard if he's released?

21            MS. SMITH:  Yes.

22            MS. KARASE:  You'd agree, then, he has significant

23   access to financial resources, correct?

24            MS. SMITH:  He has -- as disclosed by us, he has

25   significant properties here in the United States, three,
```

1  three-and-a-half, four million dollars' worth of unencumbered

2  properties, as I've learned, additional properties since the

3  last time when I -- we went back and actually checked them.

4         He does have significant assets, no different than

5  many other persons who come before the Court have significant

6  assets, that's correct.

7         MS. KARASE:  All right.  And those properties --

8  you've proffered that those are willing -- he's willing to

9  put those up as security, so any assets that he would have to

10  pay for this 24-hour guard would be aside from those

11  properties, correct?

12         MS. SMITH:  His family, his friends in the United

13  States and in France, have indicated that all of them are

14  willing to help do whatever is necessary to obtain him a bond

15  so that he can face these charges so that he can meet with me

16  in the privacy and comfort of my office or I can meet with

17  him in Miami in his home and actually defend this case and

18  defend these charges.

19         MS. KARASE:  Okay.  And are you continuing to

20  represent him in the New York proceeding as well?

21         MS. SMITH:  I've not secured local counsel in New

22  York yet.

23         MS. KARASE:  All right.  Now, the reference that

24  you made last week to whether or not Mr. Cilins provided any

25  money to the person with whom he met at the airport on the

1  day that he was arrested, are you aware whether he received

2  any documents that day that he was requesting?

3          MS. SMITH:  Based upon your information given to me

4  during your proffer, there were no documents exchanged that

5  day.

6          MS. KARASE:  All right.  And there was, in turn, no

7  money exchanged as well, correct?

8          MS. SMITH:  That's what I tried to get you to admit

9  and you didn't, said you didn't know, so I believe that is

10 correct --

11         MS. KARASE:  All right.

12         MS. SMITH:  -- based upon your --

13         MS. KARASE:  And I believe the record will speak

14 for itself on that point.

15         Your Honor, I'm just making sure I don't have

16 anything further for Ms. Smith at this time.

17         I don't, Your Honor.

18         THE COURT:  All right.  Thank you.

19         MS. SMITH:  Your Honor, does Ms. Karase have an

20 additional proffer?  I guess there was a rebuttal proffer she

21 indicated she was going to make.

22         THE COURT:  Yes.  Let me check with her.

23         Do you have any additional information or evidence

24 to proffer?

25         MS. KARASE:  I do, Your Honor.

 1          THE COURT:  All right.  Well, Ms. Smith, you may be

 2   seated then.

 3          MS. SMITH:  I'll let her proffer with her rebuttal,

 4   and then I'll proceed with my cross.

 5          THE COURT:  All right.  Do you want to just stay

 6   there while this --

 7          MS. SMITH:  I'll just stay here.

 8          THE COURT:  All right.  That's fine.

 9          MS. KARASE:  And, Your Honor, I assume that we'll

10   be permitted ample time for argument after the close of the

11   proffers, correct?

12          THE COURT:  Yes.

13          MS. KARASE:  All right.  I'll start out, Your

14   Honor, I'd like to call Officer Watson for some testimony

15   regarding information that she elicited from Mr. Cilins.

16          THE COURT:  You may be seated.

17          MS. SMITH:  And, Your Honor, I would object at this

18   point in time.  We indicated the other day we were going to

19   proceed by proffer.  This is the same thing we started with

20   last week.  Your Honor said that there would not be any --

21   barring exceptional circumstances, any evidence to actually

22   take, and we would proceed by proffer.  That was went over

23   the last week we were here, and now we're calling witnesses.

24          THE COURT:  Well, I think if I didn't make it

25   clear -- and I probably didn't -- the government can proceed

1   by proffer.  If the government wants to call witnesses, they

2   can call witnesses.  The rule, of course, allows you to

3   proceed by proffer.  You can call witnesses if you want.

4        I mean, I don't want to describe it as a

5   free-for-all here, but the way we do things, I've found, are

6   unlike how they're done elsewhere.

7        You'll have ample opportunity to cross-examine

8   Ms. Watson so I'll allow the government to call her.

9        MS. SMITH:  Thank you, Your Honor.

10       THE COURT:  Yes.  Thank you.

11       All right.  Ms. Watson?

12       Ms. Watson, if you'd raise your right hand, please.

13       Do you solemnly swear that the testimony you're

14   about to give before this Court will be the truth, the whole

15   truth, and nothing but the truth, so help you God?

16       THE WITNESS:  Yes, Your Honor.

17       THE COURT:  All right.  You may be seated.

18       And if you'd please state your full name.

19       THE WITNESS:  Kim Lee Watson pretrial services

20   Jacksonville.

21       KIM LEE WATSON, GOVERNMENT'S WITNESS, SWORN

22                    DIRECT EXAMINATION

23   BY MS. KARASE:

24   **Q.**   Ms. Watson, please tell the Court how you're

25   employed.

1  **A.**    Yes.  Good morning.  I'm employed by United States

2  Pretrial Services Agency.  I'm a pretrial services officer.

3  **Q.**    How long have you been a pretrial services officer?

4  **A.**    Almost 14 years, seven here in Florida and seven in

5  Washington, D.C.

6  **Q.**    Did you have the opportunity to interview Frederic

7  Cilins here to my left in connection with your position as a

8  pretrial services officer here in Jacksonville?

9  **A.**    Yes.  I interviewed Mr. Cilins on April the 15th,

10  2013.

11  **Q.**    Did you inquire as to any income that he had at that

12  time?

13  **A.**    Yes.  As part of our interview process, one of the

14  questions we ask an individual is if they're employed or if

15  they have any current source of income.  Mr. Cilins --

16          THE WITNESS:  May I refer to my interview, Your

17  Honor?  Your Honor, may I refer to my interview sheet?

18          THE COURT:  Yes --

19          THE WITNESS:  Thank you.

20          THE COURT:  -- if I didn't say that already.  I

21  thought I did.

22          THE WITNESS:  Mr. Cilins responded that he owns a

23  business called CWF.  I then asked him how long he's had the

24  business.  He said he's had the business for approximately

25  six to seven years.  The business is located in France.  He

1   conveyed that the nature of his business is to buy and sell

2   products.

3   BY MS. KARASE:

4   **Q.**    Did he indicate any other business ventures or

5   companies that he was involved with?

6   **A.**    I asked him if he owned any other businesses or had

7   any other source of income, and he responded that he did not.

8   **Q.**    All right.  Did you also inquire whether he had any

9   passports?

10  **A.**    Yes.  One of the questions we ask individuals -- we

11  start out by asking individuals where they're born, and as

12  Mr. Cilins had replied that he was born in France, I then

13  asked him about his, you know, citizenship or, you know, how

14  he was in the United States.  He indicated that he lives in

15  France but had a visa to be in the United States.

16          So I asked him where his passport was.  He said

17  that his passport was seized by the FBI.

18  **Q.**    Did he make any reference to any second or other

19  passports that he had that had been issued to him?

20  **A.**    No, he did not.

21  **Q.**    Now, through the duration of your interview, did you

22  have any difficulty communicating with Mr. Cilins?

23  **A.**    No.  We had no difficulty communicating at all.

24  **Q.**    Did he ask to have an attorney present during the

25  interview?

**A.**    No, he did not.

**Q.**    Did you offer him the assistance of an interpreter?

**A.**    Yes.  When I met with Mr. Cilins in the cell block, the first thing I did, obviously, was to introduce myself.  I explained to him the reason that I was there.

I asked him if he -- you know, if we would be able to speak in English or if he had any troubles, you know, understanding.  He explained to me that he spoke, you know, quite well in English and that as long as I spoke slowly, that it would probably be fine.

I advised him that if there was anything that I said that he didn't understand, to please let me know so that I could say it differently or speak more slowly.

Then Mr. Cilins read and signed what is called our notice to defendant, which explains the purpose of my interview, and the last paragraph of the notice, if I may read it, it says:  "I know I have the right to speak with a lawyer before answering any questions.  If I cannot afford a lawyer, one will be appointed to represent me" --

**Q.**    Ms. Watson?

THE COURT:  You have to slow down, please.

THE WITNESS:  Do I continue or --

THE COURT:  Why don't you start over with that paragraph and just read more slowly, if you would, please.

THE INTERPRETER:  Yes, please.  Thank you.

1          THE WITNESS:  "I know I have the right to speak

2     with a lawyer before answering any questions.  If I cannot

3     afford a lawyer, one will be appointed to represent me.

4     Asking for a lawyer will not hurt my chance for pretrial

5     release, but may delay the decision on whether or not I will

6     be released until counsel is obtained."

7          It then reads:  "I have read this form or had it

8     read to me and I understand what it means."  Mr. Cilins

9     signed this document indicating, "I do not want a lawyer

10    during this interview."

11         And I should add that it was also explained to

12    Mr. Cilins that I would not be discussing with him anything

13    related to the instant offense.  I would be asking him

14    questions such as where he was born, where he grew up, if he

15    was employed, if he had family here, those types of

16    questions.  He said he understood.

17    BY MS. KARASE:

18    **Q.**    Did you have any doubt as to whether he understood?

19    **A.**    No.  He spoke English very well.  We didn't have a

20    problem.

21    **Q.**    Did you also inquire as to Mr. Cilins' assets?

22    **A.**    Yes, I did.

23    **Q.**    And what did he tell you?  Well, and maybe -- let

24    me -- maybe I can short-circuit this a little bit.

25         The assets that are included in the pretrial

1   services report, are those all of the assets that were

2   disclosed by Mr. Cilins to you during the interview?

3   **A.**    Yes.  Those are all of the assets disclosed to me

4   during the interview.  And I would note that each time

5   Mr. Cilins told me about a property, I then followed up by

6   asking, "Do you own any other properties?  Do you own any

7   other properties?" because it -- you know, because initially

8   when he reported the condo -- the three condos that he owns

9   in Hollywood, Florida, and one condo in Miami, at that time

10  he didn't mention the other condo in Aventura, Florida.

11          So I kept asking, "Are there any other properties?

12  Do you own any other properties?" and -- at which point I

13  also asked him if he owned any boats or yachts, which is not

14  something that I generally ask because most people don't.

15  But I thought that based on having this number of properties

16  and living in France, I just was inquiring about any other

17  assets.

18  **Q.**    All right.  And is that when you learned about the

19  vessel that Mr. Cilins owns as well?

20  **A.**    That's correct.

21  **Q.**    Did you get to a point to where you asked whether he

22  owned any other properties and Mr. Cilins replied no?

23  **A.**    Yes.  At the end -- the last property that he

24  disclosed to me was the one in Aventura, Florida, which he

25  said had an approximate market value of $295,000, and he

1  indicated that that property has no rental income because he

2  and his family stay there when they're visiting United

3  States, at which point he did not disclose any other

4  properties in the U.S.

5  **Q.**    Did you believe at that point, then, you had

6  exhausted the list of assets that Mr. Cilins owned?

7  **A.**    Yes.  I believed that was the entirety of his assets.

8  **Q.**    Did he at any point mention a condominium or a

9  residence on Surf Road in Hollywood, Florida?

10  **A.**    I didn't -- I wasn't able to ascertain any specific

11  addresses because Mr. Cilins could not recall the addresses.

12  **Q.**    Okay.  Did you -- did he at any point tell you about

13  a condominium valued at more than $1 million, or a property

14  valued at more than $1 million?

15  **A.**    No, he did not.

16  **Q.**    The highest value property he told you about was the

17  one in Aventura that you've just told us about, correct?

18  **A.**    That's correct.

19  **Q.**    And he didn't tell you about another property valued

20  at close to $400,000 in Hollywood, Florida, did he?

21  **A.**    No, he did not.

22  **Q.**    When Mr. Cilins was describing his various real

23  estate to you, did he seem confused or unclear in any way?

24  **A.**    No.  There was no confusion.  It was very

25  straightforward.  He shared with me that he had these condos

1   which were rented out.  I asked him if he could tell me the

2   approximate market value to the best of his ability for the

3   properties.  He did so.

4        I then asked him if he knew the rental income that

5   he was receiving for each condo.  He was very specific.  You

6   know, he said one was $1,050.  The other two in Hollywood

7   both received $1500 a month in rental income.  The smaller

8   condo in Miami, he said, was not yet rented.  It was very

9   clear.

10  **Q.**   And going back to the passport questions that you

11  asked Mr. Cilins, did you specifically ask him about other

12  passports in other countries?

13  **A.**   I did ask him if he had any -- a passport from any

14  other country, because I know that personally I have dual

15  citizenship.  I have a passport from the United States and a

16  passport from England, so knowing that he's from France, I

17  inquired about any other passports or connections with other

18  countries.

19       He said he had a passport from France, he was a

20  citizen of France, and he didn't have ties to any other

21  country, didn't have a passport from any other country.

22  **Q.**   Did he mention whether he had traveled to other

23  countries during this portion of the interview?

24  **A.**   I did not have an opportunity to ask Mr. Cilins about

25  other travel.

1  **Q.**    Did you inquire specifically about Israel?

2  **A.**    I did inquire specifically about Israel because I had

3  obtained some information that there was possibly a -- there

4  was a possibility that he may have a passport or residency in

5  Israel, and so I asked him about that.

6         I asked him if he had, you know, any residences in

7  Israel or if he lived there or was a citizen of Israel, and

8  he said no, he didn't know why that was, you know, being

9  raised because he didn't -- he'd never lived in Israel and he

10 didn't have a passport to live in Israel.

11 **Q.**    All right.

12 **A.**    But he has traveled there.  He did disclose that.

13 **Q.**    All right.

14        MS. KARASE:  That's all I have for Ms. Watson.

15        Thank you, Ms. Watson.

16        THE COURT:  Ms. Smith, I think I'm going to let the

17 interpreter have a little break, he's been working so hard,

18 so I think what we'll do is we'll take about a ten-minute

19 recess.

20        COURT SECURITY OFFICER:  All rise.

21        (Recess from 10:37 a.m. until 10:50 a.m.; all

22 parties present.)

23        COURT SECURITY OFFICER:  All rise.  This Honorable

24 Court is back in session.

25        Please be seated.

```
 1            THE COURT:  All right.  Ms. Watson is on the

 2   witness stand and she was previously sworn.

 3            And you understand you're still under oath,

 4   Ms. Watson?

 5            THE WITNESS:  Yes, Your Honor.

 6            THE COURT:  All right.  And, Ms. Smith, I think you

 7   were preparing to cross-examine Ms. Watson.

 8            MS. SMITH:  Yes, Your Honor, may it please the

 9   Court?

10            THE COURT:  Yes.

11            MS. SMITH:  Counsel?

12                        CROSS-EXAMINATION

13   BY MS. SMITH:

14   Q.    Ms. Watson, you indicated -- let me turn the mike.

15   I'm sorry.

16            You indicated that you asked questions about

17   another passport.

18   A.    Correct.

19   Q.    Okay.  Isn't it true that you actually asked if my

20   client was a Mossad agent?

21   A.    He was a what?

22   Q.    A Mossad agent, a member --

23   A.    No, I did not --

24   Q.    -- of the Mossad?

25   A.    -- ask him that.
```

1  Q.    Okay.  Did you -- where did you learn -- from who did

2  you get information about an Israeli -- possible Israeli

3  passport?

4  A.    From Ms. Karase.

5  Q.    Okay.  And do you know where that information came

6  from?

7  A.    No, I don't know.

8         THE COURT:  You're going to have to speak up,

9  Ms. Watson.

10        THE WITNESS:  Okay.

11        THE COURT:  Speak right into that microphone.  I

12  think you're going to have to pull forward a little more,

13  please.  It's a little bit hard to hear because, of course,

14  the interpreter has to interpret, so if you could please keep

15  your voice up.

16        THE WITNESS:  Yes, sir.

17        THE COURT:  All right.

18        MS. SMITH:  I'm going to reask the question just

19  since it's being recorded.

20  BY MS. SMITH:

21  Q.    Where did you learn about a possible Israeli

22  passport?

23  A.    From Ms. Kelly Karase.

24  Q.    Okay.  And when did you have that conversation with

25  Ms. Karase?

1 **A.**    It would have been April the 15th, the day that

2 Mr. Cilins was brought into custody.

3 **Q.**    And what else did Ms. Karase tell you that morning?

4 **A.**    When an individual is arrested, it's very common for

5 pretrial services to speak with either the assigned AUSA or

6 the arresting agent, because we need to obtain information

7 such as name, date of birth, FBI number if there is one, and

8 any other pertinent information.

9 **Q.**    And what other information, other than that you just

10 listed, did you obtain from Ms. Karase?

11 **A.**    There was no other information.  That was it.

12 **Q.**    Just that he had a possible other Israeli passport?

13 **A.**    That there was possibly some ties to Israel and that

14 maybe he had a passport in Israel.

15 **Q.**    Did you verify with the Israeli embassy in Washington

16 whether he indeed had a passport?

17 **A.**    Mr. Cilins said he did not, so no, I did not contact

18 the Israeli embassy.

19 **Q.**    You testified earlier that Mr. Cilins spoke English

20 well and asked you to speak slowly?  Is that what you said?

21 **A.**    When I asked him if he needed an interpreter or if we

22 would be able to complete an interview together in English,

23 he indicated that he spoke English well, but if I spoke

24 slowly he didn't think it would be a problem.

25 **Q.**    Okay.  And you actually indicated earlier that he

1    said, "I'll probably be fine."

2           Is that what he said?

3    **A.**    Something to that effect.

4    **Q.**    Did you ever tell Mr. Cilins during the course of

5    your interview that anything he told you could be used in a

6    bond hearing if the government -- against him if the

7    government determined that he was not being truthful?

8    **A.**    I did not say that to him.

9    **Q.**    Did you ever tell him that he could be denied bond if

10   the government claimed that he either underestimated or

11   overstated or omitted something from the -- from your

12   questioning?

13   **A.**    No, I did not tell him that.

14   **Q.**    You indicated that he wasn't able to give you

15   addresses at the time; is that correct?

16   **A.**    Correct.

17   **Q.**    Okay.  He gave you properties and general locations,

18   but he was unable to remember addresses.

19   **A.**    Yes, that's correct.

20   **Q.**    Were you aware that he had high blood pressure?

21   **A.**    Yes.

22   **Q.**    Were you aware that he had been without medication

23   for a period of about 24 hours at that point when you

24   interviewed him?

25   **A.**    I don't know the exact time of his last medication.

1  **Q.**     But you were aware when you interviewed him he had

2  been without medication.

3  **A.**     One moment, please.

4          I'm not aware one way or the other.  He just

5  indicated to me that he had high blood pressure, that he had

6  a prescribed medication for high blood pressure, but I don't

7  believe I inquired as to when the last time was that he had

8  medication.

9  **Q.**     Was he able to tell you the names of his medication

10 that morning?

11 **A.**     No.  He couldn't recall the name of the medication.

12 **Q.**     And could he even recall his doctor that he saw?

13 Could he recall his doctor's name?

14 **A.**     I didn't ask him that.

15 **Q.**     Did you -- you never inquired whether he owned

16 property with anyone else, did you?

17 **A.**     I asked him multiple times if he owned any other

18 property --

19 **Q.**     Did you specifically --

20 **A.**     -- and his response was no.

21 **Q.**     I'm sorry.  I talked over you.

22          Go ahead and reanswer the question, just so the

23 record's clear.  I'm sorry.

24 **A.**     Oh, I asked him specifically if he owned any other

25 properties, and his response was no after the last one which

1  was -- that he reported which was the address in Aventura.

2  **Q.**    So you never specifically asked him if he owned

3  properties in connection with other persons.

4  **A.**    No, I did not ask him that.

5  **Q.**    Okay.  So you don't know if he interpreted your

6  question, "Do you own properties?" to mean he solely or he

7  and another person, do you?

8  **A.**    I don't know how Mr. Cilins interpreted my questions.

9  **Q.**    Okay.  Did you do any checking of the properties that

10  he indicated in the pretrial services report?  Did you

11  actually run the Property Appraiser's Office website in

12  Miami?

13  **A.**    I attempted to, but it was very challenging given that

14  I had no specific addresses.

15  **Q.**    Did you run them under his name?

16  **A.**    I tried, yes.

17  **Q.**    You indicated earlier that he was -- he wasn't

18  confused, he was straightforward, and you believed he had

19  answered to the best of his ability.

20        Isn't that what you testified to with Ms. Karase?

21  **A.**    I don't believe that was -- those were -- those were

22  my words.

23  **Q.**    You asked about dual citizenship, and, in fact, have

24  you learned that he has dual citizenship?

25  **A.**    No.  He said he did not.

1  **Q.**    Okay.  And you have not received any information to

2  the contrary.

3  **A.**    No, I have not.

4  **Q.**    And you've not received any information to suggest

5  that he has any other passports other than his two French

6  passports?

7  **A.**    Well, I was only aware of one.

8  **Q.**    Okay.  But you never inquired whether he had two

9  French passports.  You only inquired whether he had dual

10  citizenship and a passport from another country.

11      Isn't that your testimony?

12  **A.**    Yes, that's correct.

13  **Q.**    So, in fact, you never asked if he had an additional

14  French passport.

15  **A.**    I wasn't aware that you could have an additional

16  French passport, so no, I didn't ask him that question.

17      MS. SMITH:  Your Honor, may I have just a moment?

18      THE COURT:  Yes.

19  BY MS. SMITH:

20  **Q.**    Isn't it very often or frequently that it occurs that

21  a client or a defendant doesn't necessarily answer

22  everything with specificity during a pretrial services

23  interview and is able to later recall additional dates,

24  times, places, telephone numbers, or the like?  Isn't that

25  your experience in 14 years?

1   **A.**   It's a rather broad question.

2   **Q.**   Okay.  I'll see if I can narrow it down.

3         It's not unusual for a person, once they've been

4   arrested -- they're in jail; they're in chains; they're in

5   shackles, especially for someone who's never been arrested

6   before -- to forget things, is it?

7         MS. KARASE:  I'm going to object to this question,

8   Your Honor.

9         THE COURT:  I'll let her answer it.  Overruled.

10        Go ahead.

11        THE WITNESS:  What I find mostly is that these

12  days, with the -- you know, with everybody having cell phones

13  is that most typically individuals have a hard time

14  remembering contact numbers because of -- the response is,

15  "Oh, everybody's phone number's in my cell phone."

16        And -- but yes, it's not uncommon for individuals,

17  as in this instance, to perhaps not be able to recall

18  specific addresses of properties they own.

19  BY MS. SMITH:

20  **Q.**   Okay.  And isn't it true that he actually indicated

21  that he made rental income -- you indicated he had no other

22  businesses, but he actually identified the rental income off

23  of the properties.

24  **A.**   Yes, that's correct.

25        MS. SMITH:  Your Honor, I have nothing further of

1  this witness.

2            THE COURT:  All right.  Ms. Karase?

3            MS. KARASE:  I'll be very brief, Your Honor.

4                    REDIRECT EXAMINATION

5  BY MS. KARASE:

6  **Q.**    When you asked Mr. Cilins about his passport, did he

7  mention whether he had any other passports?

8  **A.**    No, he did not.

9  **Q.**    How many passports did he tell you about?

10 **A.**    The one French passport that had been seized by the

11 FBI.

12 **Q.**    All right.  And he didn't tell you that he had

13 another passport locked up in a safe in France.

14           MS. SMITH:  Asked and answered, Your Honor.

15           THE COURT:  Well, go ahead.  I'll overrule it.

16           Go ahead and answer.

17           THE WITNESS:  No.  He did not make any reference to

18 any additional passports.

19 BY MS. KARASE:

20 **Q.**    And with respect to the property that's held in his

21 name, did you -- I believe Ms. Smith covered that you did

22 not find any property that was held in his name, correct?

23 **A.**    I did not, no.

24 **Q.**    All right.  But he did disclose some properties to

25 you that were purportedly held in a business's name,

1   correct?

2   **A.**     The properties that he disclosed to me, it was my

3   understanding that these properties were owned by him.  He

4   did not indicate if they were owned by a business.

5   **Q.**     And regarding this issue of high blood pressure, did

6   Mr. Cilins seem confused at any point during your interview

7   of him?

8   **A.**     No, he did not.

9   **Q.**     Did he seem to be suffering or in any kind of pain?

10  **A.**     No, he did not.

11  **Q.**     Did you inquire whether or not his blood pressure

12  condition would prevent him from proceeding with the

13  interview?

14  **A.**     I did not ask him that.  Our typical questioning in

15  regards to individuals' physical and mental health is if they

16  have any physical health issues.  We'll, you know, allow the

17  individual to respond.  If they do have some physical health

18  issue, I then follow that up by asking if they have -- are

19  currently taking any prescription medications, and if so, can

20  they, you know, recall the name of the medications.

21  **Q.**     And did you ask those questions of Mr. Cilins?

22  **A.**     I did, and the only indication of an issue was the

23  high blood pressure, and as I said, he said he had a

24  prescription for it.  And he may have known the name.  I

25  don't know, but I didn't write it down.

1          Oftentimes people can't recall the name of the

2   medication, or it may have been in French and I did not

3   understand.  But that was the only medical concern that he

4   indicated to me.

5   **Q.**    All right.  Did he indicate an unwillingness to

6   proceed because of his high blood pressure?

7   **A.**    No.  No.  He was fine.

8   **Q.**    All right.

9          MS. KARASE:  Nothing further.

10          THE COURT:  Ms. Watson, let me just ask you a

11   question or two.

12          When -- in your report on page 2 you list the five

13   properties that you referred to and you've been asked about,

14   then you have a total amount of approximate market value and

15   total of rental income.  And then the next sentence states:

16   "In addition, the defendant and his wife are purchasing their

17   home in France and have a monthly mortgage payment of 1,850

18   Euros, equivalent to $2,410 U.S. dollars.  Mr. Cilins did not

19   indicate the current market value of this residence."

20          How did -- how did the discussion transition from

21   the properties that he had here to the discussion about his

22   home in France that he and his wife are purchasing?  In other

23   words, did you ask separate -- a separate question about a

24   property that he owned in France, or how did that -- because

25   you've explained in detail how you questioned about the five

1  pieces of property.  I was just wondering how you -- if you

2  recall, how you transitioned.

3          THE WITNESS:  Well, very soon in the interview,

4  Your Honor, we ask individuals where they currently reside.

5  And given that Mr. Cilins had provided me his address in

6  France, at that time I had asked him if -- one of our

7  questions is, you know, "Are you renting that property or do

8  you own it?" at which point he indicated that he and his wife

9  are purchasing the home and they have a mortgage.

10         And I had asked him at that point what the amount

11  of the monthly mortgage payment was.

12         THE COURT:  All right.  And so the way the report's

13  written is not necessarily in the same order that you asked

14  the questions.

15         THE WITNESS:  That's correct, Your Honor, it is

16  not.  And sometimes I'd go back and forth.  Each interview,

17  as I'm sure you're aware, is different.

18         THE COURT:  All right.  And then the only other

19  question I had was about this company or this -- you say the

20  defendant -- on page 2 -- is self-employed and currently owns

21  and operates CWF, and then it states that he buys and sells a

22  variety of products.

23         Did you ask him what those products are?

24         THE WITNESS:  I did, Your Honor, and he mentioned a

25  couple of items, but the only one that I can recall him

1  saying was that sometimes he buys and sells nonperishable

2  food.

3         THE COURT:  All right.  That's all I had.

4         Did you have any other questions, Ms. Smith?

5         MS. SMITH:  Just one, Your Honor, triggered by

6  what --

7         THE COURT:  Okay.

8         MS. SMITH:  Just one, Your Honor, that was

9  triggered by what you asked.

10                    RECROSS-EXAMINATION

11  BY MS. SMITH:

12  **Q.**    You didn't ask if his wife worked, did you?

13  **A.**    I don't recall, but it looks as though I did not ask

14  him that question.

15         MS. SMITH:  Thank you, Your Honor.

16         THE COURT:  All right.  Ms. Karase, anything else?

17         MS. KARASE:  No, Your Honor.

18         THE COURT:  All right, Ms. Watson.  You may step

19  down.  Thank you.

20         Ms. Karase?

21         MS. KARASE:  Your Honor, to add to the government's

22  evidence, I do have just a few items to proffer.

23         First, with respect to the passport issue that was

24  raised at the opening of the detention hearing last week,

25  moments before the hearing began, I was provided with the

1  information that the defendant had in his possession his

2  French passport, of which we provided copies, and that was

3  seized by the FBI.

4        When the FBI agents notified the French consulate

5  to report of Mr. Cilins' arrest, as they're required to do,

6  they provided some biographical information, including the

7  passport number they had seized.  The report that was

8  returned back to them from a Ms. Pasqual Garcia was that that

9  passport was not registered, and for the record, that's the

10 passport ending in Nos. 8523.

11       MS. SMITH:  Your Honor, can we have clarification

12 which (unintelligible) passport, just for the record?

13       MS. KARASE:  Yeah.  And I think I might have

14 actually just -- just misspoke on that.  This is the 2 -- the

15 passport that was issued in 2008, and it's ending in 4852.

16       THE COURT:  All right.

17       MS. KARASE:  Sorry about that, Your Honor.

18       THE COURT:  And you said 2008, correct?

19       MS. KARASE:  Yes, that's correct.

20       The agents, of course, were concerned when they

21 heard that this passport was not registered, and admittedly

22 may have assumed, and I certainly assumed, that not

23 registered equated to invalid or somehow had other nefarious

24 meaning.

25       They located the photocopy of the passport in a

1  briefcase for the passport issued in 2007, which has the last

2  numbers of 6794.  That's the passport that Ms. Smith has

3  produced in court today that I had an opportunity to review

4  over the break.

5          Agents ran that passport number by the French

6  consulate and were told that that passport was registered,

7  that the passport ending in 4852 was in fact validly issued

8  and is valid from the dates October 21st, 2008, to October

9  20th, 2018.

10         As I've mentioned, I had the opportunity to examine

11 the other passport that was locked up in a safe in France,

12 and that's the 2007 passport ending in 6794.  This passport

13 reflects extensive travel, including numerous trips that the

14 defendant took to Guinea in 2009 and as recently as December

15 2012.

16         He seems to have been using the 2008-issued

17 passport when he travels to the United States, for the most

18 part, according to the stamps that are included therein.

19         Your Honor, I'll also proffer, and we covered this

20 a little bit in the cross-examination of Ms. Smith, but there

21 are press accounts that report that Mamadie Toure was in fact

22 the wife of former President Conte.  I don't believe this to

23 be a material fact in any regard.  However, the evidence that

24 the defense seems to be relying upon that she was not his

25 wife includes press reports, so I'd just like to proffer that

1   there are also press reports that report that she was his

2   wife.

3          With regard to the April 14th meeting at

4   Jacksonville airport, I've previously proffered that was

5   surveilled by agents and also video and audio recorded.  That

6   was a meeting between Mr. Cilins and the confidential witness

7   that took place in French.

8          An issue has been made about the $20,000 in cash

9   that Mr. Cilins brought to that meeting.  I submit to Your

10  Honor that that cash was packaged in various Western Union

11  envelopes -- I'm sorry, Wells Fargo Bank envelopes and that

12  Mr. Cilins can be seen on the video and by agents -- and was

13  seen by agents showing the confidential witness the money.

14  Also no documents were exchanged at that meeting.

15         You'll recall it's the government's position that

16  all the while Mr. Cilins was urgently seeking the production

17  of documents for their ultimate destruction and he had agreed

18  to provide money in order for the exchange of these

19  documents.  Of course, it makes sense, then, since the

20  confidential witness failed to provide the documents at that

21  meeting, failed to actually turn them over to Mr. Cilins,

22  that he in turn failed to turn over the cash that he showed

23  the confidential witness.

24         If I may have just a moment.

25         THE COURT:  Yes.

1           MS. KARASE:  Your Honor, that's all I have by way

2    of supplemental proffer, of course, subject to

3    cross-examination by Ms. Smith, and I do have argument.

4           THE COURT:  Yes.

5           Ms. Smith, do you have any additional questions?

6           MS. SMITH:  I do.

7           THE COURT:  Okay.

8           MS. SMITH:  Your Honor, I'll begin with the

9    passport.  I'll tender what Ms. Karase looked at during the

10   break and ask her to identify the Guinea -- stamps from

11   Guinea.  She indicated that there was a 2012 entrance in this

12   passport.

13          MS. KARASE:  Your Honor, on December 18th, 2012,

14   there's an entrance into Sierra Leone, which is right next --

15   next to Guinea.  Also on January 15th, 2013, there's an entry

16   stamp for the same.

17          THE COURT:  What was that last date?  I'm sorry.

18          MS. KARASE:  Looks like it's January 15th of

19   2013 --

20          MS. SMITH:  Ms. Karase --

21          MS. KARASE:  -- for a one-month stay.

22          MS. SMITH:  Ms. Karase --

23          MS. KARASE:  Hold on.  I'm not finished yet.

24          MS. SMITH:  Okay.  Go ahead.

25          MS. KARASE:  And then the Republic of Guinea is

1  March 21st, 2009, with an entry stamp.  Also December 3rd,

2  2008; also November 27th, 2008.  There's a visa that's

3  reflected for March 3rd, 2009.  It looks like there are two

4  separate visas here for the same date for Guinea.  And then

5  there are several entries for other countries in Africa, it

6  looks like, in the 2007/2008 time frame.

7          MS. SMITH:  Ms. Karase, I believe I asked you not

8  to detail every entry, which I appreciate you doing, but to

9  ask you to detail the Guinea entries for December -- for

10 2012.

11         Okay.  You testified to the Court and proffered to

12 the Court a few minutes ago that he had entered Guinea in

13 December of 2012.  That is indeed not the case, according to

14 the passport, is it?

15         MS. KARASE:  According to the passport, he's

16 entered, on December 18th, 2012, Sierra Leone.

17         MS. SMITH:  But Sierra --

18         MS. KARASE:  My understanding is it's the immediate

19 neighbor to Guinea.

20         MS. SMITH:  But you told the Court there was a

21 Guinean -- there was a Guinean entry for 2012.

22         That is not present in that passport, is it?

23         MS. KARASE:  I don't see a stamp from December of

24 2012 showing that he entered Guinea, just the neighboring

25 country.

1          MS. SMITH:  Okay.  And there are lots of

2   neighboring African countries to Guinea, aren't there?

3          MS. KARASE:  There are, yes.

4          MS. SMITH:  But there is -- contrary to your

5   representations to the Court, there is no Guinean entry and

6   no evidence that he entered Guinea in 2012, is there?

7          MS. KARASE:  I'm not sure of what other evidence

8   maybe -- that there may be that he was in fact in Guinea in

9   2012.  I know he was conducting business there, or at least

10  there's evidence that he was conducting business there, but I

11  don't have anything in the passport that you've presented

12  today.

13         MS. SMITH:  Okay.  And in fact, though, your

14  testimony was the passport would show that he was there.

15  Isn't that correct?

16         MS. KARASE:  That's correct.

17         MS. SMITH:  In fact, in the 2007 passport there's

18  no 2012 Guinean entry, is there, either?

19         MS. KARASE:  You actually had it.  I didn't have a

20  chance to look at it because you had it.

21         There's a March 19th, 2012.  I'm not sure -- I

22  can't read the top part of that stamp.  I'm not sure where

23  that one is from.

24         MS. SMITH:  What page is that stamp on?

25         MS. KARASE:  It's page 10.

1          MS. SMITH:  Are you referring to the entry from

2    Canada?

3          MS. KARASE:  Yeah, looks like it.

4          MS. SMITH:  So it's not Guinea then.

5          MS. KARASE:  It doesn't appear to be.  It's cut

6    off, but no, it does not appear to be.  It appears closer to

7    Canada.

8          MS. SMITH:  Can you identify anything else in that

9    passport that shows an entry to Guinea in December 2012?

10          MS. KARASE:  No, I don't see anything.

11          MS. SMITH:  I'm sorry.  Or in 2012 at all?

12          MS. KARASE:  No.  He had trips to Dakkar in 2012,

13   which is another South African country, I believe, and to

14   Cape Point, South Africa.

15          MS. SMITH:  And you're aware from your

16   investigation that Mr. Cilins does a lot of business with

17   African countries, aren't you?

18          MS. KARASE:  I'm not personally aware of that, no.

19          MS. SMITH:  Your agents are not aware of that?

20          MS. KARASE:  I'm not sure.

21          MS. SMITH:  Okay.  Have you attempted to verify

22   that CFW does import/export with several South African

23   countries?

24          MS. KARASE:  No, I have not.

25          MS. SMITH:  Okay.  Do you know if your agents have

 1   verified that he does business with several South African

 2   countries?

 3          MS. KARASE:  No, I do not.

 4          THE COURT:  Did you say CFW or CWF?

 5          MS. SMITH:  Yeah, but -- CWF, CFW, whatever the

 6   name of --

 7          THE COURT:  It's the same thing?

 8          MS. SMITH:  Same thing.  If I said it backwards, I

 9   said it the wrong way, Judge.

10          THE COURT:  Well, we've used CW and I didn't want

11   to --

12          MS. SMITH:  I don't want to confuse the record.  If

13   I said CF I meant CWF.

14          Have you -- well, you said that the April 14th

15   meeting was actually video and audio surveilled.

16          Who surveilled that for the FBI?

17          MS. KARASE:  There were multiple agents present,

18   Ms. -- Agent Martinez.  I can tell you Special Agent Eric

19   Adams was one of those who was watching -- who was watching

20   and that it was audio recorded.

21          MS. SMITH:  And which one of those agents has

22   completed the transcripts, the English draft transcripts?

23          MS. KARASE:  I'm not sure.

24          MS. SMITH:  Okay.  Which one those agents speaks

25   fluent French and Guinean Creole French?

1          MS. KARASE:  I'm not sure.

2          MS. SMITH:  In fact, do any of those agents speak

3   French?

4          MS. KARASE:  I don't know.  I know that there was a

5   French interpreter that was on site though that was

6   assisting.

7          MS. SMITH:  Is that the young lady that was in the

8   back of the room the other day, the cocoa-colored skin, very

9   thin, young, pretty young lady who was sitting in the second

10  row?

11         MS. KARASE:  She was present there on April 15th --

12  April 14th.

13         MS. SMITH:  Is she an agent or is she an

14  interpreter?

15         MS. KARASE:  She's an interpreter.

16         MS. SMITH:  Okay.  Certified in French or in

17  Guinean Creole?

18         MS. KARASE:  I'm not sure.

19         MS. SMITH:  You don't know what language she's

20  certified in?

21         MS. KARASE:  I do not.

22         MS. SMITH:  Do you know if she's certified at all?

23         MS. KARASE:  I do not.  I know that she's employed

24  by the FBI.  I believe she's a -- she works for the FBI, and

25  that's -- her role is an interpreter, but I don't know what

1  certifications she holds.

2         MS. SMITH:  Okay.  What evidence do you have to

3  prove that any of the docs that Mamadie Toure was attempting

4  to sell, give, blackmail, or whatever term or that Mr. Cilins

5  was attempting to purchase were actually real, bona fide

6  documents?

7         MS. KARASE:  I don't know that that matters at all.

8         I would object to relevance, Your Honor.

9         THE COURT:  Well, if you don't know, you can just

10  say you don't know.

11         MS. KARASE:  I don't know.

12         MS. SMITH:  You don't know that they were real or

13  if they were fakes.

14         MS. KARASE:  Other than the value that your client

15  put on them, no, I don't.

16         MS. SMITH:  Okay.  You've listened to the tapes, or

17  agents have listened to the tapes, and have heard Mamadie

18  actually admit to not being married to Lansana Conte?

19         MS. KARASE:  I don't know.

20         MS. SMITH:  Why did you presume and tell Ms. Watson

21  that there was an Israeli passport or there was some travel

22  to Israel?

23         MS. KARASE:  We have information about your

24  client's extensive relationship with Beny Steinmetz and

25  believe that he has ties to Israel.

1        MS. SMITH:  Do you have any evidence of any travel

2   to Israel?

3        MS. KARASE:  There are a couple stamps in the

4   passport you presented that I can't make out.  I don't know

5   what language they're in.  I don't know if that is -- if that

6   reflects travel stamps to Israel or not.

7        MS. SMITH:  You don't know if it's Arabic or

8   Hebrew?

9        MS. KARASE:  I do not.

10        MS. SMITH:  And the stamps you're referring to have

11   French, and they're on page, I believe, 30?

12        MS. KARASE:  I only had a few minutes with it over

13   the break, so I think that there were a few that were in this

14   language that I don't recognize.  Page 30 -- and I'd ask if

15   we could get a copy of this for admission into the record

16   since we've had so many references to it.

17        I believe it is just on page 30.  I haven't gone

18   through every page, but I believe that it was just on page

19   30.

20        MS. SMITH:  And it's your -- it's your admission

21   today that there were no documents exchanged or destroyed

22   from between the time this investigation began and today's

23   date; is that correct?

24        MS. KARASE:  No, it's not correct.

25        MS. SMITH:  Okay.  What evidence do you have that

1  documents were actually destroyed?  You testified a few

2  minutes ago that no documents had ever been exchanged.

3          MS. KARASE:  I testified that no documents were

4  exchanged on April 14th --

5          MS. SMITH:  What evidence do you have --

6          MS. KARASE:  -- of 2013.

7          MS. SMITH:  Okay.  What evidence do you have that

8  between your -- March, when Mamadie Toure and Mr. Cilins

9  began talking in March, and April 14th that any documents

10  were destroyed?

11          MS. KARASE:  It's my understanding -- well,

12  destroyed, I don't.  I don't know.  But it's my

13  understanding -- you asked me whether documents were

14  exchanged or destroyed, and it's my understanding that our

15  confidential witness did provide some documents, some, I

16  believe, copies of documents, to Mr. Cilins at one of the

17  earlier meetings.

18          MS. SMITH:  That's not reflected in the complaint,

19  is it?

20          MS. KARASE:  No, but every fact of the

21  investigation is not reflected in the complaint.

22          MS. SMITH:  And, in fact, Ms. Mamadie Toure is

23  seeking immunity for her criminal acts in regard to the

24  underlying Federal Corrupt Practices Act investigation; isn't

25  that correct?

1          MS. KARASE:  I can tell you that a confidential

2    witness -- that our confidential witness is working with the

3    government in hopes to obtain some benefit regarding prior

4    criminal conduct.

5          MS. SMITH:  In regards to the complaint.

6          MS. KARASE:  That's right.

7          MS. SMITH:  And you have no evidence that she was

8    threatened, harmed, or there was any physical force applied

9    to her?

10          MS. KARASE:  Can you be a little bit more specific?

11          THE COURT:  Are you talking about as to Mr. Cilins?

12          MS. SMITH:  Excuse me?

13          THE COURT:  Are you talking about as to Mr. Cilins?

14          MS. SMITH:  As to Mr. Cilins.

15          Did he threaten her?

16          MS. KARASE:  I don't know.

17          MS. SMITH:  You have no evidence that he harmed her

18    between March -- between the time your investigation began

19    and currently, that he's ever harmed her.

20          MS. KARASE:  I don't know whether he has or not.

21          MS. SMITH:  BSGR is a multinational company?

22          THE COURT:  Are we getting outside the rebuttal at

23    this point?

24          MS. SMITH:  We probably are, Your Honor.  I think I

25    can proffer that.  I think she's argued sufficiently to that

1   previously.

2           If I can have just a moment, I think I'm done.

3           THE COURT:  Yes.

4           MS. SMITH:  Your Honor, I'm done.

5           THE COURT:  All right.  What about these passports,

6   now?  It seems like we should have copies of them for the

7   record.

8           MS. SMITH:  I have a copy that I'll provide to the

9   Court of the 2008.  I believe the 2007 we've already -- I

10  don't know if we put that one in the record, a full,

11  complete, color --

12          MS. KARASE:  I think we've reversed it.  You've

13  produced today the 2007.

14          MS. SMITH:  Yes.

15          MS. KARASE:  I have the 2008 --

16          MS. SMITH:  I did.

17          MS. KARASE:  -- that was seized from him, and I

18  thought that we previously provided copies for the Court, but

19  perhaps not.

20          MS. SMITH:  We provided black and whites.  I'm not

21  sure we provided colors.

22          THE COURT:  I'm not sure it was the complete

23  passport, but let's -- let's -- why don't we just get that

24  organized while we take a break.  I want the interpreter to

25  have a little break before we start arguing, or if there's

 1  any additional proffer.

 2          MS. SMITH:  I don't believe there's any additional

 3  proffer on our part.

 4          THE COURT:  All right.  And then, Ms. Chaddock,

 5  could you just make sure we have whatever exhibits we need to

 6  have, and then we'll proceed probably in about 15 minutes,

 7  all right?

 8          COURT SECURITY OFFICER:  All rise.

 9          (Recess from 11:27 a.m. until 11:47 a.m.; all

10  parties present.)

11          COURT SECURITY OFFICER:  All rise.  This Honorable

12  Court is back in session.

13          Please be seated.

14          THE COURT:  All right.  It looks like we have all

15  of our exhibits.  Let me just see.

16          I feel like I'm missing something.  Do I have a --

17  do I have a copy of the -- both passports?

18          You have the other one.  Okay.

19          MS. SMITH:  Your Honor, I'd like to move that into

20  evidence.  It's the 2007 passport that I told Your Honor I

21  had this morning.  Also with -- as to page 30 and 31, I can

22  tell -- I can assure the Court that it's not Hebrew.

23          It looks to me to be North -- it's Arabic, is what

24  the writing is.  My client has indicated, after I showed it

25  to him, that it is actually Morocco, and the stamp would

1  indicate it probably would be a North African country because

2  it uses the word *sortie*, which is French for leaving, *entree*,

3  which is French for entering, and then it has the Arabic.  So

4  that is the one that was mentioned that she was unable to

5  read on pages 30 and 31.

6          THE COURT:  All right.  I don't even know if I've

7  received any of these.  I know you all have submitted all of

8  these exhibits.  Why don't I just quickly run through what

9  the exhibits are, and I'll make sure that if there are any

10  objections, they can be lodged, and then I can decide whether

11  we'll receive them.

12          Let me start with the government's exhibits.  We

13  have Exhibit 1 was the -- or is the first page of the

14  passport of Mr. Cilins that -- this is the 6794; is that

15  right?

16          MS. SMITH:  We've used the year, judge, so we don't

17  get confused.  I think it's the 2000 --

18          MS. KARASE:  That's the 2007 one, yes, Your Honor.

19          THE COURT:  Yes.  You can barely see 2007, but I

20  see it here, and then the expiration is 2017, so that is the

21  front, basically, page of that.

22          And then Government's Exhibit 2 is the front page

23  of the 2008 passport.  And then Government's Exhibit 3 is a

24  color copy of the 2008 passport.

25          Those are the three government exhibits; is that

1  right, Ms. Karase?

2          MS. KARASE:  Yes, Your Honor.  And to the extent

3  they've only been marked for identification purposes, I'd

4  hereby move them into evidence.

5          THE COURT:  All right.  And is there any objection

6  to that?

7          MS. SMITH:  No, Your Honor.

8          THE COURT:  All right.  So Government's Exhibits 1,

9  2, and 3 will be received.

10          (Government's Exhibits 1 through 3 were received in

11  evidence.)

12          THE COURT:  All right.  Now, in terms of the

13  defendant's exhibits, Composite Exhibit 1 are the

14  documents -- or Exhibit 1 is made up of the documents related

15  to the property that the defendant is offering to post.  Then

16  Defendant's Exhibit 2, a composite exhibit, is the -- is the

17  information concerning the passport.  Again, I'm looking at

18  the number, but this is, I think, the 2007 passport.

19          Is that right?

20          MS. SMITH:  May I just take a look at it?

21          THE COURT:  Yes.  Yes.  And the second page is

22  French, and the first page, I believe, is the translation.

23          MS. SMITH:  Actually, Your Honor, just to correct

24  the record, it actually applies to both passports --

25          THE COURT:  To both.

1      MS. SMITH:  -- and it certifies that both were

2  legally issued in France in his hometown, and so it's for

3  both passports.

4      THE COURT:  All right.  Thank you.

5      And then Defendant's Exhibit 3 is from the

6  consulate, the French consulate, in Atlanta with respect to

7  both passports, and it essentially states that both passports

8  are still valid.

9      And then Defendant's Exhibit 4 is the letter from

10  an assistant United States attorney in the Southern District

11  of New York to Magistrate Judge Francis.

12      And Defendant's Exhibit 5 is a color copy of the

13  2007 passport.

14      Now, have I mentioned all of your exhibits,

15  Ms. Smith?

16      MS. SMITH:  Yes, Your Honor, and to the extent that

17  they were just previously identified and not moved into

18  evidence, I'd move them in at this time.

19      THE COURT:  All right.  Thank you.

20      Is there any objection?

21      MS. KARASE:  No, Your Honor.

22      THE COURT:  All right.  So the government's --

23  excuse me, Defendant's Exhibits 1 through 4 will be received

24  into evidence -- 5, I'm sorry.  I said 4 and I'm looking

25  right at the number 5.  I apologize.  It's 5.

1          (Defendant's Exhibits 1 through 5 were received in

2    evidence.)

3          THE COURT:  Now --

4          MS. SMITH:  Your Honor?

5          THE COURT:  Yes.

6          MS. SMITH:  With regards to the mortgage documents,

7    I don't know.  Do we want to admit -- I guess it depends on

8    what you're going to do, if you're going to grant bond or

9    not, because those are actually signed mortgages, and I don't

10   want to have them running out and around everywhere.

11         THE COURT:  Yes.

12         MS. SMITH:  So I don't really know that I want to

13   admit those if you're not going to actually grant bond.

14         THE COURT:  Yeah.  Let's not -- let's not admit

15   them as evidence.  They're identified, so I'll withdraw that.

16   They're identified as Defendant's Composite Exhibit 1.

17         MS. SMITH:  Okay.

18         THE COURT:  And you have the originals right now?

19         MS. SMITH:  I do.  I have the originals that I gave

20   to you so that you could review them over the weekend.  I do

21   have the folder here, so --

22         THE COURT:  All right.

23         MS. SMITH:  -- what I'll do is I have copies we can

24   switch out for the identification purposes if we need to do

25   that rather than admitting originals, if Your Honor's not

1  going to grant bond.

2        THE COURT:  Well, here's -- here's what I'm

3  thinking so we can decide how we want to spend our time

4  together for the next hour or so.

5        I'm going to listen to argument from both of you

6  and give you an opportunity to say whatever you want, within

7  some time constraint, only because I have hearings this

8  afternoon.  And then I'm going to take the matter under

9  advisement.  I want to get those mortgage documents back and

10 have them at least for consideration as I go through them.

11       I have inquired with the court in Ocala and Orlando

12 how they go about posting property, and I know -- and I know

13 this probably will look terrible on a cold record, but things

14 are just done a little different in Jacksonville.

15       I think in 19 years as a prosecutor, I probably saw

16 property posted less than five times.  It's usually -- I

17 guess it's just usually done differently, and so sometimes I

18 feel like we're an outpost here, Fort Jacksonville as we used

19 to say.

20       So I really want a little more time to study

21 those --

22       MS. SMITH:  That's fine.

23       THE COURT:  -- in connection with what I've been

24 advised by the other courts on how they handle property, and

25 I want to consider that all together with everything that has

1  been proffered, the documents and exhibits that have been

2  submitted, and the argument that you all make.

3          MS. SMITH:  And, Your Honor, with regards to the

4  mortgage documents, as I said, we do need -- if you're going

5  to use them, they're going to need to have some typographical

6  corrections.

7          THE COURT:  Yeah.

8          MS. SMITH:  I think Ms. Karase pointed out this

9  morning that there's actually a value problem on the one

10 page.  Looks like somebody copied it over.  It only changes

11 the value by $80,000, so it's not significant in the amount

12 of property we're talking about.

13         But Judge Baker is the go-to man in Orlando, if

14 you're not aware of that.  He's the one --

15         THE COURT:  Oh, no, I'm -- that's who I've gone to.

16         MS. SMITH:  These are the documents he's had us

17 prepare for him dozens of times, so --

18         THE COURT:  I thought so once I -- once I received

19 the information on how he does it, it looked to me like you

20 probably had conformed to the way that he accepts those

21 documents.

22         And then if you can -- and if you can't do it

23 now -- I haven't done it yet, but if you could total the

24 value of what the properties are worth just at some point so

25 we have that.

 1          MS. SMITH:  I can do that.

 2          And, Your Honor, with regards to the mortgages, we

 3     don't have the one for the residence, the vacation residence.

 4          THE COURT:  The Turnberry?

 5          MS. SMITH:  The Turnberry.

 6          Obviously if Your Honor was going to grant and

 7     allow -- and accept that as surety, I would prepare the

 8     mortgage documents in conformance with whatever rules that

 9     need to be -- and I'll go ahead and take responsibility for

10     preparing them and get those to Your Honor, you know, subject

11     to Ms. Karase seeing them.

12          THE COURT:  All right.  All right.  Thank you.

13          All right.  Well, Ms. Karase, any other

14     housekeeping matters before you begin your argument?

15          MS. KARASE:  Yes, briefly, Your Honor.  You

16     mentioned that you will take the matter under advisement.

17          Do you have an expectation as to when you may wish

18     to see us back?  The only reason I ask is I have an

19     appointment out of the office that I can't miss at 3 o'clock

20     this afternoon.

21          THE COURT:  No.  No.  I was thinking we have this

22     set for Monday for the preliminary hearing, and I think the

23     record's clear about my miscommunication on that, and I

24     apologize again for it.

25          But I have it set on Monday, and so I'm thinking

1  that by Monday at the appropriate time I'll have made a

2  decision, so I'm going to use this weekend, or at least part

3  of it, to review all of these matters.

4          MS. KARASE:  Yes, Your Honor.

5          THE COURT:  All right.  Any other housekeeping

6  matters?

7          MS. KARASE:  None from the government.

8          THE COURT:  All right.  Well, then, you may proceed

9  with argument.

10         MS. KARASE:  Your Honor, in examining the 3142(g)

11 factors under Title 18, we look to the nature and

12 circumstances of the offense charged, which is factor 1, and

13 also factor 2 is the weight of the evidence against the

14 person.  Given the facts of this case, I'd like to take both

15 of those factors together, because I think they are

16 intertwined significantly.

17         We've heard a lot throughout the hearing about

18 events that happened as early as 2002, 2003, 2005, and it

19 makes for a very interesting story, frankly.  As Ms. Smith

20 pointed out, she'd only been on the case for about a week and

21 a half, and the same is true for me, so we both have had some

22 getting-up-to-speed work to do.

23         However, I think that the critical time period that

24 we need to focus on begins in early March 2013.  Despite the

25 interesting story and significant motivation that is told by

1   the preceding years, the important time frame is what

2   happened beginning in early March 2013.

3           We know from the evidence that the defendant had

4   multiple communications with the confidential witness, and

5   it's disclosed that that confidential witness is hoping to

6   receive from -- some benefit from that person's assistance

7   with law enforcement.

8           That witness assisted the FBI with three recorded

9   telephone calls that are specified in the complaint, and

10  those took place on March 15th, March 16th, and March 20th of

11  2013.  There were various negotiations that took place all

12  having to do with the return and the destruction of documents

13  relating to mining concessions in Guinea.

14          Now, there's been some discussion about whether or

15  not these were valid contracts or originals or whether they

16  had been altered, but it's clear from the communications that

17  this witness had -- that -- I'm sorry, that the confidential

18  witness and Mr. Cilins had that these documents, whatever

19  Mr. Cilins believed the witness to have, were of great value.

20          I had mentioned in my cross-examination of

21  Ms. Smith a reference to paragraph 16 (c) on page 10 of the

22  complaint in which there's an individual identified as CC1

23  who's further disclosed as a high-ranking individual within

24  the Entity.  It's represented here that Mr. Cilins told the

25  confidential witness that of course, this high-ranking

 1  individual within the Entity had agreed to the sum of money

 2  that the confidential witness had requested, and this sum of

 3  money was in return for the destruction of documents.

 4       These recordings, these conversations, were not

 5  taking place in code.  There was some reference in the

 6  telephone calls that Mr. Cilins did not wish to go into

 7  specifics on the phone, which I think the Court can infer the

 8  nefarious nature, then, of the subject of their

 9  communications due to his unwillingness to go into details.

10  However, they did talk about these documents on the

11  telephone.

12       And we have further information as to exactly the

13  subject of their communications from their face-to-face

14  meetings, at which Mr. Cilins clearly felt more comfortable

15  getting into specifics in terms of dollar amount, in terms of

16  what he expected the confidential witness to falsely tell the

17  government investigators, as well as private investigators,

18  and what he expected to have into the documents that he so

19  eagerly sought.

20       Those meetings took place on March 25th, April

21  11th -- there were actually two meetings on April 11th -- and

22  on the date of his arrest, April 14th.  Again, these meetings

23  were not conducted in code.

24       Mr. Cilins offered to provide a script to the

25  confidential witness during the March 25th meeting to provide

1   the confidential witness with answers in case the

2   confidential witness was ever questioned about these prior

3   contracts, this prior relationship that she had with the

4   Entity.  Mr. Cilins was clearly acting on behalf of the

5   Entity in conducting these negotiations.

6          In paragraph 18(c) of the complaint, there's a

7   reference to what Mr. Cilins and the confidential witness

8   should do if the American government got involved.

9   Mr. Cilins was clear that they needed to destroy the papers,

10  and this was a preventative matter in light of a potential

11  investigation by the government of the United States.

12         The conduct gets even more egregious at the meeting

13  on April 11th, 2013.  The confidential witness reported that

14  the FBI had approached the witness, and Mr. Cilins indicated

15  repeatedly the need to destroy the documents urgently.

16         He was informed that there was a pending grand jury

17  investigation, as the confidential witness reported that a

18  grand jury subpoena was threatened to be served upon this

19  person.  And in case there was any doubt, a document was

20  provided in French that explained exactly what a grand jury

21  is.

22         Now, the defense has intimated that because

23  Mr. Cilins was willing to appear in the United States knowing

24  of a potential investigation and then appear again knowing of

25  the pending investigation somehow exonerates him.  And, Your

1  Honor, I submit that the contrary is true.  Once he learned

2  of the pending investigation, he became all the more

3  desperate.  It became all the more important to destroy the

4  documents.

5          Now, there's been references that, well, really the

6  only thing that has been critiqued about the meetings and the

7  recorded calls that took place in March and April of 2013 was

8  that the government's relying upon English summaries of

9  conversations that took place in French, and that's true.

10 But as I've mentioned, these conversations were not conducted

11 in code.  These are individuals that had a longstanding prior

12 relationship.

13         As recently as within the last year, as Ms. Smith

14 proffered, they were conducting legitimate business

15 transactions together.  They were speaking freely with one

16 another.  And Mr. Cilins was clear with his directions to

17 destroy the documents and to do so urgently.

18         He emphasized the importance that he needs to be

19 present when the documents are destroyed.  He suggested that

20 the confidential witness may want to deny having ever been

21 married to the Guinean official to whom the witness was

22 married previously.  He instructed that the situation was

23 very urgent and that they had to meet again soon.  He also

24 instructed that she needed to deny the existence of any

25 contracts.

1          Now, there have been questions about whether these

2     contracts were valid or not posed by the defense through

3     these proceedings, and all of these challenges are overcome

4     by the fact that the defendant was willing to pay $1 million

5     to the confidential witness for the witness's cooperation in

6     following his instructions.  This includes the instruction

7     of the destruction of documents and the denial of previous

8     affiliation with the mining concessions and receipt of money

9     in return.

10          At the end of the meeting they discussed the

11     immediate exchange of money --

12          THE COURT:  This is on 4/11 still?

13          MS. KARASE:  On 4/11, yes, Your Honor.

14          And they talked about -- this is actually the

15     second meeting that took place on April 11th.  At the first

16     meeting they talked about how $1 million would change hands

17     as part of this agreement.  But at the second meeting on

18     April the 11th, the confidential witness expressed a concern

19     to Mr. Cilins about receiving money now, and this is in

20     paragraph 22(a) of page 16 of the complaint.

21          Mr. Cilins said he'd see what he could do, and he

22     tried to get $50,000 together to give to the confidential

23     witness.  A subsequent meeting was arranged on April 14th,

24     just three days later, again, at the Jacksonville

25     International Airport.  Mr. Cilins produced several envelopes

1    from the Wells Fargo Bank containing $20,000 in United States

2    currency.

3           We know from the confidential witness and from

4    agents that Mr. Cilins offered the confidential witness a

5    peek inside the bag in which the $20,000 in cash was held.

6    There was some discussion about the documents -- I submit a

7    heated discussion, as it's been relayed to me -- and the

8    confidential witness was not willing to produce the

9    documents, and in turn, Mr. Cilins did not turn over the

10   $20,000.

11          The offense in this case -- the offenses were

12   continuous and quite egregious.  This wasn't a single

13   instance of obstruction.  This was repeated contact and

14   repeated attempts to interfere with an investigation.  The

15   recordings that have taken place in this case make this a

16   very strong case against the defendant.

17          So going back to the factors, factor No. 2, this is

18   a very strong case against the defendant, Cilins.  And

19   because of the nature of the offense, the continuity of it,

20   how egregious it was -- he blatantly told the confidential

21   witness to lie and did so in writing by producing an

22   attestation to her for her to sign -- make the offense all

23   the more egregious.  Factors 1 and 2 certainly weigh in favor

24   of detaining this defendant.

25          We also look at the history and characteristics of

1   the person, and we don't know of any prior arrest history

2   that Mr. Cilins has, but we do know about his first encounter

3   with law enforcement here in the United States.  When he's

4   interviewed by pretrial services, by a veteran officer who

5   has 14 years on the job, he fails to disclose several facts.

6           And Officer Watson had no doubt that they were

7   communicating freely and that Defendant Cilins understood

8   exactly what was being asked of him and that he was

9   communicating appropriately to indicate that he understood

10  her.

11          He failed to disclose that he had another passport.

12  When asked about his passport, he only identified the one

13  that had been seized by the FBI.  When asked about the assets

14  that he had, he left off the two most valuable properties

15  that he claims to own now, and I say claims to own because

16  frankly I don't know what else may be out there that he owns.

17          The defense has intimated that this could be the

18  result of a language barrier, high blood pressure, but

19  Officer Watson told us that he did not appear under any kind

20  of duress, that he understood the questions that were asked,

21  and he provided great detail about the properties that he did

22  disclose.

23          Conveniently, he forgot to disclose the two most

24  valuable properties, one of which is valued at five times the

25  amount -- well, significantly more.  I won't muddy the record

1   with my math, but significantly more than the other

2   properties that he has disclosed.  Your Honor, I submit that

3   this is -- was an intentional omission.

4        Now, from the cross-examination that the defense

5   conducted of Ms. Watson, it seems they are trying to split

6   hairs, that, "Well, you didn't ask him about -- you didn't

7   specify about whether it was property he owned alone or

8   property he owned with others."  The five properties that he

9   did disclose were also held in a corporation's name, and

10  clearly he disclosed those, but he failed to disclose the two

11  most valuable properties.

12       The other explanation that he's provided is that he

13  didn't have the advice of counsel --

14       THE COURT:  But the only reason, though, we know

15  that he has those two other properties is because he's come

16  forward with that, right?

17       MS. KARASE:  He has, in an attempt to persuade the

18  Court to release him on a bond and to offer those as

19  security, which gets to another factor that's included under

20  the history and characteristics of the person, and that's the

21  financial resources of the defendant.

22       We've learned, despite his income that is around

23  37,000, I think -- let me double-check -- $32,578 U.S.

24  dollars annually, he has significant property.  He also has

25  other business enterprises that were not disclosed to

1  probation.  He only identified one company when he clearly is

2  involved in many more based upon the evidence gleaned from

3  the detention hearing.

4       THE COURT:  Can you list those for me then?  I

5  mean, I know the one that he listed in the -- he gave to

6  pretrial services, but what are the other businesses or

7  companies that he's involved in?

8       MS. KARASE:  Hollywood Beachfront Townhomes, LLC,

9  and Pha Investments, LLC.

10      Officer Watson specifically asked him whether he

11  had any other companies, and he said no.

12      THE COURT:  But he did, though -- and I don't want

13  to credit him with something I shouldn't.  That's why I'm

14  asking you now, but he did reveal rental income from those

15  properties owned by the companies that you listed.

16      MS. KARASE:  He did.

17      THE COURT:  All right.

18      MS. KARASE:  He did.  But we've also learned about

19  other business ventures that he had with Mamadie Toure, and I

20  don't know the specifics of those.  Ms. Smith didn't know the

21  specifics of those in response to my questions, but they

22  included activities beyond just consumer products.  I believe

23  she mentioned him opening a school and other activities that

24  he was involved with her as recently as the past year.

25      So this would be beyond the disclosure that he gave

1  to pretrial services regarding his affiliation with just the

2  one company or at least business that the one company in

3  which he is involved conducts.

4        Also the government has proffered that he has a

5  very close personal relationship with Beny Steinmetz, of Beny

6  Steinmetz Group Resources, who, by the defense's own

7  admission, is one of the wealthiest men in Israel.

8        So getting back to the financial resources

9  component of the history and characteristics of the person,

10  he has access to significant financial resources, in addition

11  to the fact that he's able to afford a 24-hour guard, so he

12  says, which frankly, Your Honor, if he can find the financial

13  resources to pay for someone to guard him 24 hours, he

14  certainly can find the financial resources to pay someone to

15  get him out of the country, which is the primary concern of

16  this detention hearing.

17        The government is seeking his detention based on

18  risk of flight, and his financial resources, his extensive

19  financial resources, are indicative of the ability to flee.

20  Once this defendant is gone, he's gone.  If he makes it back

21  to France, we can't extradite him.  We can't get him back

22  here.

23        Now, we've heard an offer of electronic monitoring.

24  I spent the better part of last evening on the phone with

25  marshals and FBI agents trying to track down a local

1   defendant who was under 24-hour electronic monitoring who cut

2   off his bracelet and disappeared.  He has yet to be

3   apprehended, and he doesn't have near the resources -- he's

4   quite indigent -- that Mr. Cilins has.  He didn't have the

5   international connections that Mr. Cilins has.  He didn't

6   have the international travel that Mr. Cilins has.

7          Of course Your Honor's aware Mr. Cilins is not a

8   United States citizen or legal permanent resident.  He's

9   identified properties in Florida, but he doesn't have any

10  other ties to the United States that we've heard about.

11         Clearly he had access to quite a lot of cash, by

12  his presentation of $20,000 in cash at the April 14th

13  meeting.  He had another $1,000 on his person at the time of

14  his arrest.

15         THE COURT:  Another what?  I'm sorry?

16         MS. KARASE:  Another $1,000 on his person at the

17  time of his arrest that we believe to be travel money.  Not

18  certain.

19         He is looking at a significant amount of time, and

20  for someone who's never done time before, this creates a

21  strong incentive to flee.  His guideline range for the

22  offenses with which he's charged are 262 months to 327

23  months.

24         MS. SMITH:  Your Honor, I hate to object at this

25  point in time, but that is not the actual law.  There is

1  binding case law that -- so I object to that portion of the

2  proffer.

3         The binding case law of this court and every court

4  in the country says it is capped at level 30.  I've spoken

5  with the Sentencing Commission.  I have the case.  It's

6  *Giovanelli* out of the Second Circuit.  It's followed by every

7  circuit in the country, and it caps at level 30, which

8  would -- if convicted, if go to trial, would be 97 to 121

9  months.  That's without any reductions for acceptance if

10 he -- substantial assistance, minimal -- any other sort of

11 reduction.  That is with the -- the cap.

12         I have spoken with New York, with the probation

13 office in New York.  The cap is level 30.

14         THE COURT:  All right.

15         MS. SMITH:  And I will provide that, but I do want

16 to lodge that as an objection.

17         THE COURT:  All right.  Thank you.

18         MS. KARASE:  And, Your Honor, for what it's worth,

19 Ms. Smith and I did talk about the guidelines previously, and

20 I went through my calculation with her.  And when we spoke

21 previously, she had told me that, "Oh, yeah, I see where you

22 came up with that."  I missed -- I missed a certain -- the

23 offense -- one of the enhancements.

24         In any event, the statutory maximum sentence that

25 he's facing on just one of the counts is 20 years

1   imprisonment, so he's looking at significant time.

2          I mentioned his lack of ties to this community in

3   that he -- other than the property that he has, we haven't

4   heard about any family or close contacts -- there's been no

5   third-party custodian that's been offered -- to the Middle

6   District of Florida or to the United States in general, for

7   that matter.

8          For all of these reasons, Your Honor, the

9   government asks that Mr. Cilins be detained pending trial.

10          THE COURT:  All right.  Thank you.

11          Ms. Smith?

12          MS. SMITH:  Yes, Your Honor.

13          THE COURT:  Ms. Smith, when you said that the

14   guidelines are capped -- I'll be interested to look at the

15   case -- does that mean the base offense level or just after

16   all enhancements or how does that work?

17          MS. SMITH:  If I may just get to the podium, Your

18   Honor?

19          THE COURT:  Certainly.  And I'm sorry to start like

20   that.

21          MS. SMITH:  No, no, no.  That's fine.

22          Your Honor, in response to the question of the

23   Court and to Ms. Karase with regard to the guidelines, when

24   she and I were at the hearing on the 18th, I asked her how

25   she calculated.  She showed me a set of calculations.  I

1  looked at the guidelines and said, okay, maybe she's right;

2  maybe she's not, because it wasn't how I had previously read

3  the guidelines.

4        I did research.  I called the Sentencing Commission

5  and spoke with Keland Culbreath (phonetic) at the Sentencing

6  Commission.  The maximum under *United States versus*

7  *Giovanelli*, G-i-o-v-a-n-e-l-l-i, which is a Second Circuit

8  case, 464 F.3d 346, decided September 27th of 2006 -- in that

9  case the defendant was accused and convicted of obstruction

10  with regards to an underlying murder case, and I've got

11  copies for the Court.

12        The Court explained that you start with 2J1.2,

13  because that's where obstruction goes is 2J1.2.  If there is

14  a cross-reference, you go to 2X3.1 for the accessory after

15  the fact.  My original reading under the background, which is

16  binding, the background says an underlying -- an underlying

17  offense is the offense of conviction.  In other words, in

18  this case it would have to be the FCPA violation, is how I

19  read it based upon the term of art.

20        However, I must be the only person in the country

21  reading it that way, even though it says that in the

22  commentary.  The courts who have looked at it have said no,

23  this is just a pointer back to the FCPA.  The base offense

24  level gives what the bases would be, but in no circumstances

25  is the cap over 30 under the *Giovanelli* case.

 1          And if you read the actual guideline itself,
 2    *Giovanelli* scored out at -- base offense level for homicide
 3    is 43.  The Court scored him with -- and went through this
 4    long analysis, and I'll read to the Court:  "His base offense
 5    level as an accessory, pursuant to 2X3.1(a), was six levels
 6    lower than the offense level for the underlying offense,
 7    homicide, with a cap at level 30.  Since the base level for
 8    homicide is level 43 (see the guidelines at 2A1.1)
 9    Giovanelli's base offense level was capped at 30."
10          Then they combined it with his criminal history,
11    which is Category III, and they come up with 121 to 152
12    months, and that is at pages 340 -- excuse me, 352 and 353 of
13    the guidelines.
14          Obstruction is -- if he's convicted is obviously
15    punished severely, but not near as severely as the underlying
16    offense.  So this is -- I'll tender the case to the Court.  I
17    also tender a copy to Ms. Karase.
18          And, again, I spoke with Keland Culbreath at the
19    Sentencing Commission after I read everything, and he
20    explained that, again, I was the only one reading it, that
21    you didn't apply the accessory at all because of the
22    underlying offense of conviction, that everyone has
23    interpreted it to mean that it's just a pointer back to the
24    other offense, not an actual requirement of the conviction.
25          So the maximum sentence he could serve if convicted

1  on this, barring any managerial enhancements, which I

2  don't -- there's nothing in the complaint to suggest that

3  there would be some, would be 97 to 121 months.

4         MS. KARASE:  Your Honor, I'd just object to the

5  maximum sentence that he could serve.  Of course, the

6  guidelines are not binding.

7         MS. SMITH:  I understand that.  The maximum under

8  the guidelines, Your Honor.  I'll stand corrected.

9         I did speak with both attorneys in the Southern

10 District of New York as well as probation, and they've

11 indicated that typically in cases such as this, there is no

12 upward departure, barring a managerial upward departure,

13 so . . .

14        Did Your Honor have any other questions about that

15 before I get to my argument?  And, Your Honor, there is

16 another -- there are other cases.  *Gilmore* is the most

17 close -- it's just straight on it.  It basically explains how

18 to calculate the guidelines.

19        And if I could have just a moment and -- I sort of

20 got out of place with where I wanted to go.

21        THE COURT:  That's fine.

22        MS. SMITH:  Thank you.

23        Your Honor, it is the government's burden -- it's

24 the government's burden here, and they have two burdens.  The

25 first burden is they must prove by a preponderance of the

1    evidence that Mr. Cilins is an actual or serious risk of

2    flight; not just that he may flee, but that he is an actual

3    or serious risk of flight.  If they don't get past that first

4    hurdle, 18 U.S.C. 3142 says you have to fashion conditions

5    and release him.

6           If they do get over that first burden and that

7    first hurdle, they must prove by a preponderance of the

8    evidence that there are absolutely no conditions or no

9    combination of conditions that will reasonably -- not

10   guarantee -- but reasonably assure his appearance in the

11   court in New York.  That's the beginning framework.

12          Ms. Karase pointed out what Your Honor has to

13   consider, and I'm not going to bore the Court with laying --

14   outlining that law, but with regard to the nature and

15   circumstances of the offense, it is my position that were we

16   to have a full-blown preliminary examination where we could

17   actually take real evidence instead of hearsay from both I

18   and Ms. Karase, there would -- the government would not be

19   able to prove some if not all of these under any element,

20   under any theory of the law for a violation of 18 U.S.C.

21   1510, 1512(c), or 1519.

22          But that notwithstanding, and obviously that's not

23   in front of the Court this morning --

24          THE COURT:  But just without, you know, taking too

25   much time, can you just -- can you make a brief argument as

1   to those?

2            MS. SMITH:  I would rather not, Your Honor, because

3   at this point in time, if I can't present the evidence, I --

4   if you've not learned enough about me in the last week, if I

5   can't prove to you and show you with the evidence, I don't

6   want to over- -- I don't want a write a check that my body

7   can't cash, for lack of a colloquial way of saying it.

8   That's not what I would like to do this morning.

9            THE COURT:  All right.

10           MS. SMITH:  So with all due respect, Your Honor, I

11  would prefer to wait until Monday since we've decided that

12  Monday is going to be the PE.

13           Your Honor, I guess the first place I want to start

14  this morning is Mr. Cilins was not dishonest.  He was not

15  willfully dishonest with pretrial in any fashion, shape, or

16  form.  Ms. Watson indicated that she could not determine

17  exactly what he understood or didn't understand from her

18  questions.

19           She never asked him if he had two French passports.

20  There is always an element -- and she indicated that they do

21  not always -- they're frequently confused.  They don't always

22  get the answers right.  There are issues that sometimes and

23  in case in -- in this case in point he could not give her his

24  addresses of the properties.  He did not or could not give

25  her the names of the pills that he was taking.  This is not

1  unusual.  Your Honor has seen this before.  To none of us in

2  this room is this unusual.

3        He outlined the properties.  The property at the --

4  at the location in question that Ms. Karase has much ado

5  about, the $1.3 million property, is actually owned with two

6  or three other persons.  It's part of a group that owns part

7  of that group -- it's a group of a group of a group.  He

8  disclosed everything, I believe, he thought he had to

9  disclose and he understood he had to disclose.

10        Nevertheless, once he had counsel, counsel who

11  speaks French, although sometimes not so good, we talked

12  about it, and we went through and began locating the

13  properties and found the properties and have come forward and

14  disclosed them to the Court.  At the very first time I came

15  forward, we disclosed those.

16        We do not believe -- and we believe that the

17  evidence basically shows that he didn't make any willful

18  omission, and furthermore, Your Honor, we see defendants

19  frequently overstate their assets.  He didn't overstate them

20  to the Court.  He understated his assets.

21        The things that I proffered to you and gave to you

22  in the mortgage documents were the actual values listed by

23  the Property Appraiser's Office.  He listed much less values,

24  so he was very conservative in what he gave you.

25        Your Honor, we do not believe the government has

1  met the first burden, much less the second burden.  I want to

2  go through the factors, how they've not even shown that he's

3  a risk of flight.  Certainly, although a ten-year sentence,

4  where these charges are serious, they're not serious enough

5  to flee to jeopardize losing the amounts of money that he has

6  here, the amounts of property he's willing to put forth.

7         He is a respected, legitimate businessman.  His

8  frequent travels -- he travels all over Africa and Europe to

9  conduct business.  He frequently travels to the United States

10  to conduct business.  That was disclosed in the pretrial

11  services report, in the properties that he owns through the

12  LLCs that I disclosed the first day I was here.

13         The nature and circumstances of the -- well, he's

14  58 [sic] years old.  He has four children.  He has a wife.

15  He was born in Antibes, and he has lived in Antibes, France,

16  his entire life.

17         He has proffered that he would wear an electronic

18  monitor, that he would submit to electronic -- or home

19  confinement.  He would live in the vacation home in Miami, in

20  Aventura that we gave the address for this morning, that was

21  listed on the pretrial services report as Aventura.

22         And if necessary, his family, his wife, his family

23  in France, his friends in France, and his friends in Miami

24  will get together the money to ensure that he has 24-hour

25  surveillance on that house and on him to ensure he comes to

 1  court.

 2          He welcomes his day in court, Your Honor.  This is

 3  not a man who is going to run and run off to France or to

 4  anywhere else, certainly not to Israel.  Neither of the

 5  passports you have -- I don't believe there was even an

 6  Israeli stamp for an entry in either of those passports.

 7          Your Honor, he has no criminal history, and I

 8  understand that Ms. Karase makes much ado that he's facing a

 9  lot of time and so that gives him more incentive to run.

10  Your Honor, not if you're innocent, not if you welcome the

11  day to show up in court and explain that Mamadie Toure and

12  all of this is a fraud and a sham and more of the blackmail

13  and more of the same that has been going on for years.

14          He has significant ties, business ties, to South

15  Florida.  Again, he has returned to the United States three

16  times this year alone, twice during the pendency -- or three

17  times during the pendency of this investigation, at least

18  twice after he allegedly knew that there was an

19  investigation.  Why would he return if he were a risk of

20  flight?

21          Your Honor, the nature and circumstances of the

22  offense, we have put forth a theory and put forth a proffer.

23  We believe that this case -- the government has been duped,

24  as have many other people been duped, by Mamadie Toure and

25  other people.

1          The press releases that Ms. Karase has relied upon,

2     there are numerous articles that have been written.  There

3     are numerous press releases, and there are two theories of

4     thought and two main streams of thought with those, and

5     you've heard us touch on those in the last two days.

6          No. 1 --

7          THE INTERPRETER:  The interpreter needs it a little

8     bit slower.

9          MS. SMITH:  Do I need to repeat anything?

10         THE INTERPRETER:  Yes, please.

11         MS. SMITH:  What (unintelligible)?

12         THE INTERPRETER:  (Unintelligible.)

13         MS. SMITH:  Ready?

14         THE INTERPRETER:  Yes.

15         MS. SMITH:  Your Honor, this is a -- at the request

16     of the interpreter, I'm going to repeat, a sham and a

17     continuation of the blackmail that has been going on and has

18     gone on in the past by Mamadie Toure.

19         Do I need to -- (unintelligible)?

20         THE COURT:  No.  No.  Go ahead.

21         MS. SMITH:  I'll try to watch both.

22         Your Honor, as I stated before, the press has got

23     two lines of thought and two trains of stories, and not that

24     we want to rely upon the press and rely upon what news media

25     says, but both of us have proffered using press media, press

1  releases, news media, news outlets.

2      And there's two lines of thought as to what is

3  occurring:  (a), what the government's theory is, BSGR

4  obtained its mining concessions in Guinea through bribery.

5  Mr. Cilins, as an agent of BSGR, attempted to get the

6  evidence of those bribes back from Mamadie Toure, and Mamadie

7  Toure was the recipient of those bribes.  I think that's

8  probably the government sort of in a nutshell.

9      That is also George Soros's theory, who owns Global

10  Witness --

11      THE COURT:  What did you just say?  I missed that

12  last part.

13      MS. SMITH:  That is George Soros' theory.  George

14  Soros owns or is behind the NGO Global Witness.  Mr. Soros is

15  contributing lots of money in Guinea to the president, to

16  Alpha Conde, and through NGOs.

17      Mr. Soros and Mr. Steinmetz, who is the owner -- or

18  not the owner, but the private majority stakeholder in BSGR,

19  have a longstanding feud, for lack of a better way of putting

20  it.  Mr. Soros, the theory goes, would like to have

21  Mr. Steinmetz and his diamond and his ore mining and his

22  bauxite mining company out of Guinea and out of the rest of

23  Africa because Mr. Soros has interests and contacts and

24  financial ties to Rio Tinto, who now has a partnership with

25  Chinalco.

1          Those are really the two competing theories, with

2     the basis of where this is being driven.  And in that regard,

3     if you believe that theory, when you understand that theory,

4     Mamadie Toure is a pawn and is being used in that theory to

5     discredit, as is Mr. Cilins, BSGR.

6          False documents have been created.  Blackmail has

7     been done.  As I proffered previously, Mamadie Toure and

8     others on her behalf have actually submitted fraudulent

9     documents and attempted to receive money from both BSGR in

10    the past, from Mr. Cilins in the past, and it's my

11    understanding there's also issues with Rio Tinto where

12    there's fraudulent documents attempting to be blackmailed

13    against them and at least one other mining company in Guinea.

14    This is sort of the course of business, of doing business, in

15    Sub-Saharan Africa.

16          Am I going slow enough?

17          THE INTERPRETER:  Yes.

18          MS. SMITH:  Okay.

19          One of these contact -- one of these shakedowns

20    occurred, as I proffered the other day, I think, a week ago,

21    in 2010.  In that case Mamadie Toure's attorney, after

22    investigating it, contacted BSGR and withdrew all claims and

23    didn't represent her any further.  Then --

24          MS. KARASE:  Your Honor, I'm going to object to the

25    additional facts that were not submitted as part of the

1   proffer that are now coming forth in argument at this point.

2           THE COURT:  You know, I can't really remember with

3   great specificity exactly what was proffered.  I know there

4   were some things proffered about 2010, so the record will

5   speak for itself on that.  I'll overrule the objection at

6   this point.

7           MS. SMITH:  And, Your Honor, with regard to 2000

8   and -- I think there was another attempt.  It was last year,

9   I believe.  As I proffered the other day, there was another

10  attempt at blackmail, again by Mamadie Toure, and she signed

11  an attestation which is virtually identical to the

12  attestation signed or presented by Mr. Cilins this year,

13  during March or April of 2013.

14          This is a woman -- if you believe the government --

15  if you believe the government's theory, who has -- who

16  continues and who had lots of power over Lansana Conte, the

17  former president who's deceased, the following military

18  junta, presumably the interim government in between, and then

19  Alpha Conde, the new president.

20          However, this is a woman who was ran out of the

21  country by the military junta within weeks of Lansana Conte

22  being -- within weeks of him dying.  That was in January

23  2009.  She had absolutely no ability to influence anyone

24  after that point in time.  She is a fraud.  She is

25  unreliable, and she is duping everyone, just as -- as she's

1   done before.  This is another fraudulent scheme on her part.

2        We talked this morning about the concessions and

3   the BSGR mining and Rio Tinto mining.  If you -- we look at

4   the timeline that actually occurred, she could not have

5   influenced anything.

6        Furthermore, Your Honor, the tapes that the

7   government so wants to rely upon that we do not have here

8   with us, that the government sometimes appears to have

9   listened to and sometimes doesn't appear to have listened to,

10  one of those tapes, Madame Toure is on the tape discussing

11  how she's not really the wife of Lansana Conte.

12       And, again, the government places it and now wants

13  to claim that it's irrelevant whether she is or is not.

14  Well, every fact in cross-examining a confidential witness, a

15  cooperating witness, becomes relevant.  Your Honor, from your

16  years of prosecution, is well aware that every fact at that

17  point becomes very relevant.

18       The government would have you believe, under their

19  theory of the case, that BSGR put a very wealthy -- owned by,

20  according to both I and Ms. Karase, the wealthiest man in

21  Israel, a sophisticated businessman, a man who owns a

22  multinational corporation and presumably can hire the

23  biggest, best, and brightest and probably the most expensive

24  law firms in our country and every country in the world would

25  be so stupid, if they paid a bribe, to reduce to writing that

1   bribe.  Your Honor, that's illogical.  There is just

2   absolutely nothing that rings true.  That rings totally

3   hollow.

4         An attorney would never let them do that, and no

5   businessman who owns a private company who's not subjected to

6   shareholders, who's not subjected to SEC scrutiny, is ever

7   going to put such a thing in writing.  Yet the government

8   would have us believe that those contracts that Mamadie Toure

9   say just such a thing, that she was to be paid X or Y or Q

10   millions of dollars for her role in a bribery scam to obtain

11   mining rights in Guinea.

12         Your Honor, the government makes much about

13   Mr. Cilins offering on these tapes to spend thousands if not

14   millions of dollars and pay Mamadie Toure for these

15   documents.  The government's argument is they have to be real

16   or nobody would pay for them.  Your Honor, I submit to you

17   the best way to finally get rid of the blackmail is to buy

18   the blackmail documents, get rid of them once and for all.

19   It is not unheard of, unusual to have someone get blackmailed

20   with indiscreet photos, indiscreet videos, and they pay.

21         Some people go to law enforcement.  Some people try

22   to take matters into their own hands.  Your Honor, Mr. Cilins

23   was attempting not to get rid of false -- or to get rid of

24   real, legitimate contractual documents, and in that regard,

25   Your Honor, we don't have any originals.

1        I don't think you've heard during a week and a half

2   of this that the government has any originals.  All we have

3   or they have are purported photocopies of contracts.  There

4   is absolutely nothing, without those originals, to ever

5   prove -- and presumably those originals will be with the

6   Guinean government, with Mamadie Toure, and/or with BSGR, if

7   those are the entities that were all involved in this, as the

8   government portrays in its complaint.

9        Mamadie Toure has not produced originals that we

10  know of.  I asked the other day if anyone had contacted the

11  Guinean government to get any original contracts.  Ms. Karase

12  didn't know.  And as far as we know, we don't know -- I have

13  no information whether BSGR has been contacted to provide any

14  of its original contracts.

15       People who do corporate work provide a set of

16  originals to both sides, usually, or if it's an original, an

17  original goes with the Court.  It makes no sense that all

18  anyone has are photocopies.

19       Your Honor, we don't have the calls.  We don't have

20  the recordings.  Ms. Karase says that basically I've made,

21  again, a big deal that -- I've only challenged the calls only

22  on the English and -- the translation basis.  Well, that's

23  one basis to challenge them on.

24       We don't have a certified English translation.  We

25  don't know if our -- if the person who works for the FBI is

1  even certified.  We don't know if they speak the Guinea

2  dialect of French, which is like a Guinea Creole.  It's a

3  French Creole.

4          We don't have the calls.  More importantly, we

5  don't have the calls -- and, Judge, there were lots of

6  calls prior to March of this year.  We don't have those.  I

7  proffered that the other day.  We don't know what occurred on

8  those calls previous, past, or now.

9          Your Honor, I'm sure you are well familiar with the

10 fallibility of FBI interpreters or interpreters in general

11 who are not certified and who are not properly qualified.

12 We've heard nothing about the qualifications here.

13         But Your Honor was second-in-command, I believe, in

14 the office of the U.S. attorney when Al-Arian was prosecuted.

15 And in that case the FBI confused, on such an important case,

16 the word "bomb" on a translation with the word "pancakes."

17         And ultimately the U.S. Attorney's Office and DOJ

18 used the interpreters from the Federal Public Defender's

19 Office because their interpretations were accurate.  They

20 actually agreed to their interpretations to be used in court

21 and did not use the FBI interpreters because there were such

22 inaccuracies with the translations.

23         And that's the problem we have here.  We don't have

24 the tapes for someone to listen to them in French.  We don't

25 have an official translation.  And while I don't doubt that

1   Ms. Karase has been told what she believes she's been told,

2   we don't know that to be the case because we don't have

3   what's here.

4          Your Honor, the government -- and I understand

5   Ms. Karase's proffer and Ms. Karase's apology to the Court,

6   and I accept that about the passport, but they got a simple

7   issue wrong, a very simple issue wrong.  They made no -- they

8   come to court with the issue of he's traveling on an

9   invalid -- he has a nonregistered passport.

10         And even after I submitted to the Court, after

11  looking at the one passport, that he had entered and come out

12  of this country between six and ten times on that,

13  quote/unquote, fraudulent, invalid passport, Ms. Karase would

14  not withdraw the issue.  You asked her if she would withdraw

15  the issue.  She said she was unwilling to do so.

16         I had to jump through hoops to get documentation

17  from literally all over the world, from France and Atlanta,

18  that this was not accurate, that he indeed had two valid

19  passports, as I proffered to the Court.  I proffered that

20  last week, that that was going to be my belief as to what

21  would occur, and that indeed is what occurred.  He had them

22  for business purposes.  They got that wrong.

23         Your Honor, they have gotten the guidelines issue

24  wrong, things that are relatively simple in the grand scheme

25  of things when you're looking at a case so complex as this.

1    This is not your average run-of-the-mill case.  This is not

2    as simple as let's only look at what happened in March and in

3    April of 2013 between the telephone calls and between the

4    meetings.

5           We don't know -- no one knows what happened prior

6    to what the discussions were.  There was no code because,

7    again, Mamadie Toure had repeatedly and in the past brought

8    forth claims, blackmail claims, with false documents.  This

9    is at least the third time that she herself has done so.  If

10   they've gotten the little things wrong, Your Honor, how can

11   we expect at this point that they've gotten the big things

12   right?

13          So with regard to the nature and circumstances of

14   the offense, Your Honor, the least important factor, the

15   courts have said, is the weight of the evidence.  That's the

16   thing you should give the least amount of weight to.  I have

17   citations for that in just a moment, Your Honor, but that's

18   the thing that you should consider the least amount of all.

19          The most is whether he's going to be a risk of

20   flight, whether you can ensure conditions, what his nature

21   and circumstances -- his history and characteristics are, and

22   also the nature and circumstances of the offense.

23          Your Honor, some of the cases that I'd like to cite

24   for the Court include -- and I don't have a citation for

25   this -- but *Dominique Strauss-Kahn*.  He was a French citizen.

1   We all are aware he was a former head of the IMF.

2         Two years ago he was facing at least 20 years to

3   life for the rape of a Guinean who was later -- what shall we

4   say -- discredited for rape.  They had no extradition with

5   France.  His only ties to the United States were financial

6   ties, and he was released on bail.  He was released on home

7   confinement.  He was released with the conditions that he

8   surrender a passport.

9         You also have the case in this district involving

10  *Wesley Snipes*, albeit a United States citizen.  He was given

11  bond on a tax fraud case.  It was, I think -- I think it was

12  a 1 or 2 million dollar signature bond.  He was allowed to

13  actually travel to Africa, where he could not have been

14  extradited from, to complete the filming of a movie while he

15  was out on bond.

16        We have the case of *Adnan Khashoggi*, a Saudi

17  national with no U.S. ties except finances.  He was accused

18  of wire and mall fraud.  He was looking at each count of 20

19  and 30 years, and it was 10 or 12 million or more dollars'

20  worth of wire and mail fraud.

21        He was released with an extremely large bond, and I

22  have the case, and I can give the case, the actual facts.

23  But it's at 717 F.Supp. 1048 out of the Southern District of

24  New York, 1989.  He was released with a large signature bond.

25  He had to put up properties also to guarantee that bond.  He

 1   had a -- he was home confined for 24 -- 24 hours a day, and

 2   he had a guard.  Saudi Arabia would not extradite in that

 3   circumstance had he left.  He did not flee, and he was

 4   released.

 5          We have Bernie Madoff, again, who was facing and in

 6   fact was convicted and, sir, is currently serving a

 7   significant sentence, significantly more than Mr. Cilins, if

 8   convicted, will ever serve.  Mr. Madoff was released, again,

 9   with proper security, and that is in *U.S. v. Madoff*, 568

10   F.Supp.2d 240 out of the Southern District of New York, 2009.

11          We have *U.S. versus Eric Hansen*, 108 F.App'x 331.

12   That is a Sixth Circuit case, and I've scribbled 2004, but I

13   may be -- it may have been 2009.  He was a citizen of

14   Denmark.  Denmark had no provisions for extradition.  Again,

15   it's the same situation we have here, same situation with

16   Mr. Strauss-Kahn, with Adnan Khashoggi.  They determined that

17   what he had fashioned for release was sufficient to ensure

18   his appearance.

19          *United States versus Garcia*, it's at 801 F.Supp.

20   288 out of the Southern District of Iowa, 1992:  "Just

21   because a defendant is an alien does not require detention.

22   The Court can consider that as a factor, but it alone,

23   without more, does not justify detention."

24          We have the cite, Your Honor, I said a while ago

25   that you had to -- basically the two factors that you had to

1   consider is *U.S. v. Sabhnani*, S-a-b-h-n-a-n-i, 493 F.3d 63 at

2   pinpoint 75, Second Circuit, 2007.  And that stands for the

3   proposition that the government having the two burdens:  One,

4   initially to prove an actual or significant -- a serious risk

5   of flight, and No. 2, that they -- after they prove that,

6   that there was no condition or combination of conditions that

7   would justify -- that would not reasonably ensure his

8   appearance.

9          In that case the Court actually found that the

10  release of Mr. Dreier, who was accused of $400 million worth

11  of fraud -- there was money missing.  There was talk of an

12  obstruction charge, that a $10 million signature bond, home

13  confinement, round-the-clock monitoring by a guard,

14  electronic monitoring, surrender of the travel documents, and

15  pretrial services was sufficient to show -- or to reasonably

16  assure his appearance in court.

17         Your Honor, with the least weight of the evidence

18  of all other factors, the statement I said that you --

19  basically the weight of the evidence was to be considered the

20  least is *U.S. v. Honeyman*, 470 F.2d 473.  It's a Ninth

21  Circuit case, 1972.

22         Your Honor, we believe the government has not shown

23  that Mr. Cilins is a serious risk of flight.  If you believe

24  and you find that he is a serious risk of flight, Your Honor,

25  they certainly have not shown that there is no -- no

1   conditions or no reasonable combination of conditions that

2   could be put in place to ensure that he would show up for

3   court, that he would reasonably appear.

4           Your Honor, if I can just address two more

5   things -- I think two more things that I didn't address.  The

6   issue between the fact that Mr. Cilins and Mr. Steinmetz are

7   close personal friends, Your Honor, we don't have any

8   evidence to show that other than the government's proffer.

9           However, the financial ties alone are not

10  sufficient.  And furthermore, Your Honor, if BSGR is under

11  investigation, I would posit that I would be very highly

12  doubtful of the fact that any attorney hired by BSGR is going

13  to recommend that Mr. Steinmetz try to get Mr. Cilins out of

14  the country because it's not -- if the government -- their

15  version is correct, it's not going to stop anything.  It's

16  certainly not going to stop the criminal ball from rolling.

17          So, Your Honor, I don't believe that is in any way

18  relevant at this point in time or should be considered, but

19  if Your Honor considers it, it's -- it is still not a

20  factor -- it is not the deciding factor in light of all the

21  sureties that we're going to put forth.

22          Your Honor, I did not total -- I need to total the

23  amount of properties.  I know they are over 3 million.  I

24  believe they are over 3.5 million in total that Mr. Cilins is

25  willing to put forth.  We got the signature of the managing

1   director of one of the -- of the big property that the

2   government has made a -- the Hollywood Beach property that's

3   worth the $1.3 million.

4           If there are additional signatures, because I know

5   there are other persons that have parts in that, we will

6   obtain the additional, but I don't believe so because of the

7   way that the title is.

8           Your Honor, the one other issue is that he has

9   enterprises that he did not disclose.  Your Honor, we have

10  disclosed everything that I know of that he is involved in.

11  We disclosed the business -- the business entities, the LLCs,

12  that own the rental properties here in Miami.  We disclosed

13  CFW -- he disclosed CFW.  He disclosed the rental properties

14  themselves during pretrial services.

15          The government talked about the thousand dollars

16  being on -- on his person at the time of arrest.  Your Honor,

17  the government is going to be giving that money back to me at

18  the end of the -- at the close of the hearing, I'm going to

19  be signing for that with the government agent.  She's already

20  prepared the documents, and we've already went over them with

21  Mr. Cilins, so I'm going to be accepting that as proffered

22  today.

23          Your Honor, again, we don't -- we believe that we

24  have put forth sufficient evidence to, again, not show that

25  he's a risk of flight.  More importantly, even if Your Honor

1    believes he is, that we have put forth sufficient security,

2    sufficient conditions of bond that he is willing to accept

3    and willing to submit himself to this Court to reasonably

4    assure his appearance.  We therefore ask that you release

5    him.

6              THE COURT:  All right.  Thank you.

7              Ms. Karase, did you have anything else you wanted

8    to say?

9              MS. KARASE:  Yes, Your Honor, just briefly.

10             Of course, it is the government's burden, and I

11   have my -- my electronic device here because I have it by

12   e-mail only a list of defendants who have been subject to

13   electronic monitoring and have removed that electronic

14   monitoring and have fled and remain fugitives.

15             I would be happy to read through this list of

16   probably 100 names or so of defendants who were subject to

17   electronic monitoring and fled to counter Ms. Smith's

18   argument about the 10, 15 different cases where individuals

19   were granted electronic monitoring or bond of some sort and

20   appeared.  But I won't insult Your Honor's intelligence and

21   make it that much more difficult for the court reporter to go

22   through all of the instances of individuals who have been

23   subject to electronic monitoring but have fled.

24             THE COURT:  Where did you get that information?

25             MS. KARASE:  From the AUSA in New York.  It's a

1  list that's been compiled.  There's actually one from

2  Jacksonville --

3       THE COURT:  There's an objection probably similar

4  to yours before.

5       MS. SMITH:  Your Honor, No. 1, I would object that

6  this has not previously been proffered to the Court and it's

7  new evidence.

8       Second, Your Honor, I'd object as I have no way of

9  gaining access.  The cases I cited are all publicly recorded

10 and are -- with the exception of -- *Dominique Strauss-Kahn* is

11 a publicly recorded case.

12      These cases I have no access to and can't argue

13 against them at this point in time.

14      MS. KARASE:  Well, and, Your Honor, to respond,

15 these are actually all from cases, and I have case numbers.

16 I'd be happy to go through each of them if we think that is

17 a --

18      THE COURT:  Well, I think I get your point, so I'll

19 sustain the objection.

20      MS. KARASE:  All right.  Ms. Smith talked about how

21 Mamadie Toure is a fraudster, a blackmailer.  She's been up

22 to no good since 2009.  She was exiled from Guinea, and she's

23 not to be trusted.  Her client has her as a business partner

24 as recently as 2012?  That defies logic, Your Honor.

25      Ms. Smith also mentioned -- and I have to admit I

1   was very surprised to hear her say this.  She mentioned that

2   her client was meeting with the confidential witness in order

3   to get these false documents out of circulation.  I take that

4   as an admission that he was willing to meet with the

5   government's confidential witness in order to obtain the

6   documents.

7        It's up to a federal grand jury to determine the

8   authenticity of those documents as they were the subject of a

9   grand jury subpoena.  It's not up to Mr. Cilins to try to pay

10  off a witness to get access to those documents for his own

11  personal destruction.

12       When asked about the specifics about the 2013

13  interactions that Mr. Cilins had with this woman he now

14  claims is a fraudster, a blackmailer, and someone who's not

15  to be trusted, the only thing that the defense points to is

16  this reliance on transcripts, on summaries of -- summaries of

17  translations, rather.

18       And she cites to a case from the Middle District

19  where a single word -- it sounded like maybe there were other

20  instances of mistakes, but there were some problems with the

21  translation.  In this case we have several recorded telephone

22  calls and four different recorded meetings that were at great

23  length.  We're not talking about a single word that may have

24  been confused.

25       The weight of the evidence against Mr. Cilins is

1  strong, as evidenced by each of the meetings that he had with

2  the confidential witness and his willingness to pay

3  significant amounts of money, which brings me to rebut the

4  argument that Ms. -- Mr. Cilins would not flee the United

5  States given the significant assets that he has here.

6          We're talking about approximately $2 million.  In

7  the grand scheme of things, he was bartering with $1 million

8  to pay off the confidential witness for the destruction of

9  documents.  And remember, these mining concessions are valued

10  at $2.5 billion.

11          The government contends that the evidence supports

12  that these mining concessions involved BSGR, which is Beny

13  Steinmetz's company, and that Mr. Cilins was negotiating on

14  behalf of BSGR and on behalf of Mr. Steinmetz in meeting with

15  the confidential witness.

16          This $2 million worth of assets that Mr. Cilins has

17  in the United States that he's disclosed is a drop in the

18  bucket when we're talking about the total amount of money at

19  stake here.  This doesn't create an incentive to stay.

20          And, Your Honor, with that I rest on the previous

21  argument that I've made and submit that this defendant must

22  be detained prior to trial as he is a risk of flight.

23          THE COURT:  Other than electronic monitoring, did

24  you want to address any of the other specific conditions that

25  Ms. Smith has raised in light of her position that you have a

1  double burden of proving flight risk as well as there are no

2  condition or combination of conditions that will assure

3  Mr. Cilins' appearance as required?

4       MS. KARASE:  Sure, Your Honor.  Particularly she's

5  raised this issue of having a 24-hour guard in place.

6       If anything, that just, as I mentioned during my

7  initial argument, shows the resources that this defendant has

8  available to him.  And if he has the resources available to

9  hire someone to guard him 24 hours, who frankly that would be

10 kind of odd because it would be a hired hand that is

11 responsible for supervising him, which there are some

12 inherent problems there --

13      THE COURT:  I'm not sure that's how it works, but

14 we can ask Ms. Smith for more detail on that.  I don't think

15 the choice, in the cases where that happens, is the

16 defendant's, but --

17      MS. KARASE:  In any event though, Your Honor, he

18 would have the access to pay someone to help him get out of

19 that, to help -- have someone help him flee the country and

20 return to France or return to another country where he could

21 not be removed.  So I don't believe that there are any

22 conditions that would reasonably assure his appearance that

23 could be imposed.

24      I've mentioned the property.  I've mentioned the

25 electronic monitoring.  I've mentioned the guard now.  I just

1  think, given the resources available to him, that that would

2  not be a viable option.

3       Did I miss any of the other conditions that she may

4  have addressed?  I guess she mentioned the possibility of the

5  family coming here to perhaps serve as third-party custodian?

6  Was that the intention?

7       MS. SMITH:  That's the intention.  His wife has

8  asked me (unintelligible).

9       His wife has asked me a dozen times about coming

10 over here.  I've said, "Let's get through this hearing and

11 figure out where we're going," but she's -- she is willing to

12 come.  She'll have to travel back and forth, but she is

13 willing to come.

14       I believe -- and just so the record the clear, Your

15 Honor, I totaled up the value of the properties, and I know

16 this is off of what Ms. Karase asked, but it's $3,654,210,

17 rough numbers, because I'm not going to swear to my math.

18 I'm not a math major, but it's about 3.5 in round numbers.

19       THE COURT:  All right.  Thank you.

20       MS. SMITH:  And, Your Honor, just to clarify, Your

21 Honor is correct.  A 24/7 guard does not work -- it has to be

22 somebody acceptable to the government.  It usually is a

23 security firm that they would vet.

24       We would usually propose two or three or four

25 names.  They vet the company.  They get to choose one or two

1    or say, "They're all acceptable."  And it's a private firm

2    who has usually a G license or a -- which is a license to

3    carry and a license to arrest and effectuate an arrest if

4    there's a problem, so -- just so that that's clear.

5              THE COURT:  Yes.  Thank you.

6              MS. KARASE:  And, Your Honor, then I guess just to

7    address the third-party custodian, it's difficult to say

8    without having heard from anyone, but I don't think that --

9    certainly if I don't think that a 24-hour guard could ensure

10   his appearance, I don't think that his wife, a close family

11   member that would also have a motive for him to avoid penalty

12   in this case and to face judgment in this case, could do an

13   adequate job of supervising him.

14             THE COURT:  All right.  Thank you.

15             All right.  Anything else at all from anyone?

16             MS. SMITH:  I had case law, Your Honor, to the four

17   salient cases -- I had case law, Your Honor.  Two of them

18   were important cases that I'd ask you to look at, the

19   *Khashoggi* case and the *Dreier*.  I'll tender a copy both to

20   the Court and to Ms. Karase.

21             THE COURT:  All right.  Thank you.

22             MS. SMITH:  Your Honor, without just belaboring the

23   point, the purchase of false documents is not a crime.  The

24   purchase of fraudulent documents is not a crime.  It's not

25   obstruction, so I'll close on that, only with the exception

1   that the *Al-Arian* case involved years of investigation and,

2   as I recall, 20,000 hours of tapes, or some ungodly amount --

3   or 2,000 hours of tapes in Arabic, as I recall.

4          We had three and four, in the -- in the Federal

5   Public Defender's Office, and I know the FBI did too,

6   working full -- three full-time translators working full-time

7   for I think about 15 months.  So it wasn't just one word.

8          THE COURT:  All right.  Thank you.

9          All right.  Well, I appreciate the presentations

10  and the arguments that you all have made.  I'm going to look

11  at all of the cases that have been cited, and I'm going to

12  take a look at all the documents.

13         And you'll provide those property documents,

14  Defendant's Exhibit 1 for identification, Ms. Smith.  And

15  then I'm hoping to have reached a decision by Monday

16  afternoon.

17         MS. SMITH:  Your Honor, would you like me to go

18  ahead and prepare these orders for the other properties so

19  that you can e-mail them to everybody?

20         THE COURT:  Yeah.  Why don't you go ahead and do

21  that, and then I'll have everything to consider, if you

22  would, please.

23         MS. SMITH:  I'll go ahead and make the corrections,

24  and the ones that -- I can substitute the pages, but I don't

25  want to do that now.  I'll just make the corrections so that

1  we have a clean set (unintelligible).

2          THE COURT:  All right.  Thank you.

3          MS. KARASE:  And, Your Honor, one other

4  housekeeping matter.  I've told Ms. Smith this already, but

5  I've received word from New York that they have scheduled a

6  hearing date up there for May 2nd for an initial appearance,

7  and I don't have the time.  I could probably find it if you

8  want to give me a minute, but I certainly could report that

9  on Monday as well.

10          THE COURT:  Yeah.  That -- we can just take that up

11  Monday and look at that Monday.

12          All right.  Anything else, Ms. Karase?

13          MS. KARASE:  No, Your Honor.

14          MS. SMITH:  May I have just --

15          THE COURT:  Yes.

16          MS. SMITH:  Thank you, Your Honor.  I have nothing

17  further.

18          THE COURT:  What -- we need to talk about a time

19  Monday.  I thought we had already set a time, but there I go

20  again.

21          Let me ask the interpreter, sir, are you available

22  Monday?

23          THE INTERPRETER:  Yes, sir, what time?

24          THE COURT:  Well, that's what we're trying to

25  decide.

 1          What time's good for you?

 2          THE INTERPRETER:  (Unintelligible.)

 3          THE COURT:  Let me just -- I've got one thing at

 4  9:00 or maybe it's 10:15.  Let me just look.  Is it 10:15?

 5          Yeah, the money -- the money?  The morning becomes

 6  somewhat difficult because I have another matter scheduled.

 7  Yes.  I have something from 10:00 to noon.

 8          How does the early afternoon look, Ms. Karase?

 9          MS. KARASE:  That's fine for me, Your Honor.

10          THE COURT:  Is --

11          MS. SMITH:  That's fine for me, Your Honor.  You're

12  not going to get me out of a Monday morning state court

13  appearance, sounds like, though.

14          THE COURT:  Well, I'm having a trial about who

15  stole a peanut butter sandwich on Monday, so if you would

16  want to participate in that, you could.  It's an Open Doors

17  program that we have.  I don't know what grade the class is.

18          Do you, Ms. Chaddock?

19          Upper elementary?

20          So you could always say you have a court

21  appearance.

22          MS. SMITH:  I don't think I'll do that, Judge.

23          THE COURT:  All right.

24          MS. SMITH:  Yeah.  I like my credibility the way it

25  is.

 1            THE COURT:  Well, it would be true.  You just would

 2    have to reveal the nature of the case.

 3            All right.  Let's -- if we can, let's set this at

 4    1:30 because I have a 1 o'clock that shouldn't take too long,

 5    all right?

 6            All right.  Well, thanks, everyone, for their

 7    participation.

 8            Sir, you have served well, very well, and I really

 9    appreciate it.  Thank you.

10            All right.  We'll be in recess.

11            COURT SECURITY OFFICER:  All rise.

12            (The proceedings were concluded at 1:20 p.m.)

13                              -  -  -

14

15

16

17

18

19

20

21

22

23

24

25

1                          CERTIFICATE

2

3   UNITED STATES DISTRICT COURT )

4   MIDDLE DISTRICT OF FLORIDA   )

5

6

7           I hereby certify that the foregoing transcript is a

8   true and correct computer-aided transcription of my stenotype

9   notes taken at the time and place indicated therein.

10

11          DATED this 30th day of April, 2013.

12

13

14                          s/Shelli Kozachenko
                            Shelli Kozachenko, RPR, CRR
15

16

17

18

19

20

21

22

23

24

25