```
 1                 UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                    JACKSONVILLE DIVISION

 3   UNITED STATES OF AMERICA,     Jacksonville, Florida

 4               Plaintiff,    Case No. 3:13-mj-1087-JRK

 5   -vs-                           Monday, April 29, 2013

 6   FREDERIC CILINS,            1:39 p.m.

 7               Defendant.    Courtroom 5D

 8   _____

 9
```

**TRANSCRIPT OF DETENTION/PRELIMINARY/IDENTITY HEARING/INITIAL**
**APPEARANCE**
**BEFORE THE HONORABLE JAMES R. KLINDT**
**UNITED STATES DISTRICT JUDGE**

<u>**A P P E A R A N C E S**</u>

GOVERNMENT COUNSEL:

       **Kelly Karase, Esquire**
       United States Attorney's Office
       300 North Hogan Street, Suite 700
       Jacksonville, FL  32202


DEFENSE COUNSEL:

       **Michelle Smith, Esquire**
       Law Office of Michelle P. Smith
       P.O. Box 1788
       Orlando, FL  32802-1788


COURT REPORTER:

       Shelli Kozachenko
       221 North Hogan Street, #185
       Jacksonville, FL  32202
       Telephone:  (904) 301-6842

       (Proceedings reported by microprocessor stenography;
transcript produced by computer.)

# T A B L E   O F   C O N T E N T S

**Page No.**

PROCEEDINGS                                          3

# D E F E N S E   E X H I B I T S   R E C E I V E D

**Page No.**

DEFENDANT'S EXHIBIT 6...............................    39

<pre>
 1                    P R O C E E D I N G S
 2   Monday, April 29, 2013                          1:39 p.m.
 3                          -  -  -
 4        COURT SECURITY OFFICER:  All rise.  This Honorable
 5   Court is now in session.
 6        Please be seated.
 7        THE COURT:  This is the case of the United States
 8   of America against Frederic Cilins.
 9        MS. SMITH:  Your Honor, the interpreter's not
10   interpreting.  I'm sorry, Judge.  I didn't want to get
11   halfway through it and --
12        THE COURT:  You know, I went back over a lot of
13   this, and it's no wonder I'm having a little bit of trouble
14   keeping an eye on the ball each time because we're having
15   difficulties that we shouldn't be having, and so let me just
16   start before I even call the case.
17        Mr. Belamour, you're going to have to translate
18   simultaneously everything that's said in the courtroom, sir.
19        THE INTERPRETER:  I understand, yes.
20        THE COURT:  So let me call the case again.  It's
21   United States of America against Frederic Cilins, Case No.
22   3:13-mj-1087-JRK.  Kelly Karase represents the United States.
23   Michelle Smith represents Mr. Cilins.  Mr. Cilins is in the
24   courtroom.
25        And our interpreter today is Lindry Belamour.  And,
</pre>

```
 1   Mr. Belamour, were you previously sworn in this case, sir?

 2             THE INTERPRETER:  No.

 3             THE COURT:  All right, then.  If you'd please

 4   stand, I'll swear you.

 5             Do you solemnly swear to translate this case to the

 6   best of your ability from English to French and French to

 7   English?

 8             THE INTERPRETER:  I do.

 9             THE COURT:  All right.  And would you state your

10   full name, please?

11             THE INTERPRETER:  Lindry Belamour.

12             THE COURT:  All right.  Thank you.  And if you

13   would, please, make a simultaneous translation of what is

14   said in the courtroom.  Thank you.

15             And, Mr. Cilins, if you don't understand something

16   or there is a problem with anything having to do with the

17   translation, please alert us and we'll do whatever we need to

18   do to make sure that it works.

19             And, Mr. Belamour, if you would, sir, let us know

20   if we're talking too fast because we've all been guilty of

21   that at one time or another during the course of these

22   proceedings, and we'll do the best we can to be aware of it.

23             THE INTERPRETER:  Okay.

24             THE COURT:  All right.  Let me just review briefly

25   where we are with this matter.  Mr. Cilins made his initial
```

appearance on a criminal complaint filed in the Southern

District of New York.  The initial appearance here in

Jacksonville was April 15th, 2013.  At that time Mr. Cilins

asked for time to try to retain counsel.  The government

moved for detention and asked for a continuance of the

detention hearing.

We convened in this case again on April 18th, 2013,

and at that time Ms. Smith appeared on behalf of Mr. Cilins.

She had filed a notice of appearance on April 17th, 2013.  So

we convened for the detention hearing.  It was scheduled for

both the detention and preliminary hearing, which is my

custom in terms of setting these, and we proceeded with the

detention hearing by way of proffer of the attorneys and the

offering of certain exhibits.

The preliminary hearing and detention hearings were

continued.  We had reset them, and then I believe it was

because Ms. Smith was attempting to obtain documents from

France, there was the need for additional time, and she asked

to continue the hearings, the preliminary and detention

hearings, and she filed that motion on -- I believe it was on

April 22nd, 2013.

Then on the 23rd of April, 2013, I held a status

hearing via telephone because it had become apparent to me

that there had been some misunderstanding about the --

whether we had commenced both the preliminary hearing and the

1  detention hearing, and I believe it was a miscommunication by

2  me and probably as much a miscommunication of just how we

3  proceed here with those hearings.

4         And so we set the continuation of the detention

5  hearing for April 25th, and we held the hearing on that day,

6  and the preliminary hearing was reset for today.

7         Now, some things have happened in the meantime, and

8  there have been some filings and communications, and I want

9  to try to make sure I capture all of those for the record and

10 so that we can proceed in an orderly fashion today.

11        First of all, on April 25th, 2013, it should be

12 noted that a federal grand jury in the Southern District of

13 New York returned an indictment, the style of which is United

14 States against Frederic Cilins, and that is 13-cr-315, is the

15 case number in New York, and it's a five-count indictment.

16        On the 26th of April, which I believe was Friday,

17 the government filed United States' notice of supplemental

18 authority, and essentially in that supplemental authority,

19 the government set out a number of cases where defendants had

20 fled after having been placed on electronic monitoring.  And

21 also the government, in that supplemental authority,

22 discussed certain cases that had been cited by Ms. Smith in

23 support of Mr. Cilins' release.  She discussed the *Madoff*

24 case and the *Snipes* case.

25        Thereafter -- I think thereafter but I'd have to

1   look at the timing of it, so I'd better not say that.  On

2   that same day, April 26th, I received an e-mail from

3   Ms. Smith's office.  Ms. Smith had previously announced at

4   the hearing that she needed to submit some additional

5   documents and some corrected documents with respect to the --

6   or some corrected mortgage documents and affidavits with

7   respect to the property that Mr. Cilins is offering to post

8   in this case, and that e-mail was sent at 3:45 p.m., and that

9   document included the attachments that relate to those

10  properties.

11          Then on the 28th of April, 2013, the government

12  filed government's response to defense e-mail concerning

13  property to be pledged as collateral by defendant and his

14  associates, and essentially in just a little more than --

15          MS. SMITH:  Your Honor, forgive me.  I believe

16  there's a little discussion going on about an explanation of

17  a word, so if you could just --

18          THE COURT:  Yes.

19          MS. SMITH:  I caught it and -- sorry, Judge.

20          THE COURT:  Thank you.

21          One thing that does concern me when the interpreter

22  is giving explanations of words is that the interpreter could

23  be mistakenly explaining something.  I believe it was at one

24  of these hearings that there was a discussion about the grand

25  jury and an explanation by the interpreter about what a grand

1  jury is, and, of course, those explanations should be left

2  either to the Court or to Mr. Cilins' lawyer.

3          And so I just want to make sure that any

4  explanation that's given is given by whoever should be giving

5  it in the courtroom.  If it's a question of translation, I

6  don't know exactly how best to deal with that.

7          But I'm just instructing the interpreter that if

8  Mr. Cilins has a question, that you interpret that question

9  either for his lawyer or for the Court.  And I would suggest

10 you do it first to his lawyer and then, if it's appropriate,

11 she would so address the Court, because I don't want anything

12 being interpreted for the Court that isn't supposed to be

13 interpreted.

14         THE INTERPRETER:  I understand.

15         THE COURT:  All right.  Thank you.

16         Is that instruction -- is that accurate, and do you

17 have any objection to that, Ms. Smith?

18         MS. SMITH:  I have absolutely no objection to that

19 instruction and very much appreciate it.  I just happened to

20 catch the question between the two of them in listening to

21 you and catching it in the other ear, so I do appreciate

22 that.  Thank you very much.

23         THE COURT:  All right.  Thank you.

24         So does that mean that you're listening to half of

25 what I'm saying and half of what the interpreter's saying?

1          MS. SMITH:  I'm not going to admit that, Judge.

2          THE COURT:  All right.

3          MS. SMITH:  I'm listening to both of you

4  simultaneously.

5          THE COURT:  All right.  Thank you.

6          All right.  So -- let's see.  Where were we?  We

7  were talking about this response to defense e-mail filed by

8  the United States.  It's about five-and-a-half pages, and it

9  goes into some detail regarding the affidavits and

10 submissions by the defendant.

11         So it seems to me that what we've had here is a de

12 facto reopening of the detention hearing, and so I think the

13 best way to proceed first is to hear what you all have to say

14 about that, and secondly, how you want to proceed.

15         So why don't I start with you, Ms. Karase, and see

16 what your intention is here with respect to the filings and

17 what's been submitted and how you think we should proceed.

18         MS. KARASE:  Yes, Your Honor.  With respect to the

19 government's response that was filed last evening, it was

20 merely meant as a clarification to explain the two

21 individuals who are offering security on behalf of this

22 defendant and to make the Court aware of their involvement in

23 the underlying criminal case.

24         I don't believe it would be appropriate for the

25 Court to accept their security without knowing that they face

 1   some culpability as well based on their involvement.  And so

 2   the pleading was merely meant to inform the Court a little

 3   bit more about these two individuals, being Michael Noy and

 4   Avraham --

 5           MS. SMITH:  Your Honor --

 6           MS. KARASE:  -- Lev Ran.

 7           MS. SMITH:  Forgive me, Ms. Karase.  I'm sorry.

 8           We just lost the translator.  I think -- I know he

 9   didn't -- he mistranslated that last part because I've now

10   been listening to both, about the two individuals, so I'm

11   sorry to stop the proceedings.  I just want it to be

12   accurate.

13           THE COURT:  All right.  So what needs to be done?

14           MS. SMITH:  It was the last sentence she said about

15   the two individuals, if she knows where she picked up.  She

16   might need to slow down.  I think we're both going to have

17   that problem very much.

18           THE COURT:  All right.  Are we caught up though?

19           THE INTERPRETER:  Yes.

20           THE COURT:  You're fine now and you're caught up?

21           THE INTERPRETER:  Yes.  Yeah.

22           THE COURT:  Mr. Cilins, you're with us now?

23           THE DEFENDANT:  (Nods head up and down.)

24           THE COURT:  He's indicating affirmatively,

25   Mr. Cilins is, that he's with us now, all right?  He's caught

1  up.

2          All right, Ms. Karase.  Go ahead.

3          MS. KARASE:  Well, to repeat the last sentence,

4  Your Honor, I just had stated that the two individuals,

5  Michael Noy and Avraham Lev Ran, are involved in the

6  underlying criminal case.

7          The pleading sets forth the details, but in

8  summary, Michael Noy was closely following the witness

9  tampering that the government alleges was taking place and

10 was communicating and checking on the progress of that

11 tampering and that obstruction through his communications

12 with Defendant Cilins.

13         The other co-owner, Avraham Lev Ran, was one of the

14 parties to a contract that was sought to be destroyed through

15 Mr. Cilins's negotiations with the CW and was also one of the

16 documents responsive to the grand jury's subpoena that was

17 ordered to be produced.

18         And so while I appreciate that in trying to compile

19 these documents, mistakes can happen, when these two

20 individuals' names were brought up and the fact that they

21 agreed to the provision of the $3.5 million of jointly held

22 assets as security, it's an important consideration for the

23 Court to know what their motivation may be in agreeing to

24 that.

25         THE COURT:  I guess my first question about it is

1   that Mr. Noy's name appeared on documents, I believe, as

2   early as the first hearing where we convened, and there were

3   a number of days in between those, and I guess my concern

4   involves that to some degree.

5           Did the government not have that information when

6   these matters were being considered initially?  Is it

7   information that was just brought to the government's

8   attention?  And if the government did know it, didn't the

9   government think that it was just as relevant when the

10  initial documents were tendered as the government thinks it

11  is now?

12          MS. KARASE:  It wasn't until the proceeding on

13  Thursday when we were in court when these individuals were

14  identified as partners of the defendant, and I believe that

15  that was the first time that I became aware of that.

16          I thought that the original affidavits described

17  Mr. Cilins as being the sole owner of the entities.

18          THE COURT:  Well, but Mr. Noy signed notarized --

19  one or more notarized documents that were submitted the very

20  first day of the detention hearing and identified himself as

21  manager of Hollywood Beachfront Townhomes.  So to the extent

22  that he, by way of these documents, was making

23  representations to the Court, I would have at least thought

24  the government would have deemed it relevant to have provided

25  that information.

1          Was it overlooked that his name was on these

2    documents, or how is it that I'm just getting that

3    information after the submission of corrected documents?

4          MS. KARASE:  Your Honor, it was overlooked, and

5    perhaps the reason why is because he was named as a manager

6    and not an owner.  According to the documents, the only owner

7    that we needed to focus on -- the only owner was Mr. Cilins.

8    So with regard to having an actual financial interest in the

9    property, it seemed to be that it was Mr. Cilins that held

10   the financial interest.

11         THE COURT:  Well, I guess that's my question.

12   Which was it?  Was it overlooked, or was it a decision that

13   the position that he had as manager in signing the mortgages

14   that would actually be tendered to the Court did not cause

15   the government to think that information was relevant?

16         MS. KARASE:  Well, I'm not trying to play games

17   with Your Honor.  It actually was a bit of both, but --

18         THE COURT:  Did you know -- when did you get this

19   information?  You see how -- you see how when I get this

20   information so late and now it's a big deal but I wasn't told

21   anything about this before makes me question it?

22         If it was overlooked and nobody saw his name on

23   this and didn't say, "Gosh, should we go ahead and reveal

24   what we know about our investigation on him at this point?

25   Well, let's think about it.  No, let's not do it because he's

1   only a manager," and there's a decision made like that, it's

2   different than the government just totally not picking it up

3   and recognizing it.  And so I'm just trying to figure out how

4   that happens.

5         I would deem -- if it were me, someone signing a

6   mortgage that's going to be tendered to the Court, I would

7   deem that pretty relevant.  And I would think that if I had

8   information that someone like that was involved in the

9   criminal enterprise that's at issue in the case, I think I

10  would turn that over to the Court and make it known to the

11  Court.

12        I'm just trying to find out what it is.

13        MS. KARASE:  Yes, Your Honor, and I understand the

14  distinction that Your Honor is making.  I apologize for not

15  understanding that at first.

16        It's -- it was overlooked.  I did not become aware

17  of Mr. Noy's involvement until I reported back on Thursday's

18  hearing to my counterparts in Washington, D.C., and in New

19  York.  It wasn't until then, when his name was specifically

20  mentioned, that I became aware of his involvement in the

21  underlying criminal activity.

22        And by way of explanation as to why I did not dig

23  further -- I understand Your Honor's point about the

24  signature on the mortgage.  However, it seemed to me that he

25  was -- Mr. Cilins was the joint owner of the entities, and

1  frankly, by oversight, the inquiry stopped there.

2          THE COURT:  All right.  So if I'm understanding

3  this correctly, you knew Mr. Noy's name was on this, but that

4  wasn't reported to the -- your counterparts in New York, so

5  they wouldn't have known to provide that information to you.

6  Is that --

7          MS. KARASE:  Well, every document that I've

8  received in this case I've provided on to my counterparts, so

9  yes, those documents were sent on.  I can't speak to whether

10  or not there was a focus made on that or how that was missed

11  on their end.

12          THE COURT:  All right.  All right.  Is there

13  anything else you want to say about where we stand and where

14  we are at this point?

15          MS. KARASE:  No, Your Honor.

16          THE COURT:  In other words, I'm going to hear from

17  Ms. Smith and see what she thinks about this and where we

18  are, because this is -- it seems to me, by way of this

19  written -- by way of this notice and this supplemental

20  authority, that you've made an additional proffer via this

21  filing.

22          And I'm not faulting you for doing it, but I think

23  that it at least warrants the defendant having an opportunity

24  to ask questions about it or have additional time to study

25  and present whatever else the defendant may want to present.

1          But let me hear from her, then I can hear from you

2    again.   Thank you.

3          MS. KARASE:   Yes, Your Honor.

4          THE COURT:   Are we talking at the right pace for

5    you, sir?

6          THE INTERPRETER:   Yes.

7          THE COURT:   All right.

8          MS. SMITH:   Your Honor, with all due respect to

9    Ms. Karase, I respectfully disagree as to when she learned of

10   these things or when she should have learned of these things.

11         I disclosed to the Court the very first day I came

12   up here, which was the 18th, I believe -- I disclosed that my

13   client, that I knew of at that point in time, owned -- was

14   the member of several investments in South Florida, LLCs, and

15   I named them out for Your Honor, and Your Honor and I had a

16   little banter was it a B or a P or a V, and I spelled it out

17   for Your Honor.

18         One of those was Pha Investments.   I cited that I

19   had obtained everything from sunbiz, straight off of

20   sunbiz.org.   I even put that in the record, and it's in the

21   transcript.

22         If you look at the articles of incorporation and

23   who's on the registered owner, there's a Mr. Noy and

24   Mr. Cilins on Pha Investments, although Mr. Cilins is the

25   sole owner of Pha Investments or the sole membership owner.

1          I also named out both Hollywood Beachfront -- and I

2   thought it was one and the same, and I'll take

3   responsibility.  But it was Hollywood Beachfront Townhomes

4   and Hollywood Beachfront Townhomes South, but I named those

5   out also for the Court and directed the Court that I had

6   pulled the information from sunbiz, and lo and behold,

7   Avraham Lev Ran's name is on the document that I pulled and

8   brought to court with me that day and that I cited from

9   sunbiz.

10         THE COURT:  That was not submitted though as an

11   exhibit.

12         MS. SMITH:  It was not submitted, but I did cite

13   them, so Ms. Karase, Ms. Watson, everybody in the -- she was

14   certainly on notice of that.

15         I also cited a previous corporation or LLC -- and

16   I'm using corp.  I'm sorry, Judge -- LLC of FMA, which is no

17   longer active.  But oddly enough, FMA, the minute you pull it

18   up on sunbiz, the very first document lists Michael Noy and

19   Avraham Lev Ran.

20         Your Honor, I submit that Ms. Karase knew or should

21   have known and that this is a late submission and that Your

22   Honor is completely right in being, I guess, aggravated or

23   agitated, is the word that I'm sensing from Your Honor --

24         THE COURT:  I thought it was curious.

25         MS. SMITH:  Or curious.  That will work -- as to

1   the lateness of this filing, okay?

2          Your Honor, Ms. Karase and I have had several

3   conversations, and Ms. Karase has pressed me over and over

4   and over since the 18th for my client to sign the affidavits.

5   She pressed me on the 18th, she pressed me in an e-mail after

6   that, and then pressed me again last week on the 25th about

7   signing the documents.

8          And I had said to her I would sign them -- we would

9   sign them when Your Honor issued bond.  I needed to verify

10  them.  I needed to go over them.  I have that e-mail in my

11  folder if Your Honor wishes to see it.

12         Our response to this filing is, No. 1, it's late.

13  No. 2, it is an additional proffer, and the government knew

14  or should have known about these if they had done their

15  research.  And it goes back to the passport.  It goes back to

16  the guidelines.  They had those issues wrong, and once again,

17  they didn't bother to look into this issue.

18         Your Honor, with regards to what was filed, I

19  understand from the government's theory of the case, this is

20  an important fact.  From our theory of the case, it basically

21  lends exactly right into our theory.

22         These men, including Mr. Cilins, had legitimate

23  business -- we have not denied that, and I have maintained

24  that since the 18th -- with Mamadie Toure, the government's

25  informant.  They were not attempting to get rid of any

1  legitimate, bona fide original, or copies thereof, documents.

2  There had been massive attempts at blackmailing all sorts of

3  people.  This follows right through.

4       And, again, Mr. Cilins -- and if Mr. Noy -- and,

5  Your Honor, we don't have the transcripts of the tapes.  We

6  don't have the translations, the same things we didn't

7  have -- were not attempting to get rid of any legitimate

8  documents but the fraudulent, forged documents.

9       Furthermore, Your Honor, the government appears to

10 have known that Mr. Noy was in Miami.  She states that in her

11 document, yet the government did nothing to stop him.  If he

12 was a part of this investigation, if they believed he was

13 worthy of investigation or worthy of arrest, they did nothing

14 to arrest him.  He left the country on April 15th or 16th,

15 17th, before we even came to the hearing right after

16 Mr. Cilins was arrested.

17      He left on a cruise that had been preplanned prior

18 to him coming to the United States.  They did nothing to stop

19 him.  They did nothing to arrest him when he cleared customs

20 and left to go out on a cruise ship.

21      Your Honor, and I need to apologize.  In an e-mail

22 that I sent you, I relied upon an attorney in Miami by the

23 name of Alan Marcus in preparing -- in letting Mr. Marcus

24 prepare the documents.  I asked him to prepare all of the

25 documents, and there were errors in them, and I apologize.  I

1  take responsibility.  I submitted something to you that was

2  in error and found that on Friday when I was making the

3  Turnberry documents.

4      I have attempted, as has my client, to be candid

5  with the Court at all times.  I have attempted, whenever

6  there was a misperception, a miscommunication, or anything,

7  to correct it, as I did between my 18th proffer and my 25th

8  proffer.  If Your Honor remembers, I actually made some

9  corrections -- I made some corrections to my proffer based

10 upon information that I later learned and I did not want to

11 mislead the Court.

12     So in sum, Your Honor, I think it's late.  I think

13 the government knew or should have known about it.  We

14 certainly didn't do anything to hide it.  And I -- as I said,

15 I did not catch it till I actually sat and went through them

16 to make sure we had a final good set of documents, as I told

17 Your Honor that I would do on Thursday, before I submitted

18 the Turnberry documents to you.

19     And furthermore, Your Honor, I don't think it

20 changes the analysis of anything.

21     THE COURT:  Just give me one moment, please.

22     MS. SMITH:  Your Honor, I do have a copy of the

23 e-mail.  I'm the world's worst about trying to save paper and

24 print on the back.  The back is an old copy of a brief, but I

25 do have the e-mail between myself and Ms. Karase that was

1  sent on April 19th between the two of us about the affidavits

2  that were initially tendered to the Court on the 18th.  I do

3  have that for submission to the Court if the Court wants to

4  see it.

5         THE COURT:  Well, let me take a look at it.

6         And I don't want to assume that I get your point,

7  even though I think I do, with respect to the issue that you

8  raised regarding Ms. Karase wanting Mr. Cilins to sign the

9  affidavits, but maybe -- why don't you spell it out so that

10  no one has to read between the lines.

11         MS. SMITH:  Your Honor, I could not -- and forgive

12  me.  Sometimes I can be obtuse.  I could not figure out the

13  rush to have these signed.  I got asked on the 18th, again on

14  the 19th, and again on the 25th.

15         Then when the cross-examination of Ms. Watson came

16  up and I asked them -- I mean, I knew in court, because I was

17  getting notes from my client, that he was part of a

18  three-member on the Hollywood, and that's how I knew.  We

19  later went down and discussed it, and he said it's a

20  three-member LLC; it's a three-member group.

21         But I asked the question to Ms. Watson, based upon

22  what happened in the hearing on Thursday, did she know if

23  there was any partners?  Was she aware if he had any partners

24  in those two properties?  Did she ask about any companies

25  with any partners?  Was she aware of what he really

1  understood about ownership or not ownership?

2         My -- my idea now in afterthought -- and, Your

3  Honor, forgive me.  You can say it's just my terrible

4  judgment and outlook on life or whatever -- is that the

5  government actually had an idea and was going to try to hoist

6  me on my petard by having him -- if we signed the ones

7  without catching the mistake and then say he lied.  If we

8  didn't catch them, he lied.  If we did catch them, he lied.

9         And that's my point here is that I tried to come

10  forward and be honest with Your Honor when I realized we had

11  a problem and we had an issue, when I sat down and read them

12  and after I spoke with him after the hearing at length.  I

13  stayed with him at least an hour, maybe an hour and a half in

14  the marshals office after we finished that day.

15         I think they knew and laid in wait, and that's just

16  my opinion.  I don't -- I hate to say that, but that's my

17  gut, based upon the complete push and push and push and push,

18  because there's no need to execute the affidavits.

19         The policy in Orlando, the policy in Tampa, when

20  you execute the mortgage documents -- when you execute, you

21  execute everything as a package, not ahead of time, because

22  if Your Honor's not going to grant bond, there's really no

23  reason -- those papers are going to go through the shredder

24  because we don't need signed mortgages and affidavits running

25  around.

1          So it's my belief that they actually knew.  I can't

2     prove that.  I don't know that, but that's my belief, Your

3     Honor.

4          MS. KARASE:  And, Your Honor, of course I object to

5     that, and I wish to be heard on that -- these

6     representations.

7          THE COURT:  Well, just -- you'll get a chance to be

8     heard.

9          MS. SMITH:  And, Your Honor, you asked me to spell

10     it out, and that's --

11          THE COURT:  Well, no, I mean, I don't -- I think if

12     there's a point that you want to make, you should spell it

13     out.

14          Let me just ask you though, in this e-mail --

15     there's an e-mail from you dated April 19th --

16          MS. SMITH:  It's just a two-page e-mail.

17          THE COURT:  Yes.  Yes.  And it states, "Attached

18     please find mortgage documents" -- this is to Ms. Karase.

19          MS. SMITH:  That was the initial set that you asked

20     me on the 18th -- we gave you the originals, and Ms. Karase

21     asked if we could send copies to her.  I told her because of

22     the lateness of the hour, I wasn't going to be able to go

23     back to the office that evening, but we could send them the

24     next morning.

25          That was the original set of copies that you had.

1  So we scanned the original set that you have the copies of

2  from the 18th and sent them to her that morning.

3          The next line up as you come up the e-mail string

4  is her response back, and the next line up after that is my

5  response back.

6          THE COURT:  And to finish your first e-mail, you

7  say, "We apologize for not getting these to you sooner.

8  However, we had some technical difficulty with our scanner."

9          Then she responds to you what apparently appears to

10  be four minutes later, and says, "Ms. Smith, were the

11  affidavits you offered to the Court yesterday signed by

12  Mr. Cilins and were they notarized?"

13          And then you send back, "No.  As I represented to

14  the judge yesterday, they were not signed by Mr. Cilins.  The

15  distance to Georgia has been an issue.  Mr. Cilins will sign

16  them in court if the judge approves the properties as

17  security.  I am a notary."

18          MS. SMITH:  That's correct.

19          THE COURT:  All right.  And you're saying that

20  this, in addition to other conversations you had, cause you

21  to reach that conclusion?

22          MS. SMITH:  It is, Your Honor.  That coupled with

23  the fact that I laid out the names of the companies.  We've

24  all been aware from day -- since the 18th of Pha, FMA, and

25  Hollywood Beach Townhomes.  I missed the Hollywood Beach

1  Townhomes South until I, like I said, looked at these

2  documents.

3         And I actually called Alan Marcus Friday and said,

4  "Look, why did you do these in a one owner?  Isn't there

5  three members?"

6         He goes, "I didn't do them as one member."

7         And I said, "I think you did.  Go back and look at

8  them."

9         He pulled them and it was, "Oh," expletive.  "Oh, I

10  did."

11        And I said, "You've got to correct those or send

12  them to me and I will correct them."  I said, "I also need --

13  if there's more than one member, I need the resolution

14  articles so that I can submit those to the Court," because

15  one member can't pledge -- it's like a corporation.  One

16  member can't pledge on behalf of everyone else except in a

17  private -- a small corporation, an S corp.

18        And he said, "Okay."  And he immediately scanned

19  everything to me and sent it to me.

20        The corrections were made on my end to the

21  ownership based upon -- I said, "What do the articles say?"

22        He said, "One-third is your client's.  Two-thirds

23  are the other two clients'."

24        That was my conversation Friday, this Friday, the

25  26th.

1          But as of the first week, there was an issue, and

2     there was a complete push all the way through to get us to

3     sign, and I honestly, Your Honor -- I don't want to belabor

4     the point.

5          THE COURT:  No, no.  You've made your point.

6          MS. SMITH:  I made the point.

7          THE COURT:  All right.  Well, let me hear from

8     Ms. Karase on that.

9          MS. KARASE:  May I actually inquire of Ms. Smith

10    regarding a representation that she made?

11         THE COURT:  Well, let's -- let me hear from you

12    first because she probably wants to hear from you on the

13    representations you made in your supplemental authority, so

14    let's -- let me just hear what you have to say about this,

15    and then we'll move to the next step.

16         MS. KARASE:  Your Honor --

17         THE COURT:  Just one minute.  I want to make sure

18    that the interpreter is up to speed with us.

19         THE INTERPRETER:  Yes, Your Honor.

20         THE COURT:  All right.  Thank you.

21         All right.  Ms. Karase?

22         MS. KARASE:  I'm going to call it mistaken,

23    Ms. Smith was mistaken, when she said that we had a

24    conversation about whether or not those documents were signed

25    on April 18th.  That did not happen.

1          April 19th, the e-mail you hold in your hand, was

2    the very first time I inquired whether there were

3    documents -- whether these documents were signed or not, and

4    that was because I did not have a copy of the originals that

5    were submitted to Your Honor, and I was trying to get a sense

6    for what was different between the ones that I had and the

7    ones that Your Honor had.  That was all.

8          It was my understanding that she had submitted

9    signed mortgage documents to you, and I didn't know if she

10   was providing me the same that she'd provided to you.  There

11   was nothing -- this wasn't a trap that the government was

12   laying for her or for her client.  It was simply trying to

13   determine what was before the Court as compared to what the

14   government had.

15         And if she'd like for the Court to believe that the

16   government pressed and pressed and pressed, that's not how

17   this happened, Your Honor.  I did mention to her again on

18   Thursday, the 25th -- she said that she had additional

19   documents, and I asked whether or not they were signed, and,

20   again, she said no.

21         All I can do is tell you this wasn't some trap the

22   government was laying for her to get her client to sign

23   documents that the government knew to be inaccurate.  It was

24   simply trying to determine the final set that we were working

25   with and what, in fact, her client was representing to be the

1  truth.

2        And I mentioned previously the knowledge that the

3  government had about Michael Noy, which wasn't until

4  conversations with the other AUSAs on Friday, the 26th.

5        There have been -- Ms. Smith has talked about

6  mistakes that the government has made, and as we both pointed

7  out, we hadn't been on this case for very long when we were

8  proceeding with full-blown hearings.

9        And just as Ms. Smith came and corrected the

10  mistakes that were made on the defense side regarding the

11  properties, the government came forward and, after doing a

12  fair amount of digging on its own side and being in touch

13  with representatives in France, we were able to determine

14  that the passports that were initially represented as one of

15  which being unregistered were both, in fact, valid.

16        And you'll recall at the very beginning of my

17  proffer, when we reconvened, I did point that out to the

18  Court.  So there have been attempts to correct the record on

19  both sides of the V in this case.

20        THE COURT:  All right.  Thank you.

21        Ms. Smith, did you want me to make this an exhibit,

22  or did you want -- did you just hand this to me to look at?

23  I've read it basically into the record, so there's a record

24  of what it says.

25        MS. SMITH:  It doesn't matter, Your Honor.  If we

1  put it into the record, I would ask that we can take a clean

2  copy, because as I said, it's probably a recycled brief on

3  the back or drafts of something.  But I don't have a

4  preference either way.  It is what it is.  You have read it.

5  You've read it into the record.  It's obviously preserved in

6  there, but --

7          THE COURT:  All right.  Well, I think we'll just

8  leave it that way at this point then since it's been read

9  into the record.

10          All right.  Let me just take a brief recess.  I

11  wanted to read a couple of things, and then what we'll do is

12  decide how we proceed today, and we'll see how far we can

13  get.

14          We'll be in recess.

15          COURT SECURITY OFFICER:  All rise.

16          (Recess from 2:22 p.m. until 2:44 p.m.; all parties

17  present.)

18          COURT SECURITY OFFICER:  All rise.  This Honorable

19  Court is now in session.

20          Please be seated.

21          THE COURT:  I think we'll proceed this way.  I am

22  going to accept the government's response to defense e-mail

23  concerning property to be placed as collateral by defendant

24  and his associates.

25          I understand -- I think I do -- Ms. Smith's

1  position regarding all of this and what she thinks it either

2  means or doesn't mean, but I do think that I'm going to allow

3  her to ask some questions on the written document, treating

4  it as a proffer of information and allow her to ask questions

5  on it.

6         I have one question to start with though, and it's

7  this.  And I'm asking -- and I'm putting this to you,

8  Ms. Karase.

9         Who is -- Jeremy Noy and Michael Noy are related

10 how?  Are they the same person?  What is -- what is the

11 relationship there?  And am I reading this -- should I be

12 reading this that they are one and the same or that they are

13 different people?  And if they're different, who is Jeremy

14 Noy vis-a-vis Michael Noy?

15        I'll tell you what.  We've got -- everyone has a

16 lot of stuff in front of them, and if you'd like just to

17 remain seated, I would be fine with that.  It's highly out of

18 the ordinary, but you can do it however you want.  If you're

19 going to stand, though, it has to be by a podium because

20 those microphones are so bad at that table.

21        So you can proceed however you like.

22        MS. KARASE:  I'll go to the lectern, Your Honor.

23        THE COURT:  All right.

24        MS. KARASE:  Your Honor, I'm not sure the

25 difference between Michael Noy and Jeremy Noy.  Michael Noy

1  is the individual that was intercepted on the wire and was

2  the individual identified as having communications with the

3  defendant during and immediately after the meetings with the

4  confidential witness.

5          THE COURT:  All right.

6          All right.  Ms. Smith, did you want to ask

7  questions on this written submission?

8          MS. SMITH:  Your Honor, as long as it's not going

9  to delay getting a ruling, my client -- I mean, we would ask

10  the Court, when we're done today, to go ahead and issue a

11  ruling one way or the other.

12          My client's been waiting for now two weeks to

13  decide whether he's going to go to New York on his own on May

14  2nd, which is three days from now, two or three days by my

15  count, or whether he's going to go by courtesy of the marshal

16  and get there in a month or two months or whatever it's going

17  to be, because with the sequester my assumption is it's going

18  to be longer than it normally is, which is three to four

19  weeks to get anywhere.

20          So with that, I'll ask a few questions, but I'm not

21  going to belabor the point today.  I would ask that the Court

22  issue a ruling one way or the other.

23          THE COURT:  All right.

24          MS. SMITH:  What day did you first learn that

25  Michael Noy was a potential target?

1          MS. KARASE:  On Friday, April 26th.

2          MS. SMITH:  Why did you wait until April 28th to

3    notify the Court of this?

4          MS. KARASE:  It wasn't until we had telephone

5    communications as a trial team to discuss how to respond to

6    the e-mail that you sent on Friday at 3:45, approximately

7    3:45, that we could flesh everything out and decide how to

8    appropriately respond.

9          MS. SMITH:  Okay.  So it's your testimony today

10   that you knew nothing about Michael Noy being a potential

11   witness, despite having the local FBI agent sitting next --

12   or potential target despite, throughout two proceedings,

13   having the local FBI agent sitting next to you?

14         MS. KARASE:  That's correct.

15         MS. SMITH:  All right.  And it's local FBI that

16   actually intercepted -- allegedly intercepted these calls?

17         MS. KARASE:  I'm not sure where the calls were

18   intercepted.  I believe that the judicial authorization came

19   from New York.  I'm not sure.

20         MS. SMITH:  But didn't you previously testify that

21   the FBI agent in the room here, along with two male agents --

22   Eric Adams, I believe was the name you used, and someone

23   else -- actually did the surveillance locally, listened to

24   the tapes locally, and actually some of the translations were

25   done locally?

1         MS. KARASE:  Well, correct.  Actually Tim Adams is

2    with the FBI.  Eric Adams is an HSI agent with whom I've

3    worked before, so I think I may have mixed those names up.

4         But in any event, there were agents that -- at

5    least one agent, Christopher Martinez, that came in from New

6    York who was also involved on the surveillance team.  I'm not

7    sure if there were others.  I assume that there were, but I

8    don't know for certain.

9         MS. SMITH:  Okay.  And didn't you also testify

10   previously on one of your proffers that the young lady that

11   had been sitting the very first day in the hearing about

12   three rows back was also one of the French-speaking agents or

13   worked for the FBI as an interpreter?

14        MS. KARASE:  I did, yes.  Her name is Diane.  I'm

15   not sure of her last name, but she is a French interpreter

16   who works for the FBI.

17        THE COURT:  You just need to slow down just a

18   touch, I think.

19        MS. SMITH:  Thank you, Judge.

20        When did you first learn that Avraham Lev Ran might

21   be a possible target?

22        MS. KARASE:  On the same day, on the 26th.  I did

23   know that your client had been in touch with other

24   individuals who had fled upon learning of his arrest, but I

25   did not know of their identities.

1          MS. SMITH:  And when you say fled, what do you mean

2    by fled?

3          MS. KARASE:  Well, I now know that Avraham Lev Ran

4    was in Florida at the time of your client's arrest and that

5    he changed his travel plans and departed the United States a

6    day early and that Michael Noy also left on a cruise ship

7    after calling repeatedly trying to contact your client.

8          MS. SMITH:  Okay.  And the cruise, did you verify

9    that the cruise had been booked weeks or months earlier?

10         MS. KARASE:  I don't have any information about

11   that.

12         MS. SMITH:  You didn't attempt to make that

13   verification, did you?

14         MS. KARASE:  I asked.  The agents did not know.

15         MS. SMITH:  Do you know if the agents attempted to

16   make that verification?

17         MS. KARASE:  I don't know whether they -- they said

18   that they did not know.  I don't know whether they checked

19   and couldn't find out or they didn't check at all.

20         MS. SMITH:  Okay.  So you're not aware whether they

21   actually contacted the cruise line and verified that the

22   cruise had been booked months previous.

23         MS. KARASE:  Well, there are various cruise lines

24   that depart from Miami, and I believe that's where Mr. Noy

25   departed from.  I don't know that they knew any details about

1   the cruise line.

2        MS. SMITH:  So it's your testimony that nobody

3   flagged their departure in and out even though they were

4   potential suspects?

5        MS. KARASE:  I'm not sure if they did or not.  I

6   assume that they didn't since they weren't -- they weren't

7   stopped.

8        MS. SMITH:  And who did you speak with with regards

9   to your claims that Mr. Lev Ran changed his flights to leave

10  a day early?

11       MS. KARASE:  That was with Special Agent Martinez

12  and with Stephen Spiegelhalter with United States Department

13  of Justice.

14       MS. SMITH:  And who did they speak with at the

15  airlines to see that the flights were changed?

16       MS. KARASE:  I don't know.

17       MS. SMITH:  Okay.  So you don't know if they in

18  fact made that verification or didn't make that verification,

19  do you?

20       MS. KARASE:  I do not know that.

21       MS. SMITH:  Okay.  Are these the same agents and

22  persons you relied upon about the passport issue that turned

23  out to be a red herring?

24       MS. KARASE:  Objection to the argumentative nature

25  of that question.

1          THE COURT:  Yes, it's sustained.

2          MS. SMITH:  Okay.  Did you -- are these the same

3    agents that you attempted -- that you spoke with about the

4    passport issue when you claimed that it was unregistered and

5    invalid?

6          MS. KARASE:  The agent that confirmed -- that

7    received the information that one of the passports was

8    invalid -- I'm sorry, there I go using the word again -- was

9    unregistered was Special Agent Stelly, who was in the

10   courtroom with me.

11         MS. SMITH:  Did you attempt to have Agent Stelly or

12   anyone locally verify when Mr. Lev Ran left or when Mr. Noy

13   left?

14         MS. KARASE:  No.  My information was that

15   Mr. Lev Ran departed on April 16th, and by your own words,

16   Mr. Noy departed on either the 15th, 16th, or 17th, is what

17   you said just a few moments ago.

18         MS. SMITH:  But you also verified, you said, that

19   he had left on a cruise.

20         MS. KARASE:  That was -- that came from both

21   Special Agent Martinez and AUSA Spiegelhalter.

22         MS. SMITH:  Okay.  And the contract that you're

23   referring to on page 4 of your pleading, was that an original

24   contract that you had in your possession or a photocopy of a

25   photocopy?

1          MS. KARASE:  I've never had one of these contracts

2  in my possession.

3          MS. SMITH:  Okay.  Were you -- well, have you seen

4  that contract?

5          MS. KARASE:  No, I have not.

6          MS. SMITH:  Okay.  So are you aware whether it is

7  an original or whether it is a photocopy of a photocopy?

8          MS. KARASE:  It's my understanding that it is a

9  copy, but I don't know that for certain.

10          MS. SMITH:  Okay.  Do you know where the original

11  is?

12          MS. KARASE:  No, I do not.  I believe that was the

13  subject of the various meetings between your client and the

14  confidential witness.

15          MS. SMITH:  So you do not know for a fact and

16  cannot represent to this Court that that is an actual,

17  verified, valid contract as compared to a fraudulent one used

18  to blackmail or extort, can you?

19          MS. KARASE:  All I can say is that your client was

20  willing to pay a lot of money for the receipt of this

21  contract.

22          MS. SMITH:  Ms. Karase, the question was, can you

23  verify, as an officer of the Court, that the contract in

24  question on page 5 and 6 is an actual, valid, signed contract

25  or whether it is a fraudulently made-up contract?

1          MS. KARASE:  No.  I cannot say that one way or the

2     other.

3          MS. SMITH:  Your Honor, I have nothing further.

4          THE COURT:  All right.  Thank you.

5          Thank you, Ms. Karase.

6          You know, I'm thinking that one other thing we need

7     to do as a housekeeping matter is make a copy of your e-mail

8     to me part of the record because there's a response without a

9     motion or anything.  And so I think we're going to -- we

10    should have that as part of the record.  I know it's attached

11    to the response, but I think it would be best if we did that.

12         MS. SMITH:  Your Honor, I have one.  Actually this

13    one is on clean paper because I printed it from home.  And I

14    have -- it's a two-page e-mail that I sent to both -- just so

15    the record is clear -- Megan Chaddock, which is your

16    courtroom deputy; Kelly Karase from the United States

17    government, who's present in the courtroom; and to your

18    chambers, the recognized chambers e-mail.

19         THE COURT:  Okay.

20         MS. SMITH:  Your Honor, the only thing Ms. Karase

21    is asking is whether we want to redact the -- my guess is the

22    e-mail addresses were redacted off of the -- off of the

23    exhibit attached to her copy.  I'll leave that to the Court,

24    but I believe it's probably appropriate because it contains

25    DOJ and Your Honor's e-mail.

1          THE COURT:  All right.

2          MS. SMITH:  So that being said, if someone has a

3   black highlighter, I'll be happy to --

4          THE COURT:  All right.  Well, we can take care of

5   that, then, in just a moment.

6          MS. SMITH:  Your Honor, I'd move that into evidence

7   at this time.

8          THE COURT:  All right.  Megan, let me just ask you

9   something about that.

10          (Brief pause.)

11          THE COURT:  All right.  So without objection, that

12   will be received as Defendant's Exhibit 6.

13          (Defendant's Exhibit 6 was received in evidence.)

14          THE COURT:  All right.  Now, is there anything else

15   that anyone wants to say or be heard on, Ms. Smith?

16          MS. SMITH:  Your Honor, I think in order to make

17   the record complete, I had attached the documents that we've

18   referenced, those mortgages.  Obviously we had talked about

19   the mortgages that you have in your possession are the

20   original ones.

21          I'll be willing to go down the street to Kinko's

22   and print those copies of what I attached so we can add them

23   in as an exhibit, if that's fine with Ms. Karase.  I believe

24   to make the record complete, regardless of how you rule, I

25   believe there's going to be an appeal, no matter what you do,

 1   so I'd like to add those to the record, if that's fine with

 2   Ms. Karase.

 3              THE COURT:  Okay.

 4              MS. SMITH:  And we can go down --

 5              THE COURT:  I'll tell you what.  I'm going to take

 6   a quick break in just a moment again -- sorry -- and allow

 7   you all to look at this.  I think I have a copy that you

 8   could make -- will this be an exhibit that's identified but

 9   not moved in like Exhibit 1?

10              MS. SMITH:  Well, no, I think we can go ahead and

11   move that one in and attach it to that email since that would

12   make the complete e-mail at that point in time.

13              THE COURT:  Oh, this one.

14              MS. SMITH:  Yeah, the copy that came to the Court

15   for the Court's review.

16              THE COURT:  Yes.  I'm following you now.

17              MS. SMITH:  Not the original ones, which is Exhibit

18   1, but just a copy so that we actually have a complete

19   e-mail.

20              THE COURT:  Yes.  That would be -- that would be

21   made part of Defendant's Exhibit 6.

22              MS. SMITH:  Yes, Your Honor.

23              THE COURT:  All right.  I'll let you all look

24   through this to make sure that's what you want, and then let

25   me just make sure that there's nothing else.

1          I do want to bring up one other matter, though,

2     before we're done.

3          Is there anything else on the detention issue

4     before we . . .

5          MS. SMITH:  Your Honor, I have nothing further by

6     way of proffer.  We made arguments the other day.  We sort of

7     both supplemented them again here today.  I don't think I

8     have anything further at this moment in time.

9          Obviously if Ms. Karase gets up and makes a

10    statement, I may have some sort of response back, but at this

11    point I have nothing further.

12         THE COURT:  All right.  Thank you.

13         Ms. Karase, did you have anything else?

14         MS. KARASE:  No, Your Honor.  At this point I rest

15    on the arguments that have already been made and the

16    pleadings.

17         THE COURT:  All right.  Thank you.

18         Now, I did mention -- and I'm shifting gears a

19    little bit here, but I did mention that the grand jury in New

20    York, in the Southern District of New York, returned an

21    indictment, and I think it would be appropriate to have an

22    initial appearance on that indictment and to -- and then we

23    would take up the issue of the identity hearing.

24         I believe the return of the indictment has obviated

25    the need for the preliminary hearing, although Ms. Smith's

1  objection to the scheduling of the hearing was already noted,

2  with respect to the scheduling of the preliminary hearing and

3  the fact that it was continued over until a date prior to

4  which the grand jury -- the grand jury returned the

5  indictment.

6       So I don't know if you want to try to do that this

7  afternoon or how you wanted to do that, Ms. Smith.

8       MS. SMITH:  Your Honor, I've already gone over the

9  indictment with my client.  We've already discussed it.  I

10 met with him downstairs before the hearing.  We'd like to go

11 ahead and have the initial appearance on that today, and also

12 we would obviously waive identity.  I don't believe

13 identity's an issue at this point in time, so . . .

14      THE COURT:  All right.  Thank you.

15      I think what I'll do is I'm going to take up the

16 detention matter, and then we'll do the initial appearance on

17 that, and then we'll go from there.

18      I have another hearing at 3:30.  I think I can

19 probably push that to 4:00 if I need to, so we'll make sure

20 we get everything that we need to get done here today.

21      Let me just take a brief recess and make sure our

22 schedule is lined up for that next hearing, so we'll be in

23 recess for a few moments.

24      COURT SECURITY OFFICER:  All rise.

25      (Recess from 3:02 p.m. until 3:13 p.m.; all parties

1  present.)

2        COURT SECURITY OFFICER:  All rise.  This Honorable

3  Court is now in session.

4        Please be seated.

5        THE COURT:  All right.  I'm going to make some

6  findings and comments regarding the detention issue at this

7  point.  I'll reduce the -- most of my comments to writing in

8  the form of a written order.  But in the event I don't

9  capture everything in the written order, then I'll make sure

10 in that order that I adopt whatever findings I make now.  And

11 then with respect to my findings now, if there are additional

12 findings that are necessary, they'll be contained in the

13 written order.  But this is mainly done to give both sides an

14 idea of what I'm basing my ruling on in terms of the issue

15 here.

16        And let me just say this.  Ms. Smith made a comment

17 a minute ago about her client's been waiting two weeks, and I

18 think the record's clear that those two weeks have been spent

19 by both parties asking for additional time and the Court

20 trying to give everybody as much time as possible in an issue

21 that is important to both sides.

22        So these two weeks have been spent obviously with

23 both attorneys working very hard and diligently to gather the

24 information they think supports their respective position.

25 And so while it's been two weeks, there's been no purposeful

1  delay by anyone, and so -- but I do understand Mr. Cilins

2  wanting a ruling, and it is time to move on with this matter.

3         The basis for the government's motion is the

4  government believes that Mr. Cilins is a flight risk.  And

5  the legal framework, of course, is set out in 18 U.S.C.

6  Section 3142 in terms of how the Court has to consider and

7  decide a motion to detain a defendant, and moving to detain a

8  defendant as a flight risk is one of the enumerated reasons

9  that the government can move to detain someone.

10        The Second Circuit looks at this in a way that I

11  believe is consistent with the -- with 3142.  It's not

12  necessarily the way that it's done at least in this division,

13  in this district.  Usually when the Court is considering

14  whether someone's a flight risk, I think whether the person's

15  a flight risk and whether there are conditions of release

16  that will assure the person's appearance as required is

17  intertwined and there's a single finding.

18        But this is a Second Circuit case, and I believe

19  that it's at least worth the attempt by me to try to follow

20  the law as the Second Circuit has decided.  And *United States*

21  *versus Sabhnani*, S-a-b-h-n-a-n-i, 493 F.3d 63, Second

22  Circuit, 2007, I believe, is the case where the Second

23  Circuit set up this two-tier analysis where the government

24  first has to prove by a preponderance of the evidence that

25  defendant presents an actual risk of flight.

1          And then, if the government does that -- in other

2     words, assuming that the government has satisfied that

3     burden -- then the government must then demonstrate by a

4     preponderance of the evidence that no condition or

5     combination of conditions can be imposed on defendant that

6     would reasonably assure his presence in court.

7          And Ms. Smith provided *United States versus Dreier*,

8     D-r-e-i-e-r, 596 F.Supp.2d 831, Southern District of New

9     York, 2009, in support of that position, and I read that case

10    that she provided to me.  So the question becomes whether, in

11    the first instance, the defendant is a flight risk.

12         Now, the cases also, at least from my reading of

13    them, seem to point to Section 3142(g) of Title 18 as the

14    section to consider these issues, both the first issue of

15    whether the defendant's a flight risk and, second, whether

16    there are conditions of release that would assure the

17    defendant's appearance as required, reasonably assure the

18    defendant's appearance as required, and that's assuming the

19    first prong is met.

20         Now, in this case the defendant is now charged in a

21    five-count indictment, and I'm focusing initially on the

22    nature and circumstances of the offense listed under 18

23    U.S.C. Section 3142(g).  And with respect to the charges,

24    Counts One and Two charge defendant with separate violations

25    of Title 18, United States Code, Section 1512.

1          Count One charges 1512(b)(2)(B) and 2, and it

2    charges -- and I'm not going to read it in its entirety but

3    that from at least in or about March 2013, up to and

4    including on or about April 14, 2013, that --

5          MS. SMITH:  Go ahead.  Sorry, Judge.  I just knew

6    we were --

7          THE COURT:  Yes.  Just let me know, sir, if I'm

8    going too fast, please.

9          THE INTERPRETER:  It's okay.

10          THE COURT:  Did knowingly use intimidation,

11    threaten, and corruptly persuade a person, and attempt to do

12    so, and engage in misleading conduct towards another person

13    with intent to cause and induce a person to alter, destroy,

14    mutilate, and conceal an object with intent to impair the

15    object's integrity and availability for use in an official --

16          THE INTERPRETER:  Can you say again the last

17    sentence?

18          THE COURT:  Yes.

19          MS. SMITH:  He got stopped at -- Judge, if I could

20    just help -- basically with engage in misleading conduct, is

21    where he got stopped, is where he lost you at, so --

22          THE COURT:  All right.  Engage in misleading

23    conduct towards another with intent to cause and induce a

24    person to alter, destroy, mutilate, and conceal an object

25    with intent to impair the object's integrity and availability

1   for use in an official proceeding.

2           And then specifically the count states that

3   Mr. Cilins agreed to pay money to an individual in exchange

4   for that individual's agreement to provide to Mr. Cilins for

5   destruction documents that were to be produced before a grand

6   jury in the Southern District of New York.

7           And then Count Two charges that Mr. Cilins did

8   knowingly use intimidation, threaten, and corruptly persuade

9   a person, and attempt to do so, and engage in misleading

10  conduct towards another person with intent to hinder, delay,

11  and prevent the communication to a law enforcement officer of

12  the United States of information relating to the commission

13  and possible commission of a federal offense.

14          Specifically, Count Two charges Mr. Cilins directed

15  an individual to make false statements to special agents of

16  the FBI regarding the commission and possible commission of

17  federal offenses, and this is alleged to be in violation of

18  18 U.S.C. Sections 1512(b)(3) and 2.

19          The third count charges a violation of Title 18,

20  United States Code, Sections 1512(c)(2) and 2, and it charges

21  that Mr. Cilins knowingly and corruptly did obstruct,

22  influence, and impede an official proceeding, and did attempt

23  to do so.  And this -- and then Count Three further states

24  Mr. Cilins agreed to pay money to an individual in exchange

25  for that individual's agreement to provide Mr. Cilins, for

1   destruction, documents that were to be produced before a

2   grand jury in the Southern District of New York.

3          Count Four charges that Mr. Cilins willfully and

4   knowingly did endeavor, by means of bribery, to obstruct,

5   delay, and prevent the communication of information relating

6   to a violation of a criminal statute of the United States by

7   a person to a criminal investigator.

8          Then more specifically it alleges that Mr. Cilins

9   agreed to pay money to an individual in exchange for that

10  individual's agreement to sign a document containing false

11  statements relating to violations of criminal statutes of the

12  United States under investigation by special agents of the

13  FBI, and this is alleged to be in violation of Title 18,

14  United States Code, Sections 1510(a) and 2.

15         And then finally, Count Five charges that

16  Mr. Cilins did knowingly alter, destroy, mutilate, conceal,

17  cover up, falsify, and make false entries in records,

18  documents, and tangible objects, and did so with the intent

19  to impede, obstruct, and influence the investigation and

20  proper administration of a matter within the jurisdiction of

21  a department and agency of the United States, that is, the

22  United States Department of Justice, and in relation to and

23  in contemplation of such matter.

24         And then more specifically it alleges that

25  Mr. Cilins provided to an individual for that individual's

1  signature a document containing false statements, knowing

2  that those false statements related to a criminal

3  investigation being conducted by the FBI.  This is all

4  alleged to be in violation of Title 18, United States Code,

5  Section 1519.

6       So with respect to the nature and circumstances of

7  the offense, in general terms the defendant is charged with

8  obstructing an investigation by the federal grand jury in the

9  Southern District of New York and in relation to that

10 investigation.  And I'll address more specifically the weight

11 of the evidence in a moment because that has come under an

12 aggressive attack by the defendant.

13      But the grand jury has returned this indictment.

14 The grand jury has found probable cause to believe that

15 Mr. Cilins committed these crimes.  And in determining

16 whether the government has carried its burden with respect to

17 whether the defendant's a risk of flight, I do believe that

18 persons who obstruct investigations do so to avoid,

19 ultimately, prosecution, and persons flee to avoid

20 prosecution.  So although the conduct is different, the

21 motive to obstruct and the motive to flee is very often one

22 and the same.

23      Now, with respect to the weight of the evidence,

24 this, of course, is the factor that the Court gives the least

25 consideration to and the least weight to.  It's very early in

1  these stages, but if one thing has become evident, Mr. Cilins

2  at this point vigorously denies the allegations and has

3  already, just in these two weeks, mounted, as I said before,

4  an aggressive defense to the allegations.

5          Here, through the detailed cross-examination of the

6  government's proffer and through the defense counsel's

7  proffer, the defendant has raised a number of issues

8  regarding the government's case, including the reliability of

9  the CW, the cooperating witness, the accuracy of the

10 transactions -- or, excuse me, translations of the

11 conversations that occurred between the defendant and CW, and

12 has questioned the bona fides of the translator in the case

13 and has questioned other aspects of the government's quantum

14 of evidence and the strength of that evidence.  And I think

15 many of those points, at least at this early stage, are well

16 taken.

17         And even though the government has the defendant

18 recorded on a number of occasions, both over the telephone

19 and face-to-face, and the, at least, summaries of those would

20 appear at this point to suggest that the defendant -- that

21 there's probable cause to believe the defendant committed

22 these crimes, I don't think this is a factor that I can find

23 in favor of the government.

24         As one of the cases Ms. Smith provided to me, the

25 Court in that case said the Court wasn't intelligent enough

1  at that point in the proceedings to make a determination on

2  whether the government had a strong case or not, and I feel

3  the same here.  Although I do believe that both of you have

4  provided a great deal of information, it's just that you view

5  it quite differently, so I find this factor to be neutral at

6  best.

7          You know, I see a number of people are here for our

8  3:30 proceeding, and I'm afraid that that's not going to take

9  place at 3:30.  I'm hoping that by 4 o'clock we can proceed,

10  so if you all want to go about your business until 4 o'clock,

11  that's fine with me.

12          All right.  Now, with respect to the next factor

13  listed under 3142(g) -- and if I didn't say it, of course,

14  the weight of the evidence is No. 2 -- next is the history

15  and characteristics of the person.

16          As to the mental and physical condition of

17  Mr. Cilins, he appears to be in very good health, except that

18  he does suffer from high blood pressure.  But other than

19  that, he has no mental health issues or physical health or

20  medical concerns, and he did provide a urine sample that

21  yielded negative results the day he made his initial

22  appearance.

23          In terms of the family ties, it appears the

24  defendant does not have any ties to the United States.  He

25  has a wife and children who reside in France, and I did not

1   see and I have not heard that he has any other family tie --

2   or has any family ties to the United States.  I do note that

3   it was proffered that his wife is willing to travel to the

4   United States to serve as a third-party custodian on his

5   behalf but that she would have to travel back and forth.

6          In terms of employment and financial resources, the

7   defendant reported that he is self-employed and currently

8   owns and operates CWF.  He said that he earns approximately

9   25,000 Euros, which is the equivalent of about 32,578 United

10  States dollars, annually.  And then he advised the pretrial

11  services officer of five properties that he owns, and he

12  receives rental income from those properties, and the stated

13  rental income monthly from the properties was $4,050.

14         At the -- during the hearing Ms. Smith proffered on

15  the defendant's behalf and proffered the business entities of

16  Mr. Cilins that are related to the ownership of these

17  properties and additional properties.  The approximate market

18  value of the properties, according to what was told to the

19  pretrial services officer by Mr. Cilins, was $779,000.

20         The additional -- there were additional properties

21  proffered by Ms. Smith that Mr. Cilins has an ownership

22  interest in, and when all was said and done, I think an

23  approximate value of $3.6 million of the property is fairly

24  accurate and accurate enough for these purposes.

25         The defendant does not have any known criminal

1   history.  He has no failures to appear, and as I said, he

2   doesn't appear to have any drug or alcohol abuse issues.

3         There are other matters that are relevant to

4   this -- to the consideration under 3142(g).  I don't know if

5   this falls under past conduct or just general information,

6   but the defendant does have two passports, which is lawful in

7   France, and from what I understand from the proffer, an

8   accepted practice, so I'm not drawing any negative inference

9   from that, but those passports do reflect a great deal of

10  travel by the defendant.

11        And this was just a review that I did over the

12  weekend and some today.  I saw that he had traveled to

13  Senegal on multiple occasions, Liberia, Guinea on multiple

14  occasions, Mali, Sierra Leone, Sierra Leone, Canada, South

15  Africa, United States.

16        And I make that point because -- not because the

17  travel in itself is illegal, and I'm not suggesting in any

18  way it is.  In fact, I believe Ms. Smith proffered much of

19  that information.  But it does show that the defendant has

20  contacts in various places kind of outside of France and

21  outside of the United States.

22        And I believe it was also proffered that he does

23  have -- he has business in those areas, and that's why he

24  travels there.  And I believe it was also represented that he

25  traveled in -- throughout Europe based on -- because of his

1  work.

2      I know also under 3142(g) that I must take into

3  consideration whether at the time of the current offense or

4  arrest the person was on probation, etc., but with no

5  criminal record I think it's obvious that he wasn't under any

6  type of supervision.

7      And then the Court must consider the nature and

8  seriousness of the danger to any person or the community that

9  would be posed by the person's release, and here danger's not

10  a prong under consideration, and so I'm not analyzing that

11  portion of Section 3142(g)(3) -- excuse me, 3142(4) at this

12  time.

13      Also in terms of considering whether the government

14  has proved that the defendant's a risk of flight, I have

15  taken into account the maximum penalties that the defendant

16  faces based on the indictment.  The maximum statutory penalty

17  is, if I calculated this right -- and, of course, there's

18  always the possibility that I didn't.  I totaled it at 68

19  years imprisonment.

20      Now, we all know that 68 years imprisonment, even

21  if Mr. Cilins were convicted of all counts, is highly

22  unlikely, but it's still the maximum penalty that he faces

23  and is a possibility.  I believe both Ms. Karase and

24  Ms. Smith have pointed to the guidelines as a more realistic

25  gauge or view of what the defendant's sentence could be if he

 1  were convicted, and at this point, and in looking over the

 2  case law, I would agree with Ms. Smith's analysis on this

 3  point.

 4       I didn't give it as much thought as you all will

 5  going forward and as any sentencing court would, but it would

 6  seem to me that -- and I believe that the sentence that she

 7  mentioned -- and I'm trying to recall this from the top of my

 8  head -- was somewhere around 97 to 121 months, and that would

 9  be without acceptance of responsibility or any other downward

10  adjustments.  Nevertheless, that also is a significant length

11  of time.

12       Now, regarding, more specifically, a couple of

13  different areas, I first want to address the government's

14  position that the defendant was not candid with pretrial

15  services, because I think that was a point early on that the

16  government made, and Ms. Smith took great issue with it.  The

17  government called Ms. Watson, the pretrial services officer,

18  to testify, and I have a number of observations with respect

19  to that.

20       I do agree with Ms. Smith that there are times when

21  defendants don't remember everything that they own and

22  every -- where everyone lives.  And a lot of that type of

23  information, it is difficult for defendants to recall that,

24  and so I understand why Mr. Cilins may not have recalled all

25  of the property that he owned.

1           I'm more concerned with some of the other

2   information that he did not provide, and that would include

3   listing the business entities that he is associated with that

4   in fact own these properties.  So I'm concerned about the

5   fact that he didn't reveal that information.

6           It, I suppose, could be a coincidence that he

7   didn't recall the two properties that are worth the most or

8   the highest value properties that he has, and so that does

9   concern me, but I don't think on this record I can make a

10  finding that he purposely lied to or misled pretrial

11  services.

12          I don't really think that the language barrier was

13  a major factor.  I don't think -- Ms. Watson has dealt with

14  people who speak different languages over time, and I believe

15  that if she perceived any problem at all, she would have said

16  something, and I think she would have detected it.  But

17  nevertheless, just given the circumstances, I know that

18  when -- when there are traumatic events in one's life,

19  sometimes you just don't think so clearly.

20          One of the players drafted this weekend in the

21  football NFL draft was trying to recall when Coach Coughlin,

22  I think, called him from New York -- it's the quarterback

23  from Syracuse -- and he said basically his mind went blank

24  and he felt like he had blacked out because of the excitement

25  of the moment.  I think that was the player.  I can't think

1   of his name.  His first name's Ryan.  But my point is that

2   I'm concerned about those things, but I'm not going to go so

3   far as to find that Mr. Cilins purposely misled the pretrial

4   services office.

5          But in that same vein, Mr. Cilins reported income

6   of about $32,500 a year annually from his business CWF and

7   his rental income of about $4,000.  That total of $36,000

8   just to me does not square with a number of other facts in

9   the case that have been presented to me.

10          One, it does not square with what's on pages 14 and

11  15 of the affidavit where it's alleged by the government --

12  the FBI agent that the defendant was going to pay the CW a

13  total of a million dollars, $200,000 initially and then

14  $800,000 later, in conjunction with the alleged obstruction

15  and the production of and destruction of documents.

16          And I believe the so-called Entity in the affidavit

17  was going to be the source of the money, but nevertheless,

18  that Mr. Cilins could have access to that amount of money in

19  a relatively short period of time concerns me and would not

20  square with, in my mind, the assets that he has and that he's

21  represented that he has.

22          And if I'm recalling this correctly, he allegedly

23  had $20,000 with him in his last meeting with the cooperating

24  individual.  And, again, given his assets, whether it's the

25  five properties listed in the report and his residence in

1   France or taking all of his assets together, it just doesn't

2   square that this is a man who only makes $32,000 annually in

3   his business and has rental income of about $4,000.  He's a

4   world traveler.  He's a world business -- a worldly

5   businessman, and that causes me great concern.

6            Additionally, there has been information proffered

7   about the defendant's relations to what's referred to as the

8   Entity in the affidavit that is believed to be involved in

9   and part of mining contracts in and around the amount of

10  $12 billion.  I believe that's alleged in the affidavit to be

11  a conservative number.

12           The company BSGR was mentioned, and there was also

13  an indication that the defendant does have business dealings

14  with an individual associated with BSGR who lives in Israel,

15  even though it was never established, or I believe alleged,

16  that he traveled -- that the defendant traveled to Israel.

17           But taking all of those matters into consideration,

18  I believe the government has -- and I do find the government

19  has proved by a preponderance of the evidence that the

20  defendant is a flight risk.

21           Really the more difficult question here is the

22  second part of this analysis, as set out in the statute and

23  as recognized by the Second Circuit, and that is whether

24  there are conditions of release or a combination of

25  conditions of release that will assure the defendant's

1  appearance as required.

2         My notes reflect that the defendant has suggested a

3  fairly extensive and comprehensive list of conditions,

4  starting with the use of an electronic monitor, the posting

5  of $3.6 million in property, a residence that belongs to the

6  family in South Florida -- I believe that's the Turnberry

7  residence in Aventura, Florida.  It's the family residence

8  where the family spends time in South Florida.

9         The defendant has offered to pay for or have those

10 related to him -- when I say related, either family or

11 friends -- pay for 24-hour security.  And in conjunction with

12 the electronic monitoring, I think it was suggested that the

13 defendant would be under house arrest, only allowed to travel

14 to the Southern District of New York for court appearances

15 and to meet with his attorney.

16        His wife is willing to travel and to be a

17 third-party custodian, although she'd have to travel, I

18 believe, back and forth some to France.  And the Court also

19 could impose other conditions, some of which are standard and

20 others that are not:  in addition to the home confinement,

21 the posting of the money, the 24-hour security, and the wife

22 serving as the third-party custodian in the residence in

23 South Florida.  Regular contact with pretrial services would

24 be another possibility.  Daily telephonic contact with

25 pretrial services would be another possibility.

 1          I wanted to refer to one of the cases that was

 2   provided to me by Ms. Smith because I believe in that case --

 3   I think I have it up here if you'll just give me a moment.

 4   Well, maybe I don't.  I might have left it on my desk because

 5   I made some notes from it.

 6          But one of the, I believe, district judges

 7   reviewing one of the magistrate judges' orders added a long

 8   list of additional -- of additional conditions, some of which

 9   I'm not sure I had heard of before, but there were a number

10   of those, and I might see if I can get those cases brought

11   out to me.  If anyone's listening, they're on the floor in my

12   office.

13          I wasn't really meaning you, Megan, but . . .

14          (Brief pause.)

15          THE COURT:  All right.  I was wrong.  They're not

16   in front of me.  They were on the floor in my office.  I have

17   them now though.

18          This was -- I was looking at Judge Rakoff, Rakoff,

19   R-a-k-o-f-f's opinion in *United States against Dreier*,

20   D-r-e-i-e-r.  That's the 596 F.Supp.2d 831 case that I had

21   referenced earlier.

22          And in that particular case he went through the

23   conditions, and he found that the conditions that were

24   additional to what had been added was that the defendant

25   expressly consent in writing to the use of armed security

guards, of temporary preventive detention and the use of

reasonable force to thwart any attempt to flee and that the

cost of supplying the armed security guards for three months,

estimated by defense counsel to be around $210,000, be paid

in advance into an escrow account maintained by the U.S.

Attorney's Office; that contemporaneous with the defendant's

return to his apartment, government officers, with

defendant's consent and assistance, remove from the premises

any and all computers, cell phones, modems, and any other

means by which the defendant could communicate electronically

except by landline telephone, as well as anything else that

might serve as a weapon.

He wasn't allowed to have any features on his

telephone, no visitors be allowed to visit defendant without

prior permission from the pretrial services officer, only

after consultation with the U.S. Attorney's Office.  So that

was in addition to home detention, strict supervision by

pretrial services, ongoing cooperation with the

court-appointed receiver in identifying and preserving

assets.

So my point is there are just a whole host of

conditions that were presented by the defendant, and there

are additional ones that I've considered, including the ones

I just read.

In addition to what I noted before about the

1   various aspects of the case under 3142(g), I want to address

2   some of these conditions specifically.

3           I've never found or believed electronic monitoring

4   to necessarily be a condition that prevents someone from

5   fleeing.  I think that it allows probably swifter notice of

6   flight than for someone who doesn't have electronic

7   monitoring, but I don't think it's necessarily effective in

8   preventing someone from fleeing.  And I think that was the

9   point of the government's presentation of a number of people

10  who have been on electronic monitoring and have fled.

11          With respect to the property that the defendant has

12  requested and has offered to post, my concerns there are

13  really twofold, I guess.  First, recognizing that, I believe,

14  we've all made mistakes during the course of the last two

15  weeks where various matters have been represented and then

16  later turned out not to be accurate, and I don't think anyone

17  has purposely made any misrepresentations about anything, I

18  believe, though, that the mistakes related to the posting of

19  the property really detract from the confidence that the

20  Court can have in the posting of that property.

21          And I don't fault Ms. Smith for it, even though she

22  takes responsibility for it.  Someone else was drawing up

23  those documents.  Someone else was preparing those documents.

24  That person was acting on information from someone else, and

25  by the time you trace where the mistake is or was, regardless

1   of whether it was inadvertent or intentional, it still has

2   the effect of undermining the Court's confidence.

3          I've heard it said before that if you're standing

4   on a corner and you step out in the street and you're run

5   over by a bus, whether it's intentional or accidental, you're

6   still run over.  And so regardless of how the mistakes got

7   there or how that happened, it undermines my confidence in

8   the posting of those properties with respect to the

9   defendant.

10          And I say, too, that the -- that $3.6 million is

11  obviously -- I'm stating the obvious for most of us -- a

12  boatload of money, but given the allegations and the various

13  activities that the defendant is alleged to have been

14  involved in, both in the criminal complaint and in the

15  indictment, make $3.6 million not seem like that large of an

16  amount anyway, given that we're talking about a mining

17  contract that's estimated to be -- conservatively estimated

18  to be worth about $12 billion.  So I don't have confidence in

19  the posting of that property.

20          The defendant's lack of ties to New York, in my

21  mind, and lack of ties to the United States distinguish that

22  from the cases that were presented to me and that I read that

23  were provided by Ms. Smith.  There were cases presented where

24  persons were alleged to have been involved in crimes that

25  involved a lot more money than -- or a lot of money, millions

1  and millions of dollars.

2         This one particular case I believe you cited to me,

3  Ms. Smith, *United States against* -- and I'll spell it,

4  K-h-a-s-h-o-g-g-i, 717 F.Supp. 1048.  It's a Southern

5  District of New York case, 1989.  This particular defendant

6  was in Switzerland and waived his appellate rights in

7  Switzerland and traveled to New York for arraignment.  And I

8  believe he was a citizen of Saudi Arabia, and the Saudi

9  Arabians -- there was no agreement with Saudi Arabia to

10  extradite.  There was no treaty.  And this is a case where

11  the Court found the defendant did not pose a substantial risk

12  of flight.

13         The first point, though, made by the Court under

14  the conclusions was, "The defendant's business affairs depend

15  upon his ability to deal with high government and private

16  business officials.  His flight from the United States would

17  have a ruinous impact upon his ability to conduct business in

18  the manner with which he is accustomed," and it was his ties

19  to -- his business ties to the United States and his business

20  ties in particular, I believe, to the Southern District that

21  were very persuasive to that Court.

22         It was also noted that the royal consulate general

23  of Saudi Arabia had guaranteed that the defendant's homeland

24  would ensure the defendant's appearance at trial, even though

25  there was no extradition treaty.  And so I felt like that

1  case was sufficiently different than this case.

2         And in the *Madoff* case, of course, he was a United

3  States citizen who had very close ties to the Southern

4  District of New York in all kinds of respects.

5         And then the *Wesley Snipes* case was another one

6  that was cited, but it seems to me that the *Wesley Snipes*

7  case, again, was different in the sense that Mr. Snipes had

8  numerous ties -- family, business, financial -- to the United

9  States, and I know those were all considerations in the Court

10  granting a bond to Wesley Snipes and even allowing him to

11  remain on bond after he violated the conditions of release.

12         So while there were similarities to the cases that

13  were cited to me by the defendant, I just think in this case

14  where you have a defendant who has business ties in different

15  parts of the world, Europe, Africa, possibly Israel, the

16  United States, you have someone who doesn't have any ties to

17  the United States other than the business holdings that he

18  has apparently with two persons who are deemed to be under

19  investigation by the United States related to these same

20  crimes, I believe that the government has carried its burden

21  of proving by a preponderance of the evidence that there are

22  no condition or combination of conditions of release that

23  will assure the defendant's appearance as required.

24         I think the most difficult one is that 24-hour

25  security because I think that that -- that that would have

1   the potential to be -- to reasonably assure the defendant's

2   appearance as required.  But to me the defendant remains a

3   mystery as to his financial resources, and there are too many

4   contradictions in the amount of money he makes annually,

5   around $32,500, even his monthly rental income of about

6   $4,000, yet he is associated with business entities that own

7   $3.6 million in property in South Florida.  It's unknown to

8   me how he acquired those properties or his interest in those

9   properties that are owned free and clear.

10          The defendant has what appear to be admitted

11   relations, business relations, with the cooperating witness

12   in this particular case, and some connection to the Entity

13   described in the complaint that allegedly, according to the

14   complaint, has a 12 -- is associated with a $12 billion

15   mining contract.

16          So I believe that based on a consideration of the

17   proffers and all of the evidence submitted and consideration

18   of the various authorities that were provided to me that the

19   government has carried its burden as to both prongs, and I'll

20   enter an order to that effect.

21          All right.  Shall we go ahead with the initial

22   appearance then?

23          Mr. Cilins, if you'd come to the podium with

24   Ms. Smith, please.

25          MS. SMITH:  And, Your Honor, just so that the

1  record is clear, we obviously object to your findings and to

2  your holdings, just so we don't lose anything for appellate

3  review.

4          THE COURT:  Okay.  I think your comments before I

5  made them sufficed to object, but, no, I understand, of

6  course, and I think that's clear.

7          Mr. Cilins, would you state your full name for me,

8  please, sir?

9          THE DEFENDANT:  Frederic Cilins.

10         THE COURT:  And, sir, you're 50 years old; is that

11  correct?

12         THE DEFENDANT:  Yes, 51 years old.

13         THE COURT:  You're 51 years old.  All right.

14         MS. SMITH:  He's going to have a 51st birthday this

15  year.

16         THE COURT:  Yes.  That's why I thought -- I think

17  you told me you were 50 before.

18         THE INTERPRETER:  Okay.  He's 50 years old.  He'll

19  be 51 year old.

20         THE COURT:  All right.  And you do read, write, and

21  understand some English?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Can you talk into this microphone?  I

24  know he's translating.

25         THE DEFENDANT:  *Oui.*

1              THE COURT:  And you do read, write, and understand

2    French, correct?

3              THE DEFENDANT:  Yes, sir.

4              THE COURT:  And do you understand the French that

5    the interpreter's speaking?

6              THE DEFENDANT:  Absolutely.

7              (Defendant and interpreter speaking at the same

8    time.)

9              THE COURT:  Now, wait.  Wait.  You're going to have

10   to slow down now.  You're going to have to slow down.

11             What I'm trying to figure out is if you understand

12   him well enough to understand what I'm telling you right now.

13             THE DEFENDANT:  Yes.  Now I understand what you're

14   saying.

15             THE COURT:  All right.  Are you under the care of a

16   physician or psychiatrist?

17             THE INTERPRETER:  He doesn't understand the

18   question.

19             THE COURT:  Are you under the care of a doctor for

20   any physical ailment?

21             THE DEFENDANT:  I don't need a doctor.

22             THE COURT:  I'm sorry?

23             THE INTERPRETER:  He doesn't need a doctor.

24             MS. SMITH:  And then he said, "I need it for my

25   heart, for my pressure."  I'm listening to both of them now

1 | and --

2 |    THE COURT:  Right.  And if we don't get this done

3 | in a short period of time, we're going to have to put this

4 | over till tomorrow because I have a hearing that I have to

5 | hold, and Judge Conway said we will not be in court after

6 | 5 o'clock.  So I'm going to do the best I can to get through

7 | this, but I can't control everything.

8 |    So let me start over with this part of it.

9 |    MS. SMITH:  Go ahead, Judge.

10 |    THE COURT:  You told me you need to see a doctor.

11 | Is it because of your blood pressure condition?

12 |    THE INTERPRETER:  He said that normally he have to

13 | take pills for his blood pressure.

14 |    THE COURT:  All right.  As you stand here right

15 | now, are you under the influence of drugs, alcohol, or any

16 | other intoxicant?

17 |    THE DEFENDANT:  No.

18 |    THE COURT:  Do you clearly understand where you

19 | are, what you are doing, and the importance of this

20 | proceeding?

21 |    THE DEFENDANT:  Yes.

22 |    THE COURT:  All right.  We've been talking about it

23 | some today.  There was an indictment returned in the Southern

24 | District of New York.

25 |    Did you get a copy of the indictment?

1              THE DEFENDANT:  Yes.

2              THE COURT:  All right.  Ms. Karase, if you could

3   advise Mr. Cilins of the charges and the penalties.

4              Ms. Smith, do you waive a full and complete reading

5   of the indictment?

6              MS. SMITH:  Your Honor -- yes, Your Honor, we would

7   waive a full and complete reading.  And to the extent that

8   Your Honor went through the charges previously, we would

9   accept that as an announcement of what the charges and the

10  penalties are.

11             THE COURT:  Well, let me ask him if he understood

12  that.

13             THE DEFENDANT:  *Oui*.

14             THE COURT:  Mr. Cilins, a little -- a few moments

15  ago, I reviewed the five charges in the indictment.

16             Do you understand the charges based on what I said?

17             THE DEFENDANT:  Yes.

18             THE COURT:  And I went over the maximum penalties,

19  and let me just -- well, you'd better review the maximum

20  penalties if you would, please.

21             MS. KARASE:  Yes, Your Honor.

22             Mr. Cilins, if convicted of Count One, it carries a

23  maximum penalty of 20 years imprisonment, a $250,000 fine, to

24  be followed by a term of up to three years of supervised

25  release.  Should you violate a term of that supervised

1  release, you could be sent back to prison for an additional

2  two years, and a mandatory $100 special assessment.

3           The same is true for Counts Two, Three, and Five.

4           Count Four, if convicted, carries a maximum term of

5  imprisonment of five years, to be -- a $250,000 fine, or both

6  the term of imprisonment and the fine, to be followed by a

7  term of supervised release of two years.  And should you

8  violate a term of supervised release, you could be sent back

9  to prison for two years, and a mandatory special assessment

10  of $100.

11          Cumulatively, if you're convicted of all five

12  counts of which you're charged in the indictment, you could

13  be imprisoned for 85 years, face a fine of $1,250,000, both

14  the term of imprisonment and the fine, a period of supervised

15  release of up to three years, and should you violate a term

16  of supervised release, you could be sent back to prison for

17  ten years, and a $500 mandatory special assessment.  And that

18  is if each of the sentences were ordered to run consecutive

19  to one another.

20          There's also a forfeiture provision of the

21  indictment that provides for the forfeiture of all property

22  derived from the commission of the charged offenses.

23          THE COURT:  All right.  Thank you, Ms. Karase.

24          Do you understand -- you told me you understand the

25  charges.

```
 1            Do you understand the maximum penalty you face,

 2    sir?

 3            THE DEFENDANT:  Yes.

 4            THE COURT:  All right.  And, of course, you are

 5    represented by Ms. Smith at this hearing.

 6            And you do know with respect to this indictment, as

 7    I informed you before, you have a constitutional right to

 8    remain silent.  You do not have to make any statement.  You

 9    do not have to give a statement at any time to any law

10    enforcement officer or government agent.

11            If you do make a statement, anything you say can be

12    used against you in this case.  If you have made a statement

13    in the past, you need not make any further statement in the

14    future.

15            Do you understand your right to remain silent?

16            THE DEFENDANT:  I understand.

17            THE COURT:  Now, there are just two other matters,

18    and this won't take long.

19            I am required to advise you that there's a

20    procedure under which you can have your case transferred to

21    this district, but to do that you would have to agree to

22    plead guilty, and the U.S. attorney for this district and the

23    U.S. attorney for the Middle District -- excuse me, the

24    Southern District of New York would have to agree to that

25    also.
```

1          Do you understand that?

2          THE DEFENDANT:  Yes.

3          THE COURT:  All right.  And because you're charged

4   in an indictment, you have the right to an identity hearing

5   at which the government has to prove that the Frederic Cilins

6   charged in the indictment is you and not some other person

7   with the same name.

8          Do you understand your right to the identity

9   hearing?

10         THE DEFENDANT:  Yes.

11         THE COURT:  All right.  Now, Ms. Smith has

12  indicated that you wish to waive your right to that hearing,

13  and if you do that, then I will find that you are the same

14  Frederic Cilins charged in the indictment, and I will order

15  that you be transported to the Southern District of New York

16  to face the indictment there.

17         Do you understand all of that?

18         THE DEFENDANT:  Yes.

19         THE COURT:  All right.  And that's what you want to

20  do?

21         THE DEFENDANT:  Yes.

22         THE COURT:  All right.  Let me just -- I think I

23  forgot to swear Mr. Cilins so let me just do that if I can.

24         Would you raise your right hand, please, sir?

25         Do you solemnly swear that the statements you're

1  about to make will be the truth, the whole truth, and nothing

2  but the truth, so help you God?

3          THE DEFENDANT:  Yes.

4          THE COURT:  All right.  Mr. Cilins, I believe that

5  Ms. Smith has just reviewed a document with you, and it's the

6  waiver of Rule 5(c)(3) hearings.  And the waiver sets out the

7  charges that are contained in the Southern District of New

8  York case.

9          And it states that you have been advised about your

10 right to counsel, which I advised you of earlier, and of

11 course you're represented by Ms. Smith, and No. 2, your right

12 to an identity hearing, which I just explained to you.  And,

13 of course, you no longer have a right to a preliminary

14 hearing because you've been indicted.  And I did advise you

15 of your -- of Rule 20 and the possibility of transferring the

16 case.

17         So if it is your desire to waive your identity

18 hearing, then you would check the box and sign the form.

19         Do I have the form?

20         MS. SMITH:  (Indicating.)

21         THE COURT:  Oh, you do?  Okay.

22         MS. SMITH:  And, Your Honor, he did sign the form.

23 I signed it.  I've indicated it was interpreted in open court

24 as you read it to him or explained it to him and dated it

25 with today's date.

1          THE COURT:  All right.  Thank you.

2          All right.  It's being passed up to me.

3          MS. SMITH:  And, Your Honor, I did make -- there

4   was a typo.  It says to ank or to thank, and I took the thank

5   or the ank out.

6          THE COURT:  Yes.  All right.  Yes.  All right.

7   Well, thank you.

8          All right.  And you have checked, "I waive identity

9   hearing and have been informed I have no right to a

10  preliminary hearing."

11         And that is your signature, isn't it?

12         Is that your signature?

13         THE DEFENDANT:  Yes.

14         THE COURT:  Mr. Cilins, has anyone threatened you,

15  forced you, coerced you, or intimidated you in any way to get

16  you to waive your right to this identity hearing?

17         THE DEFENDANT:  No.

18         THE COURT:  Has anyone promised you anything in

19  exchange for that waiver?

20         THE DEFENDANT:  No.

21         THE COURT:  Is it your own independent decision?

22         THE DEFENDANT:  Yes.

23         THE COURT:  All right.  I do find Mr. Cilins has

24  knowingly, intelligently, freely, and voluntarily waived his

25  right to the identity hearing.

 1          Ms. Smith, do you waive production of any documents

 2    that might be contemplated under the rule, like a certified

 3    copy of any of those documents?

 4          MS. SMITH:  I would, Your Honor.

 5          THE COURT:  All right.  That will be so noted.

 6          All right.  And Mr. Cilins will be -- I'll order

 7    the marshal to transport him forthwith.

 8          I would like, if you would, check into his blood

 9    pressure medication situation --

10          THE MARSHAL:  Yes, sir.

11          THE COURT:  -- because I'm hoping that that can be

12    addressed prior to him being transported.

13          THE MARSHAL:  I'll check on that.

14          THE COURT:  All right.  Ms. Karase, is there

15    anything else?

16          MS. KARASE:  No, Your Honor, not from the

17    government.

18          THE COURT:  Ms. Smith, anything else?

19          MS. SMITH:  No, Your Honor.

20          THE COURT:  All right.  Then we'll be in recess.

21          COURT SECURITY OFFICER:  All rise.

22          (The proceedings were concluded at 4:24 p.m.)

23                              -   -   -

24

25

1                              CERTIFICATE

2

3    UNITED STATES DISTRICT COURT )

4    MIDDLE DISTRICT OF FLORIDA   )

5

6

7           I hereby certify that the foregoing transcript is a

8    true and correct computer-aided transcription of my stenotype

9    notes taken at the time and place indicated therein.

10

11          DATED this 2nd day of May, 2013.

12

13

14                              s/Shelli Kozachenko
                                 Shelli Kozachenko, RPR, CRR
15

16

17

18

19

20

21

22

23

24

25